1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF MISSISSIPPI
2           NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA

5         vs.                    Criminal Action No. 3:16CR54HTW-FKB

6

7    MARK LONGORIA

8

9

10       COURT REPORTER'S TRANSCRIPT OF SENTENCING HEARING

11

          BEFORE HONORABLE HENRY T. WINGATE
12       UNITED STATES DISTRICT COURT JUDGE

13              February 13, 2017
                Jackson, Mississippi
14

15

16   APPEARANCES:

17   MR. DARREN J. LAMARCA
     Assistant United States Attorney
18
          Representing the Government,
19        United States of America

20

     MR. THOMAS M. FORTNER
21   Attorney at Law

22        Representing the Defendant,
          Mark Longoria
23

24   COURT REPORTER:
     Brenda D. Wolverton, RPR, CRR, FCRR
25   Jackson, Mississippi

1           THE COURT:  Call your case, please.

2           MR. LAMARCA:  Your Honor, the matter before the court

3      is United States versus Mark Longoria.  This is Docket Number

4      3:16CR54.  Mr. Longoria is present with his attorney, Tom

5      Fortner, and is present for sentencing to a plea to an

6      information, Your Honor.

7           THE COURT:  All right.  Will the defendant and counsel

8      approach the podium?  All right.  Make your announcement again,

9      Mr. LaMarca.

10          MR. LAMARCA:  May it please the court, the matter

11     before the court is United States versus Mark Longoria, Docket

12     Number 3:16CR54.  Mr. Longoria is present with his attorney,

13     Tom Fortner, Your Honor, for sentencing pursuant to a plea to

14     an information.

15          THE COURT:  All right.  Mr. Fortner?

16          MR. FORTNER:  Yes, sir.

17          THE COURT:  Have you discussed the presentence

18     investigation report with your client?

19          MR. FORTNER:  I have, Your Honor.

20          THE COURT:  And do you have any objections to the

21     presentence investigation report?

22          MR. FORTNER:  We do, Your Honor.

23          THE COURT:  All right.  How many objections do you

24     have?

25          MR. FORTNER:  We have two objections and a request

1   that the court grant a variance from the sentencing guidelines.

2   THE COURT: All right.

3   MR. FORTNER: Two specific objections.

4   THE COURT: Mr. Longoria, you can have a seat while

5   your attorney is submitting this matter to me.

6   THE DEFENDANT: Thank you, sir.

7   MR. FORTNER: Your Honor, do you wish me to explain my

8   objections and then put on testimony? I have a witness or two

9   witnesses to substantiate my objections. Do you want me to

10  briefly outline them?

11  THE COURT: Which one would you like to do?

12  MR. FORTNER: I think I could briefly outline each one

13  and then call my witness. I think I can do that fairly

14  quickly.

15  THE COURT: Why don't you do that?

16  MR. FORTNER: Yes, sir. Judge, the first objection

17  that we have to the presentence investigator's conclusions are

18  that -- is that the base offense level calculated by the

19  probation officer to be 30 is incorrect because the writer

20  over-calculated the total benefit received by Mr. Longoria as a

21  result of his activity as being $361,225 when the total benefit

22  was, in fact, much less than that, $191,389.91. If the court

23  accepted our position, it would result in a two-level decrease

24  in the base offense level for this case or the total offense

25  level for this case. That's the first objection.

1        The second objection is that the probation officer has

2    contended that restitution should be assessed against

3    Mr. Longoria in the amount of $368,205.75.  We object to that

4    and state categorically that that is incorrect and would put on

5    proof to show the court that regardless of Mr. Longoria's

6    illegal action in participating in this case, he actually --

7    his company actually saved the State of Mississippi a

8    substantial amount of money from what it otherwise would have

9    been required to pay for the same quality testing cup that his

10    company provided to the state.

11        So, in fact, he owes no restitution at all.  And

12    illegal or not, his company's actions benefited the State of

13    Mississippi during fiscal year 2014.  And we have a witness to

14    put evidence on to both of those points.

15        THE COURT:  And how many witnesses do you have?

16        MR. FORTNER:  One in particular on these issues, and

17    that's the CPA that works for the company.

18        THE COURT:  All right.  Let me turn to the

19    prosecution.  How many witnesses do you have, if any?

20        MR. LAMARCA:  Your Honor, depending upon what we hear

21    on direct examination, I imagine we would have one witness, and

22    that would likely be the case agent.

23        THE COURT:  Okay.  Mr. Fortner, call your witness.

24        MR. FORTNER:  Your Honor, the defense would call

25    Elaine Makris.

**ELAINE MAKRIS,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. FORTNER:

Q    Would you state your name, please?

A    Elaine Makris.

Q    Ms. Makris, how are you employed?

     THE COURT:  How do you spell your last name?

     THE WITNESS:  M-A-K-R-I-S.

     THE COURT:  Okay.  Thank you.

BY MR. FORTNER:

Q    How are you employed?

A    I am the primary accounting manager, account manager and bookkeeper of DTC Drug Testing Corporation since March 2015.

Q    All right.  So in the year of 2013 and the year of 2014, you did not work for DTC.  Is that correct?

A    Correct.

Q    And who works for DTC or worked for DTC when you were hired?

A    That would be Mark Longoria and some of the time Kimberly Longoria.

Q    And Kimberly Longoria is related to Mark Longoria in which way?

A    She is his wife.

Q    Okay.  You have to speak up.

```
1    A    Okay.  Yes, sir.

2    Q    And could you point out Mark Longoria for us, please?

3    A    Yes.  Right here.

4    Q    Is that the gentleman whose shoulder my hand is touching

5    right now?

6    A    Yes, sir.

7    Q    Okay.  Thank you.

8    A    You're welcome.

9    Q    Elaine or Ms. Makris, were you asked by the United States

10   Attorney's Office, subpoenaed by the Federal Grand Jury to

11   bring certain documents and yourself here to Jackson,

12   Mississippi, when this case was first being investigated?

13   A    Yes, sir.  The company received the subpoena, and I acted

14   as a responsible party to gather those documents and bring

15   them.

16   Q    And is that because you are the accountant/bookkeeper for

17   the company?

18   A    Yes, sir.

19   Q    And were those documents that you were asked to bring

20   documents that showed contractual arrangements and monetary

21   compensation and exchange of money between DTC and the

22   Mississippi Department of Corrections for fiscal year 2014?

23   A    Yes, sir.

24   Q    And did you supply those documents to the Federal Grand

25   Jury and to the United States Attorney's Office?
```

1    A    Yes, we did.

2    Q    And did you testify before the Federal Grand Jury?

3    A    No.  On that day on that hearing, we were here and prepared

4    to do that, but due to whatever proceedings happened, we were

5    not called.  I just had a conversation with Mr. LaMarca after

6    the fact.  But we did hand over the packet to them.

7    Q    Okay.

8    A    In those proceedings.

9    Q    During the course of your conversations with Mr. LaMarca,

10   who is the Assistant U.S. Attorney, did you explain the

11   financial arrangements and contractual arrangements between DTC

12   and the Mississippi Department of Corrections for fiscal year

13   2014?

14   A    We had a brief conversation but I wouldn't say that we went

15   through page by page.

16   Q    Did the documents you provide give an explanation of those

17   relationships?

18   A    It gave an explanation of the transactions very clearly

19   down to check copies and POs and invoices.

20   Q    All right.  And did you voluntarily provide all of those to

21   the U.S. Attorney's Office?

22   A    Absolutely.

23   Q    I'm going to show you a document --

24            MR. FORTNER:  May I approach the witness, Your Honor?

25            THE COURT:  Go right ahead.

BY MR. FORTNER:

Q    -- and ask you if you can identify this document.  You can take it.

A    Yes, sir, I can identify that.

Q    What is that?

A    This is a spreadsheet that I created that outlines what DTC, Drug Testing Corporation, billed to the State of Mississippi, and it compares it to what would have been paid if the State of Mississippi had engaged the prior year's vendor for the same product.

Q    Okay.  And were you aware of the engagement of the prior year's vendor prior to fiscal year 2014, or did you make yourself aware of that?

A    I became aware of that during the due diligence we did gathering these documents.

Q    All right.  Can you tell the court how much -- what the cost of the drug cup testing service was to the State of Mississippi Department of Corrections for the fiscal year 2013?

A    The prior year -- make sure we are speaking of the same timeframe, that I am answering your question to that timeframe. The prior year, I don't know what they paid total, but I know that the product cost they paid was $9.40 per cup for the prior year, the fiscal year '13.

Q    And do you know how much that was for fiscal year '13 total, or do you not know?

1  A    I would have to know the number of cups they bought, and I

2  only know what the PO was, so I can't say definitively.

3  Q    But it was how much money per cup?

4  A    It was $9.40 per cup.

5  Q    And what was the price of the cup that DTC sold per their

6  contract with the State of Mississippi for fiscal year 2014?

7  A    That was $5.95 per cup.

8  Q    And do you know what the total amount was paid to DTC by

9  the Mississippi Department of Corrections for providing drug

10  testing cup equipment to the Department of Corrections for

11  fiscal year 2014?

12  A    I do.

13  Q    And what was that amount?

14  A    $782,276.25.

15         THE COURT:  Would you repeat that, please?

16         THE WITNESS:  $782,276.25.

17         THE COURT:  Okay.

18  BY MR. FORTNER:

19  Q    Prior to that contract being let out for bid for 2014, was

20  there to your knowledge a purchase order presented by the

21  previous year's contractor for the Mississippi Department of

22  Corrections to buy the same services for 2014?

23  A    Yes, sir.  There was a purchase order.

24  Q    And was that in the form of a purchase order?

25  A    It was, yes.

Q    And how much did the 2013 provider fill out the purchase

order for fiscal year 2014 for the State of Mississippi to pay?

A    That purchase order was for $999,925.

Q    All right.  So now, what was the total amount of the monies

paid by the State of Mississippi to Drug Testing Corporation

for fiscal year 2014?

A    782,276.25.

Q    And what was the total amount that they would have paid to

the previous provider for 2014 per that purchase order?

A    Per the purchase order, it would have been 999,925.

Q    And is that a difference of over $200,000?

A    Yes, sir.

Q    Okay.

        MR. FORTNER:  May I approach, Your Honor?

        THE COURT:  You may.

        MR. FORTNER:  Your Honor, we would like to ask that

this document be marked as an exhibit to the witness'

testimony.

        THE COURT:  Any objection?

        MR. LAMARCA:  Your Honor, I would like to voir dire

the witness before, so we would object.

        THE COURT:  Then I will hold making a ruling until

after cross-examination.

        MR. FORTNER:  May I mark this for identification

purposes?

```
 1            THE COURT:  What's the number on there?
 2            MR. FORTNER:  It was not premarked, Your Honor.
 3            THE COURT:  All right.  Why don't you make it D-1
 4    then.
 5            MR. FORTNER:  D-1 for identification?
 6            THE COURT:  D-1 for identification.
 7            MR. FORTNER:  May I approach?
 8            THE COURT:  Yes, please.  Thank you.  D-1 for I.D.
 9    only.
10       (EXHIBIT D-1 MARKED)
11    BY MR. FORTNER:
12    Q   Ms. Makris, can you tell us what other documents you
13    brought with you in response to that subpoena?
14    A   Yes, sir.  We prepared a packet that had the subpoena copy.
15    It had the contract with M.D.O.C.  That was the contract with
16    DTC and M.D.O.C.
17    Q   Was that for fiscal year 2014?
18    A   Yes, sir.  It had letters from the M.D.O.C. explaining the
19    state's choice based upon the bid specifications.  It had a
20    contract profit and loss statement or income statement that
21    showed the revenue or the sales less the direct costs, less
22    also the costs to Mr. McCrory, Investigative Research.  And it
23    had supporting documents with shipping schedules for the
24    product, supplier invoices.  It had materials about the drug,
25    scientific details.  It had comparative scientific details of
```

1    the cup that was not chosen.  It had the contractor agreement

2    that DTC had with Mr. McCrory, and it had copies from Drug

3    Testing Corporation to Investigative Research.

4    Q    Now, are those all the documents that you have brought with

5    you today that you have just described to the court?

6    A    I did bring these with me today that I had brought last

7    summer.  The additional document is the spreadsheet you and I

8    just reviewed.  That was not developed in that packet.

9    Q    May I see these, please?

10   A    Yes, sir.

11          MR. FORTNER:  Your Honor, we would like to ask that

12   these documents be marked as a defense exhibit for --

13          THE COURT REPORTER:  I'm sorry.  I can't hear you.

14          MR. FORTNER:  I'm sorry.  We ask that these documents

15   described by Ms. Makris be admitted as a composite exhibit for

16   identification purposes subject to Mr. LaMarca's voir dire of

17   the witness.

18          THE COURT:  Okay.  They will be marked for

19   identification.  Composite exhibit.

20      (EXHIBIT D-2 MARKED)

21   BY MR. FORTNER:

22   Q    Ms. Makris, according to the documentation that you have

23   and your understanding from reviewing documents concerning the

24   2014 contract between DTC, Investigative Research, Inc. and the

25   Mississippi Department of Corrections, what was Investigative

1    Research, Inc.?  What was that company?

2    A    That was a consulting firm.

3    Q    And was that the consulting firm that is associated with

4    one man named Cecil McCrory?

5    A    Yes, sir.

6    Q    Did DTC have a contract with Investigative Research, Inc.,

7    to facilitate contractual agreements with the Mississippi

8    Department of Corrections?

9    A    Yes, sir.

10   Q    And what contract or contracts did Investigative Research,

11   Inc., assist DTC in facilitating with the Mississippi

12   Department of Corrections?

13   A    The contract of supplying the drug testing cups.

14   Q    Was there any other contract between -- any other contract

15   negotiated or facilitated by Investigative Research with the

16   M.D.O.C. on behalf of Drug Testing Corporation?

17   A    No, sir.

18   Q    Was there any other contract facilitated or initiated by

19   Investigative Research, Inc., on behalf of DTC with any other

20   agency within Mississippi that you are aware of?

21   A    No, sir.

22   Q    Was the entire amount -- what was the entire amount paid to

23   DTC to Investigative Research/Cecil McCrory by DTC?

24   A    229,835.14.

25   Q    And what was the cost of the product provided by DTC to the

1    Mississippi Department of Corrections?

2    A    $421,051.21.

3    Q    Was there any other money paid by DTC to Investigative

4    Research for any other services whatsoever that you are aware

5    of?

6    A    No, sir.

7    Q    There is no record of any payments other than those

8    payments you have just described.  Is that correct?

9    A    That is correct.

10   Q    Did DTC in fiscal year 2014 enter into a competitive

11   bidding process for the M.D.O.C. drug testing program for that

12   fiscal year?

13   A    Yes, sir.

14   Q    And did DTC submit a bid?

15   A    Yes, sir.

16   Q    Do you know how much per cup that bid was?

17   A    $5.95.

18   Q    Were there any other bids that you're aware of that were

19   also submitted?

20   A    Yes, there were.

21   Q    And what were those bids?

22   A    The ones I know of are U.S. Diagnostics.

23   Q    And how much was that bid?

24   A    That one I don't have on my spreadsheet, but I believe it

25   was significantly lower.

1    Q    And was there another bid?

2    A    There was another one that was slightly higher.

3    Q    So there were -- were there at least three bids that you

4    are aware of?

5    A    That's what I'm aware of, yes, sir.

6    Q    And U.S. Diagnostics was the lowest of the three bids.  Is

7    that correct?

8    A    Correct.

9    Q    In the paperwork that has now been marked as Exhibit 2 for

10   identification purposes -- Defendant's Exhibit 2 for

11   identification purposes, are there explanations by officials

12   with the Department of Corrections rejecting the U.S.

13   Diagnostics' lowest bid?

14   A    Yes, sir.

15   Q    And do those documents set forth specific reasons for

16   rejecting U.S. Diagnostics' lower bid?

17   A    Yes, sir.

18   Q    And are those reasons -- would it be fair to say that those

19   reasons are because U.S. Diagnostics' lower bid did not meet

20   the bid specifications set by the State of Mississippi for the

21   product that they wanted to buy?

22   A    That's correct.

23   Q    Let me ask you this, Ms. Makris.  The drug cups provided by

24   DTC in 2014 at a lower price than the drug cups that were

25   provided in 2013 to the Mississippi Department of Corrections,

1  were those the same product?

2  A    Yes, sir.  They were the same.

3  Q    Okay.  Did they operate the same way?  Did they work the

4  same way?

5  A    They worked exactly the same.

6  Q    Did they meet the same bid specifications that Mississippi

7  had paid $9 and something for a year earlier in 2013?

8  A    Yes, sir.

9  Q    All right.  Regardless of how the bid was obtained, what

10 happened with that as far as from a numbers standpoint, an

11 accounting standpoint?  Did DTC save the State of Mississippi

12 money in 2014 for the same product that the state had paid for

13 in 2013?

14 A    Yes, sir.

15 Q    Did it cost the State of Mississippi 369,000 more dollars

16 for DTC to provide that 2014 product than it had cost them in

17 2013?

18 A    Not in comparison, no, sir.

19 Q    In fact, it was over $200,000 less.  Is that correct?

20 A    Yes, sir.

21 Q    Now, assuming based on your spreadsheet that Investigative

22 Research was paid by DTC $229,835.14 for their services in

23 obtaining the drug cup testing contract for 2014, assuming

24 that's correct, and assuming that $60,000 was paid by

25 Investigative Research/Cecil McCrory, to Commissioner Epps,

1  assuming that to be true, how much money did Investigative
2  Research actually receive or actually -- would it be $229,000
3  roughly minus $60,000?
4  A   Yes, sir, because that was passed on.  The 60 was passed on
5  to someone else.
6  Q   Okay.  So would it be fair to say that Investigative
7  Research retained $169,835.14 as payment for its consulting
8  services once it paid $60,000 to Commissioner Epps?
9  A   Yes, sir.
10 Q   Okay.  Was there any indication in your books that DTC paid
11 Investigative Research any other sum of money?
12 A   No, sir, none at all.
13 Q   And was there any indication in your books that DTC paid
14 any sum of money directly to Commissioner Epps?
15 A   No, sir.
16 Q   And did -- I know this may be repetitious, but did DTC pay
17 Investigative Research for any other service whatsoever other
18 than the obtaining of the contract in question in this case?
19 A   No, sir.
20       MR. FORTNER:  May I have just one minute, Judge?
21       THE COURT:  Okay.
22    (SHORT PAUSE)
23       MR. FORTNER:  Your Honor, we will tender the witness.
24 Thank you.
25       THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. LAMARCA:

Q   Ms. Makris, I'm Darren LaMarca.  You and I met back in June.  Was it not?

A   Yes, sir.

Q   And you had at that time complied with the subpoena that was issued by the court actually.  It was not a grand jury subpoena but a subpoena nonetheless.  You complied with it.  Correct?

A   Yes, sir.

Q   And you brought to me on behalf of that subpoena that was issued a set of documents with a cover letter addressed to me with the actual subpoena included as well and then a set of documents complying with that.  Right?

A   Yes, sir.

Q   Okay.

         MR. LAMARCA:  May I approach, Your Honor?

         THE COURT:  You may.

BY MR. LAMARCA:

Q   Take a look at that and see if that is the entire set of documents that you recall bringing to the court in response to that subpoena.

A   Yes, sir, it is.

         MR. LAMARCA:  Your Honor, I ask that it be admitted as Government's Exhibit 1.

1          THE COURT:  Any objection?

2          MR. FORTNER:  I don't have any objection, Judge.

3          THE COURT:  All right.  G-1 is admitted.

4     (EXHIBIT G-1 MARKED)

5          MR. LAMARCA:  Your Honor, these documents would

6     include D-2.  So in that respect, the government would have no

7     objection to D-2.

8          THE COURT:  Then D-2 is admitted.  The term for

9     identification is deleted with regard to D-2.

10     (EXHIBIT D-2 MARKED)

11    BY MR. LAMARCA:

12    Q   Now, with regard to D-1, Ms. Makris, do you remember

13    that -- where Mr. Fortner was asking you a few questions about

14    the prior year's bid and the winning bid for I think Brannon?

15    A   Yes, sir.

16    Q   And that's this document for identification only.  Is that

17    the document that Mr. Fortner was talking to you about earlier?

18    A   Is what you are looking at supposed to be on the screen?

19         MR. LAMARCA:  It should be on your screen.

20         THE COURT:  It's not on hers.

21    BY MR. LAMARCA:

22    Q   Is that the document that Mr. Fortner was talking to you

23    about?

24    A   Yes, sir.

25    Q   That was not something you produced in response to the

1  subpoena.  Right?

2  A    Correct.  This was not produced at that time.

3  Q    All right.  And the first time you have actually produced

4  it to me would be 15 minutes ago?

5  A    Yes, sir.

6  Q    All right.  Now, you've taken --

7  A    Could I clarify something?

8  Q    Sure.

9  A    The middle section where it has DTC activity in it was part

10  of the packet I had presented to you.  The comparison part was

11  not.

12  Q    True, in a --

13  A    Yes, sir.

14  Q    In a different format?

15  A    Yes, sir.

16  Q    Let's talk about then this document that was produced for

17  the first time today.  Right?

18  A    Yes, sir.

19  Q    And you received -- and I went ahead and circled -- do you

20  see that right there, the amounts that you referenced earlier

21  about how the State of Mississippi actually did not lose

22  anything but saved a lot of money.  Do you recall those

23  questions?

24  A    Yes, sir.

25  Q    All right.  Now, that was for the previous year.  Is that

1   right?

2   A    That represents a purchase order that was given for the

3   year that DTC actually engaged in the transaction, but the

4   pricing that is set forth in that purchase order was

5   referencing the previous year's product.

6   Q    So is that the pricing for the previous year?

7   A    Yes, sir.

8   Q    Okay.  Now, the pricing for the current year, the year

9   we're actually talking about when DTC won the bid, is half of

10  that roughly.  Is that right?

11  A    Yes.

12  Q    So for the year that DTC won the bid, DTC's bid was 495.

13  Is that right?

14  A    It was 595.

15  Q    I'm sorry.  595.

16  A    Yes, sir.

17  Q    And Brannon or Redwood Toxicology was actually $6.  Is that

18  right?

19  A    Yes, sir.

20  Q    Now, did Brannon -- Brannon was the manufacturer of the

21  cups.  Is that true?

22  A    Yes, sir.

23  Q    So DTC purchases the cups from Brannon and then sells them

24  by bid if accepted by the State of Mississippi.  Is that right?

25  A    Yes, sir.

1  Q   Okay.  And you looked to see that Brannon, the actual

2  company that manufactures the cups, was also selling to whom?

3  Redwood?  Or not?

4  A   I don't know if it was -- if that was the nature of the

5  relationship between Brannon and Redwood.  I don't know that

6  that was the structure of their relationship.  I am not

7  familiar with if Redwood was owned by Brannon or a subsidiary

8  or joint venture.  I'm not familiar with that relationship, so

9  I can't say that they sold to Redwood particularly.

10  Q   Okay.  Do you know if Mr. Longoria ever worked with -- for

11  Brannon?

12  A   He did.

13  Q   He did?

14  A   Uh-huh.

15  Q   Did he ever work with Redwood Toxicology?

16  A   I do not know.

17  Q   Now, U.S. Diagnostics had submitted a bid of 298?

18  A   I believe it was 2 something.  I don't have the exact

19  number in front of me.  We do have it somewhere.

20  Q   Would you accept 2.98 if that were, in fact, the case?

21  Would you like to ask Mr. Fortner?

22  A   Yes, sir.

23  Q   Okay.

24        MR. FORTNER:  Uh-huh.  Yes.

25        THE WITNESS:  So, yes, I accept that.

BY MR. LAMARCA:

Q   All right.  With Mr. Fortner's concurrence, you are good with 2.98?

A   Yes, sir.

Q   All right.  Now, had the product been sold to the State of Mississippi through U.S. Diagnostics, the State of Mississippi would have saved a lot of money compared to purchasing the cups for 5.95.  Is that right?

A   They would have saved on the transaction itself, but there are other issues that would have had costs associated with them whereas that are part of that conversation.

Q   Such as the training of employees on a new product.  Is that right?

A   No, sir.

Q   Okay.  Do you remember producing to me this document here that was part of Government's Exhibit 1 that explains why U.S. Diagnostics' ProScreen drug test cup would not be sufficient?

A   Yes, sir.

Q   Okay.  And is that not at the bottom of why it would not be sufficient would be they had to train employees on the new product?  Do you see that?  Number 5?

A   Uh-huh.

Q   Is that -- did I misstate it, or am I correct?

A   There are two types of training and conversation about drug testing, and one has to do with clear waiver, and I was

1  thinking of that when you asked that question.

2  Q   All right.  So back to my question.  You said there would

3  be other issues that would not -- that would actually cost the

4  state some additional monies as opposed to just the 2.98 per

5  cup.  Is that right?

6  A   Yes, sir.

7  Q   So I was asking you if any of those other issues would have

8  been the training of new people or people on the use of this?

9  A   So the answer is yes.  The training would have been part of

10  the additional cost to the state.

11  Q   All right.  And 1 through 5 was sent by the

12  commissioners -- several commissioners on behalf of M.D.O.C. to

13  the Department of Finance justifying why the $5.95 per cup cost

14  of DTC is a much better way to go than the $2.98 cost for U.S.

15  Diagnostics.  Right?

16  A   Yes, sir.

17  Q   Do you know where this information that was obtained by

18  these commissioners as to why U.S. Diagnostics' cups would not

19  perform as well or why they would not be as cost efficient,

20  where that information came from?

21  A   Specifically, no.  I mean I don't know each -- like the

22  conversations they had specifically that led to this document.

23  Q   Do you know whether Mr. Longoria sent an e-mail to

24  Mr. McCrory at Investigative Research with this information in

25  it explaining to Mr. McCrory why U.S. Diagnostics' cups would

1  not be cost efficient?  Do you know that?

2  A    I don't know about an e-mail, but I do know that his input

3  was received by the state.

4        THE COURT:  Whose input?

5        THE WITNESS:  Mr. Longoria's.

6        THE COURT:  Okay.

7        THE WITNESS:  Technical input.

8  BY MR. LAMARCA:

9  Q    Have you had occasion to review the e-mails of Mr. Longoria

10  to Mr. McCrory regarding the awarding or the request for

11  proposal of the contract awarded to DTC in 2013?

12  A    No, sir.

13  Q    So when we look at the cost savings for the Mississippi

14  Department of Corrections, you're telling the court we should

15  not look at the numbers for the year 2013, that would be

16  beginning August 1 of 2013 on, but actually as to all these

17  other reasons as to why U.S. Diagnostics should not apply as

18  reflected in the letter of August 15th, 2013.  Is that true?

19  A    I kind of lost the question.

20  Q    We shouldn't look at just numbers?

21  A    Correct.  Correct.  They are performance -- mainly

22  performance aspects.

23  Q    Now, do you -- you had nothing to do with the performance

24  aspects of what the Mississippi Department of Corrections was

25  looking for when it bid these cups?

A    I didn't at that time.  I have become more knowledgeable about it since then.

Q    All right.  In other words, you had nothing to do with or have any input into the performance aspects of the cups that M.D.O.C. was requesting.  Is that true?

A    I did not personally, no.

Q    Do you know whether Mr. Longoria did?

A    That he had input into the Department of M.D.O.C.'s requirements for or the technical attributes of the cups?  He did.  Yes.

Q    He did?

A    Yes, sir.

Q    So that his company would actually be the one that could complete or fulfill the contract to the exclusion of others?

A    No, sir, I disagree.

Q    How do you know that?

A    Well, what I know is that everything that was presented to the Department of Corrections for Mississippi and other corrections and customers, private and public alike, has to do with the output and the result that's going to be delivered by his products.  And if I could go on, I will state that even before my work with DTC, I have been in the business of writing and responding to RFPs and bids for about a decade.  One of the things that stand out is that very often bid writers are experts in procurement and not necessarily experts in the

subject matter of what they are seeking proposals for, and the input given by DTC to the authorities in this case empowered them to have an effective product that would have the least risk safety-wise to the inmates and employees alike.  And that's my perspective on not just this bid but the way that the business is conducted.

Q   So are you telling the court that U.S. Diagnostics' cups would not fulfill the mission of M.D.O.C. in screening inmates?

A   Yes, that's what I'm saying.

Q   And so it was a matter of Mr. Longoria explaining to his consultant, Mr. McCrory, just what needed to be in the proposal, the request for bids, by M.D.O.C.?

A   If he asked that question, Mark would answer that question and then he would go into exact detail as to why, because of his scientific background.

Q   Now, when Mr. Longoria -- well, let me ask it this way.  If Mr. Longoria asked or told Mr. McCrory, *If you include these things, I will get the bid and no one else will* --

          MR. FORTNER:  Your Honor, that's assuming facts not in evidence.

          THE COURT:  That's rather speculative.  Go to another question.

          MR. LAMARCA:  May I have just a moment, please, Your Honor?

          THE COURT:  Okay.

1    (SHORT PAUSE)

2        MR. LAMARCA:  May I have the court's indulgence,

3    please?  I would like to play a recording for the witness.

4        THE COURT:  Okay.

5    (SHORT PAUSE)

6        MR. LAMARCA:  May it please the court?

7        THE COURT:  Okay.  Go right ahead.

8        MR. LAMARCA:  Thank you.

9    BY MR. LAMARCA:

10   Q   Ms. Makris, do you remember me showing you the explanation

11   from the commissioners with regard to why they should not

12   accept the low bid from U.S. Diagnostics that you had produced?

13   A   Yes, sir.

14   Q   Let me show you what's been marked Government Exhibit 2.

15   Do you see that in front of you?

16   A   Yes, sir.

17   Q   Do you see that that's in August of 2013?

18   A   Yes, sir.

19   Q   And do you see that that is an e-mail from Commissioner

20   Epps to Mr. Longoria?

21   A   Yes, sir.

22   Q   And that it says, *Thanks, Chris Epps, Commissioner?*

23   A   Yes, sir.

24   Q   Do you see the e-mail beneath that that says August 14th,

25   2013, at 6:51 p.m.?

A    Yes, sir.

Q    Okay.  Which predates or I shouldn't say predates but it is a couple hours prior to Mr. Epps thanking Mr. Longoria?

A    Yes, sir.

Q    And you see that Mr. Longoria is telling the commissioner why U.S. Diagnostics does not meet and other important reasons not to go with the lowest priced product?

A    Yes, sir.

Q    And those are his reasons as to why he should not go with the lower priced product.  Right?

A    Yes, sir.

Q    And those along with Paragraph 2 and Paragraph 1 of the commissioner's are verbatim.  Are they not?

A    Yes, sir.

Q    Okay.  Now, at the time that this was being sent, were you employed at Drug Testing?

A    No, sir.

Q    So you don't know the relationship between Mr. Longoria, Mr. McCrory and Mr. Epps.  Do you?

A    No, sir.

Q    You were not aware that Mr. Longoria had discussed with Mr. McCrory that if they win this bid Mr. Epps would get money?

        MR. FORTNER:  We would object, Your Honor.  That also assumes facts not in evidence.

        MR. LAMARCA:  Your Honor, he pled guilty to that, and

1    I think that was part of the plea colloquy.

2           THE COURT:  The objection is overruled.

3    BY MR. LAMARCA:

4    Q    You're not aware of that, are you?

5    A    No, sir.

6    Q    Have you been made aware of that?

7    A    Have I been made aware of that?

8    Q    Yes, ma'am.

9    A    Of a relationship?

10   Q    Correct.

11   A    Between --

12   Q    A relationship of money that originates with the Department

13   of Finance with the State of Mississippi paid to DTC, paid to

14   Mr. McCrory and then funneled back to Mr. Epps.

15   A    Only in the course of this case.

16   Q    So the answer would be yes, you have been made aware of

17   that?

18   A    Yes.

19   Q    Now, on that same e-mail that I have just shown you that I

20   have marked as Government's Exhibit 2 for identification, let's

21   go to the next page of that e-mail.  Do you see that, the

22   signature or the sender's line being Mark Longoria?

23   A    Yes, sir.

24   Q    Now, do you have any explanation as to why under it it

25   would say Redwood Toxicology?

1   A   I wasn't there at that time, so I don't know his job

2   transition scenario at that time, but I do know that he left

3   the corporate employment scenario in that general timeframe,

4   and I know that certain companies were bought out by certain

5   other companies, and I can only speculate that this is part of

6   that perhaps.

7   Q   Okay.  So the answer would be you don't know?

8   A   I don't know.  Correct.

9   Q   All right.

10  A   Like I said earlier.

11  Q   Because I asked you earlier about Redwood Toxicology and

12  what relationship he had, and you didn't know of any.

13  A   Correct.

14  Q   All right.  Because Redwood Toxicology was also the company

15  that made the bid a nickel higher than DTC.  Is that right?

16  A   Yes.

17  Q   For this August 2013 contract.  Right?

18  A   Yes.

19  Q   All right.  Do you know if the bid that was sent to the

20  Mississippi Department of Corrections by Redwood Toxicology

21  noted Mr. Longoria's relationship with Redwood Toxicology?

22  A   I don't have any knowledge of that either way.

23  Q   If I see this correctly, it actually shows Mr. Longoria's

24  e-mail address being an e-mail at Redwood Toxicology.  Is that

25  right?

1   A    That's what that shows, yes, sir.

2   Q    And he is sending a reason to -- this explanation to Mr.

3   Epps as to why his company should get this bid as opposed to

4   U.S. Diagnostics.  Right?

5   A    He is explaining the reason that the product attributes of

6   one wouldn't meet the requirements.

7   Q    Now, we do know that Redwood Toxicology submitted a higher

8   bid than Drug Testing Corporation.  Right?

9   A    That's what I have learned in this process, yes, sir.

10  Q    Right.  You testified earlier that they submitted a bid one

11  nickel higher per cup?

12  A    Yes, sir.

13  Q    All right.  I'm going to play you a recording, and see if

14  you recognize the voices on that recording.  Okay?

15  A    Okay.

16  Q    And I'm going to play you a recording from July 8th of

17  2014.  All right?  It has been produced to defense counsel

18  previously.

19        MR. LAMARCA:  Your Honor, is the sound system on

20  through the recording?  Your Honor, my laptop has begun to

21  reboot.

22     (SHORT PAUSE)

23  BY MR. LAMARCA:

24  Q    I digress.  Ms. Makris, I'm going to play you a recording

25  from May 21 of 2014.

```
1    A    Okay.

2    Q    You recall based on the production that you made that there

3    was a second bid or purchase order I should say from the State

4    of Mississippi for additional cups.  Right?

5    A    Yes, sir.

6    Q    That was in -- somewhat contemplated as a possibility by

7    the initial contract in August of 2013.  Right?

8    A    Contemplated by?  I'm not following you.

9    Q    An additional set of drug testing cups were purchased by

10   the State of Mississippi?

11   A    Yes, sir.  It was the bridge order because they needed more

12   to have enough product to finish the fiscal year before a new

13   hypothetically contract would begin, yes, sir.

14   Q    Before they would have to bid out another contract?

15   A    Yes.

16   Q    They needed this to -- you called it a bridge order.

17   A    Yes, sir, and that was also included in the numbers we

18   provided earlier.

19   Q    Right.  Exactly.  Okay.  Let me ask you to listen and tell

20   me if you recognize --

21            THE COURT:  We will be in recess for 10 minutes.

22       (RECESS)

23            THE COURT:  All right, Mr. LaMarca.

24            MR. LAMARCA:  Thank you, Your Honor.

25   BY MR. LAMARCA:
```

1  Q   Ms. Makris, before we broke, we were going to ask you to

2  see if you recognize the voices on this recording from May 21

3  of 2014.  All right?  Which is prior to the bridge loan.  Is it

4  not?

5  A   I believe so, yes.

6  Q   I say bridge loan?  Bridge sale.

7  A   Bridge order, yes, and transaction, yes.  What was the date

8  you said?

9  Q   May 21, 2014.

10  A   I think it was around that same time.

11  Q   Okay.  All right.  Let me ask you if you recognize this

12  voice or either of these voices.

13      (Recording played.)

14  BY MR. LAMARCA:

15  Q   Do you recognize that voice?

16  A   Yes, sir.

17  Q   And who is that?

18  A   Mark Longoria.

19  Q   Okay.  You don't recognize the other voice?

20  A   No, sir.

21  Q   Okay.  Let's go on a little further.  We know the date of

22  the phonecall.  Right?  5-21, 2014?

23  A   Yes, sir.  Uh-huh.

24      (Recording played.)

25  BY MR. LAMARCA:

1    Q    Who is Redwood and Alere?  Do you know?

2    A    In relation to this scenario, no.  I mean I know that they

3    are providers of drug testing products.

4    Q    Okay.

5         (Recording played.)

6    BY MR. LAMARCA:

7    Q    Now that you have heard that, do you believe that the

8    product that was produced by DTC for the price that they

9    produced it was a good deal for the state?

10   A    I can't make that assumption, no.

11   Q    All right.  Or that the state saved money?

12   A    I still believe that they saved money, yes, sir.

13   Q    And you do know that Redwood Toxicology was the bid that

14   was a nickel higher than DTC.  Right?

15   A    I believe so, yes.

16   Q    You testified to that previously?

17   A    Yes, sir.

18   Q    Okay.

19   A    What I just heard, though, it's confusing to me, so I mean

20   there were a lot of nuances to it, so I don't --

21   Q    You had not heard this before?

22   A    No, sir.

23        (Recording played.)

24   BY MR. LAMARCA:

25   Q    Do you have any idea what he is talking about *if this thing*

*goes back out?*

A   I presume it means if it goes to an open bid process, at which it would go on to bid portals, bid sync and so on and so forth and all the distributors of all products would be able to supply a bid to it.

Q   All right.

MR. LAMARCA:  Your Honor, we would ask -- this is -- would be G-3 marked for identification, and we will ask that it be admitted through later testimony, may it please the court?

THE COURT:  Any objection to G-3?

MR. FORTNER:  No, Your Honor.

THE COURT:  Admitted.  G-3.

(EXHIBIT G-3 MARKED)

MR. LAMARCA:  Thank you.  May I have one moment, please?

THE COURT:  Okay.

(SHORT PAUSE)

MR. LAMARCA:  No further questions, Your Honor.

THE COURT:  All right.  Redirect.

MR. FORTNER:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. FORTNER:

Q   Can you see what I have got on the screen in front of you?

A   Yes, sir.

Q   Is that the letter that was written that's been admitted

1   into evidence now setting forth five reasons why the U.S.

2   Diagnostics bid was -- did not meet bid specifications?

3   A    Yes, sir.

4   Q    And as far as you know -- now you were not involved in that

5   process at that time.  Is that correct?

6   A    Correct.

7   Q    You did not work for Mr. Longoria or for DTC at that time?

8   A    Correct.

9   Q    But as far as you know and are aware, is there anything

10  false in this document?

11  A    No, sir.

12  Q    Did U.S. Diagnostics' bid, in fact, not meet the bid

13  specifications based upon the five reasons set forth in this

14  document?

15  A    That is accurate, yes.

16  Q    And if the State of Mississippi had accepted U.S.

17  Diagnostics' bid for that fiscal year, would they have been

18  accepting a bid that did not meet the bid specifications

19  required by the Department of Corrections?

20  A    That is correct.

21       MR. FORTNER:  Your Honor, that's all the questions I

22  have of this witness.

23       THE COURT:  All right.  You can step down.  Call your

24  next witness.

25       MR. FORTNER:  Thank you.  We call Mark Longoria, Your

Honor.

**MARK LONGORIA,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. FORTNER:

Q    Would you tell us your name, please?

A    Mark Longoria.

Q    Mr. Longoria, were you a participant in a company called

Drug Testing con-- what's the name?

A    Drug Testing Corporation, yes, sir.

Q    And did you, in fact, earlier plead guilty in this court to

a conspiracy charge concerning a contract entered into between

Drug Testing Corporation and the Mississippi Department of

Corrections for fiscal year 2013?

A    '14.

Q    '13 or '14?

A    '13 to '14.

Q    Mr. Longoria, what exactly did DTC do?  What sort of

products -- how long have you been working in this business?

A    I have been working in this business approximately 27

years, sir.

Q    And is Mississippi the only state that you have done

business with over the last 27 years?

A    No, sir.  All over the United States.

Q    There have been various companies' names mentioned during

1   the course of this hearing so far.  Are you familiar with those

2   companies?

3   A    Absolutely.

4   Q    Redwood Toxicology?

5   A    Yes, sir.

6   Q    What other are some of the companies involved --

7   A    Redwood, Alere, Incell Technologies, U.S. Diagnostics.

8   They are all either distributors or manufacturers.  Brannon

9   manufactures drug testing products.

10  Q    All right.  And do you -- as DTC, did DTC buy products from

11  different manufacturers?

12  A    We do.

13  Q    Did you and do you do business with different

14  manufacturers?

15  A    Absolutely.

16  Q    Let's talk for a moment about your -- the last 15 years of

17  your professional life.  You started DTC at what time?

18  A    2000.

19  Q    During the course of owning and operating DTC, did you work

20  for other companies also?

21  A    Yes, I did.

22  Q    For instance?

23  A    Brannon Medical Corporation.

24  Q    How long did you work for Brannon Medical?

25  A    13 years.

Q   Were there any other companies that you worked directly for?

A   No, sir.

Q   Did you ever work for Redwood Toxicology?

A   Well, the way that I need to answer that is this:  Alere Toxicology bought Brannon Medical, the company that I worked for at that time of this bid.  They also owned Redwood Toxicology.  They also owned Pro Laboratories, Icup Instant Technologies.  They were buying up all kinds of different manufacturers and laboratories at that time.

Q   And what company was buying them up?

A   Alere Toxicology.  So they bought Brannon Medical, and I worked for Brannon Medical.  I was the director for national accounts.  I handled all the government contracts in Louisiana, Mississippi, Virginia, West Virginia, Illinois, Indiana for drug testing.

Q   And you have seen the e-mail that was put on the screen introduced into evidence by the government of the exchange you had with Commissioner Epps, an e-mail exchange.  Is that correct?

A   Yes, sir.

Q   With an address from you of Redwood Toxicology?

A   Yes, sir.

Q   Can you explain that to the court?

A   I can.  When Alere Toxicology bought Brannon Medical, I was

1  an employee of Brannon Medical still, but my job was to assign

2  all state contracts.  All criminal justice drug testing was

3  going to be run through -- not through Brannon anymore but

4  through Redwood Toxicology out of Redwood, California.  So my

5  job, all the state contracts that I had, I had to then assign

6  them, which is not -- it takes some time and they may not even

7  want to change the company from Brannon to Redwood, but my job

8  was to get all government contracts changed over to Redwood

9  Toxicology.  Whichever contracts they deemed, those were the

10 ones that needed to go through Redwood Toxicology, through that

11 distribution and manufacturing and everything through that

12 distribution branch.

13 Q    Mr. Longoria, what company was directing you to do that?

14 A    Alere Toxicology.  They were the parent company.  They

15 owned all the companies at the time.

16 Q    They bought everybody?

17 A    Right.  So I was working for Brannon and I was assigning

18 state contracts for Alere over to Redwood because they owned

19 both Brannon and Redwood.

20 Q    And were there other professionals in the field such as you

21 who were in the same situation?

22 A    Yes, sir.

23 Q    And at that time did you also own and operate Drug Testing

24 Corporation?

25 A    Yes, sir.

1  Q    And were you continuing to bid on contracts in different

2  states on behalf of Drug Testing Corporation?

3  A    Yes, I did.

4  Q    Did you do business in other states besides Mississippi as

5  DTC?

6  A    Yes, sir.

7  Q    And at the same time were you working for Alere, i.e.

8  Redwood Toxicology?

9  A    Brannon Medical, but the parent company that bought us was

10 Alere.  So technically I was an employee of Alere Toxicology.

11 Q    Let me ask you something.  How does someone like

12 Commissioner Chris Epps or someone like Consultant Cecil

13 McCrory or some other Commissioner of the Department of

14 Corrections in some other state know about the specifics and

15 the specifications of a drug testing cup?  How do they know

16 about that?

17 A    They know that through the professionals that work in that

18 industry that understand the toxicology, the technology, the

19 health and human resources, regulatory, the FDA guidelines.

20 All those products are regulated by the FDA.

21 Q    Let me ask you --

22 A    Yes, sir.

23 Q    -- do you as the contractor or the owner of DTC and the

24 person who is trying to sell that product, do you provide that

25 information to Commissioners of Department of Corrections

1   around the country?

2   A   Everybody we're trying to sell to, yes, sir.

3   Q   Do you provide that to consultants who you might work with

4   in different states?

5   A   Yes, sir.

6   Q   All right.  Do companies such as your own also hire

7   consultants in different states to try to attempt to get the

8   business of those Departments of Correction?

9   A   Yes, sir.

10   Q   Okay.  Did you do that in Mississippi?

11   A   Yes, sir.

12   Q   And did you -- and in doing that, did you hire

13   Investigative Research, Inc., owned by Cecil McCrory?

14   A   Yes, sir.

15   Q   All right.  Now, how would Cecil McCrory or Commissioner

16   Epps know what type of drug testing cup might best suit their

17   needs?

18   A   They would find out that from manufacturer's

19   representatives like myself.

20   Q   And as a manufacturer's representative, do you go to trade

21   shows that are attended by Department of Corrections

22   Commissioners?

23   A   Absolutely.  ACA, APPA, National Association of Drug

24   Courts.  All corrections, community corrections.

25   Q   Tell the court -- you have to slow down a little bit.

1    A    Okay.  Tell.

2    Q    The court what does ACA stand for?

3    A    The American Correctional Association.

4    Q    And does the American Correctional Association engage in

5    accreditation policies for Departments of Corrections around

6    the country?

7    A    Absolutely.

8    Q    And at least while you were working with Mississippi

9    Department of Corrections, were they accredited by ACA?

10   A    Yes, sir.

11   Q    And what exactly is the Clinical Laboratory Improvement

12   Act?

13   A    CLIA, the Clinical Laboratory Improvement Act, is an arm of

14   health and human resources.  And what they do is they regulate

15   different types of medical testing, like drug testing.

16   Q    And is CLIA overseen or are they a subset of the Food and

17   Drug add -- the United States Food and Drug Administration?

18   A    As I know it, under the Health and Human Services of the

19   United States, yes.

20   Q    But it is a federal agency.  Is that correct?

21   A    Yes, sir.

22   Q    It is a federal act.  Is that correct?

23   A    Yes, sir.

24   Q    In order to maintain accreditation by the American

25   Corrections Association, is the drug testing -- are the drug

1  testing products used by a Department of Corrections, must they

2  be CLIA certified or approved or CLIA waived, one or the other?

3  A    Yes, sir.

4  Q    All right.  To your knowledge was U.S. Diagnostics' drug

5  cup, their drug testing procedure that was bid lower than your

6  bid for fiscal year 2013-2014, was it a CLIA waived or CLIA

7  approved product?

8  A    No, sir.

9  Q    If Mississippi had accepted that bid, would they have been

10  in violation of CLIA?

11  A    Yes, sir.

12  Q    And would that have put them in violation of the federal

13  regulations?

14  A    Absolutely.

15  Q    Would that and was that a requirement of the bid

16  specifications that the product be CLIA approved or CLIA

17  waived?

18  A    Yes, sir.

19  Q    Was your product CLIA approved or CLIA waived?

20  A    Yes, sir.

21  Q    Was Redwood Toxicology's product CLIA approved, CLIA

22  waived?

23  A    The product they bid was, yes.

24  Q    In fact, was it the same product itself?

25  A    Same product.

1   Q   Okay.  And were those products CLIA approved or CLIA
2   waived?
3   A   Yes, sir.
4   Q   Is there anything in this letter that's been admitted into
5   evidence giving five specific reasons why U.S. Diagnostics' bid
6   was not acceptable, did not meet bid specs, was there anything
7   in there that was not true?
8   A   No, sir.
9   Q   Okay.  Did you write these reasons out for the commissioner
10  or for the consultant?
11  A   Absolutely.
12  Q   And were they all true?
13  A   Absolutely.
14  Q   Was there anything false about them?
15  A   No, sir.
16  Q   Mr. Longoria, G-1 has already been entered into evidence,
17  and in G-1 there is a copy of an independent contractor
18  agreement between Drug Testing Corporation and Investigative
19  Research, Inc.  Is that correct?
20  A   Yes, sir.
21  Q   Did you have a signed contract with Cecil McCrory and
22  Investigative Research and DTC hiring Investigative Research to
23  provide consultant services to obtain this business with the
24  Mississippi Department of Corrections?
25  A   Yes, sir.

1    Q    Let me ask you this.  Just how big of a deal in your

2    industry is CLIA?  I mean how big of a deal is that?

3    A    The manufacturer spends hundreds of thousands of dollars

4    submitting their products to the FDA and CLIA to be able to

5    sell in the United States.  So it's a major deal.

6    Q    And what did -- for the product that we are talking about,

7    did Brannon Medical, even beginning as far back as 2002 or

8    2003, begin negotiating with the FDA and CLIA to get their

9    product CLIA waived or CLIA approved?

10   A    Yes, sir.

11   Q    Were you involved in that?  Were you aware of that?

12   A    I was.

13   Q    And at what point did this product that you were selling to

14   the Department of Corrections become CLIA approved or CLIA

15   waived?

16   A    The paperwork shows the CLIA waiver shows sometime in 2005.

17   Q    And was your product CLIA waived, the product you bid to

18   the M.D.O.C. that fiscal year?

19   A    Yes, sir.

20   Q    And were there -- I don't know how to -- what you would

21   call a reference guide that is included with your product?

22   A    That's called a manufacturer's package insert.  It is

23   required by the FDA.  Because this product is CLIA waived or

24   moderately complex, it is a requirement that that

25   manufacturer's package insert that has all the technical

1    information has to be in every product sold -- in every box of

2    product sold.

3    Q    Did your product -- you sold the ToxCup drug screen cup.

4    Is that correct?

5    A    Yes, sir.

6    Q    Was that product -- that was DTC's product.  Correct?

7    A    Manufactured by Brannon Medical.  We sold that product,

8    yes.

9    Q    You bought that from Brannon Medical?

10   A    Yes, sir.

11   Q    And did you include a quick reference guide in the boxes of

12   your product?

13   A    The manufacturer provided -- it's mandatory that it has to

14   be in every box of product.

15   Q    And did that -- I'm going to show you this.  Is this -- if

16   we look at the first page of the ToxCup drug screen cup quick

17   reference --

18   A    Manufacturer's packaging, yes, sir.

19   Q    Okay.  And does this point out that it is, in fact, a CLIA

20   waived test?

21   A    Yes, sir.

22          MR. FORTNER:  Your Honor, this is included in G-1 just

23   for the court's information.

24          THE COURT:  Okay.

25   BY MR. FORTNER:

1   Q    And I'm going to show you this, Mr. Longoria.

2   Mr. Longoria, is this the U.S. Diagnostics' ProScreen Drugs of

3   Abuse Cup Reference Guide?

4   A    Yes, sir.

5   Q    And is this, in fact, not CLIA waived?

6   A    No, sir.  It says for diagnostic use only.

7   Q    And, in fact, does it also point out material required but

8   not provided?

9   A    Yes, sir, it does.

10  Q    And is this, in fact, the U.S. Diagnostics product whose

11  bid was much less than DTC's bid but was also not accepted

12  because it didn't meet bid specification?

13  A    Yes, sir.

14  Q    The following year, the year after that we are talking

15  about here, let's say going into 2014, did DTC bid on this

16  contract again?

17  A    Yes, sir.

18  Q    And what happened the next year?

19  A    We were undercut by Redwood significantly and did not get

20  the bid.

21  Q    Did you bid higher or lower than you had bid the year

22  before?

23  A    I bid lower.

24  Q    And did you get undercut by Redwood anyway?

25  A    Significantly.

1    Q    Okay.  Let me ask you something, Mr. Longoria.  Is that

2    unusual in the industry?  I mean is that the nature of the

3    competition of the industry?

4    A    Brannon Medical has hundreds of distributors that sell the

5    same product, and when you go to bid, you take your best guess

6    at where you need to be at.  And if you get undercut and that

7    other product meets the specs, you don't get the business.

8    Q    Okay.  Your conversation that was played in here earlier

9    today, that conversation did occur.  Correct?

10   A    Absolutely.

11   Q    And was that a conversation you had in an attempt to get

12   the bid?

13   A    Absolutely.

14   Q    And did you point out in other conversations with either

15   McCrory or Epps details about your cup, your drug testing cup,

16   the ToxCup drug screen cup that you felt made it a better

17   product for the State of Mississippi?

18   A    I did that with every customer I sold it to.  Absolutely.

19   Q    Okay.  Did you always have those conversations?

20   A    Absolutely.

21   Q    Did those people often call you and ask you about specifics

22   about your product?

23   A    The Department of Corrections people from all over the

24   United States.

25   Q    And, Mr. Longoria, as a contractor in this particular

1    field, provider of this particular service, do you also make

2    charitable contributions to programs that, say, the Department

3    of Corrections advertises for providers like yourself to make

4    charitable contributions to?

5    A    All the time.

6    Q    Golf tournaments?

7    A    Golf tournaments.

8    Q    Raffles, whatever they have?

9    A    St. Jude's Fundraisers, Special Olympics, Correctional

10   Peace Officer Foundation.

11   Q    Does that correct -- does that occur all over the country?

12   A    In every state.

13   Q    Okay.  And in order to do that business or obtain that

14   business, do contractors like yourself make charitable

15   contributions or sponsorships for various fundraisers like

16   that?

17   A    Absolutely.  That's how most of the state representatives,

18   the employees, actually go to those conferences.  They are

19   sponsored by the vendors.  They help pay for the conference.

20   The vendors help pay for the conferences.

21   Q    Mr. Longoria, is there anything else at this point that you

22   could add to this that I have not asked you about that you feel

23   like you need to explain to the court?

24   A    I don't think so other than the fact that the Department of

25   Corrections and the professionals that write the bid

specifications and things like that, they bid on thousands of items. And for a technical product like this -- if you are bidding on a bar of soap, that's a little bit different. But if you are bidding on something that's regulated by the FDA, there is a lot of technical stuff in there that it's not their expertise. So they depend on us to give them that expertise, and that's what we try to do.

MR. FORTNER: We will tender the witness, Your Honor.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LAMARCA:

Q   Mr. Longoria, back in August of 2013, you worked for Brannon Medical which had been purchased by Redwood Toxicology?

A   No, sir. They had been purchased by Alere Toxicology.

Q   Alere. Explain then who Redwood is.

A   Redwood is another distributor that Alere also purchased.

Q   All right. So Alere had purchased Redwood and Brannon?

A   At different times, yes.

Q   And back in August of 2013 -- well, let's go back to July of 2013. Who did you work for?

A   Well, I was employed by Brannon Medical Corporation, and I would have to go back and look at -- Alere owned the company. They bought the company a year before, so I was still doing business for Brannon Medical. And at some time during that time period, Alere had me also working with Redwood to assign

1    all of Brannon Medical's state contracts over to Redwood

2    Toxicology.

3    Q    And did you get that contract signed over to Redwood

4    Toxicology that was with M.D.O.C. in 2013?

5    A    No.  That went out to bid.

6    Q    And when it went out for bid, did you make a bid on behalf

7    of Redwood Toxicology?

8    A    No, I did not.

9    Q    Were you still employed with Redwood Toxicology at the

10   time?

11   A    I was employed by Alere working for Brannon and Redwood.

12   Q    And your instructions were to take all the contracts and

13   move them to whom?

14   A    My instructions were to try and get all of the existing

15   contracts moved over that they designated over to Redwood.

16   Q    Did you give your best effort to do that?

17   A    Yes, I did.

18   Q    And still bid on behalf of DTC?

19   A    Yes, because Brannon wasn't -- they didn't want Brannon

20   bidding on the contract.

21   Q    Who is they?

22   A    Alere Toxicology.

23   Q    But they wanted you to move the contracts from Brannon to

24   Redwood?

25   A    They wanted to move the existing contracts, like Illinois,

1  Virginia, Louisiana, over to that because they were existing

2  contracts.

3  Q   I see.  So there was no existing contract because it was

4  going out to bid so you felt that it was a free for all.  Is

5  that right?

6  A   No, I was just doing what the company told me to do.

7  Q   You made a bid on behalf of DTC.  Right?

8  A   I did.

9  Q   Okay.  So that wasn't what the company told you to do?

10 A   The company, Brannon Medical, said that they weren't going

11 to bid and to put it out to the distributors.  And DTC was an

12 authorized distributor of Brannon Medical products.

13 Q   So did Brannon tell to you make a deal on behalf of DTC

14 with M.D.O.C.?

15 A   They told me to bid on the contract.

16 Q   Did they tell other people to bid on the contract as well,

17 all these other companies?

18 A   They have hundreds of distributors, and anybody that

19 subscribes to Bid-Search, BidSync, like U.S. Diagnostics could

20 have bid on that contract.

21 Q   Sure.  Anybody could have bid on the contract?

22 A   Right.

23 Q   But my question to you was did Brannon want you to convey

24 or get those contracts assigned to Redwood?

25 A   The contracts that they wanted me to get changed over, when

1    you have a legal contract like the State of Virginia, that was

2    the last one that I signed over, that I helped the state change

3    names.  They wanted me to get the Brannon name removed and the

4    Redwood Toxicology name legally with that state contract

5    assigned so that all of the product would go through Redwood

6    Toxicology.

7    Q    When did you no longer become employed with Redwood, or

8    Brannon, I should say?  You tell me.

9    A    Somewhere -- well, I would think somewhere in late '13 or

10   early '14.  I think it's late '13.  I don't remember the exact

11   date.

12   Q    Do you believe it was late '13?

13   A    I'm not really sure of the exact date, just because it's

14   been a long time ago and I deal with a lot of different

15   companies and stuff like that, and I don't remember the exact

16   date.

17   Q    You've heard this recording about how Redwood was not happy

18   with bidding a nickel over or higher than what you had bid on

19   these contracts for DTC.  Do you recall hearing that just a few

20   minutes ago?

21   A    I do.

22   Q    Why weren't they happy about bidding higher than you?

23   A    They want that margin going through Redwood, and Brannon

24   wanted that margin to stay going through Brannon.  And DTC was

25   an authorized distributor of Brannon.

1  Q   So why did you convince Redwood to bid higher than you?

2  A   Because Brannon wanted that product line still going

3  through them as much as possible.  Brannon is responsible for a

4  line of 13, $14 million that they do annually, and Redwood is

5  responsible for their own line of business as far as what they

6  provide to Alere annually.

7  Q   Redwood knew they wouldn't get the bid if they were higher

8  than you, right, for the same cup?

9  A   I was doing what Brannon wanted me to do which was bid

10 through a Brannon authorized distributor and keep the business

11 going through Brannon, that line of margin.

12 Q   Owned by Alere?

13 A   Owned by Alere.

14 Q   Redwood owned by Alere?

15 A   Uh-huh.

16 Q   The bottom line is if we can sell it and make the money as

17 opposed to you, we make more money.  Right?

18 A   I don't understand what you're saying.

19 Q   You don't?  All right.  Let's talk about Alere selling a

20 product for a nickel higher per cup than you are able to.

21 A   That's Redwood.

22 Q   The same cup?

23 A   Yes.

24 Q   Would they not make more money?

25 A   Yes.  Redwood would.

1    Q    Redwood would, which is owned by Alere?

2    A    Uh-huh.

3    Q    And you don't see an issue with the fact that you undercut

4    Redwood by a nickel, a company that you enticed to bid higher

5    than you?

6    A    No.

7    Q    So then let's go to this e-mail.  You asked me if you --

8    A    Excuse me.  Can I say something?

9    Q    Sure.

10   A    I worked for Brannon for 13 years.  Rafael Juan (phonetic)

11   was the owner.  If they wanted that line of margin to continue

12   to go through Brannon, that's who my loyalty was to.

13   Q    Are you finished?

14   A    Sure.

15   Q    All right.  Let me show you this e-mail.  Do you see that

16   e-mail?  Do you remember that e-mail?

17   A    Yes, I do.

18   Q    All right.  You don't mention CLIA there.  Do you?

19   A    We weren't talking about the CLIA spec.  This is a

20   different spec.

21   Q    A different spec?  Is this a Mark Longoria Spec or a CLIA

22   spec?

23   A    This goes to how the cup operates.  If you have a cup that

24   the test strips are built in the side, if the test strips are

25   built in the side like this, at the bottom of the strips when

1  urine hits the bottom of the cup, they activate.  You have no
2  control over when it activates.  The Brannon cup, the lid is
3  built in the top.  So to beat this cup, which is what this spec
4  is talking about, if you go into a bathroom and void in the
5  cup, I could put a little bit of water in this, pour it out,
6  then void in the cup with regular urine, the temperature strip
7  would work and I would beat the cup every time.  You can't do
8  that with a Brannon cup.

9         THE COURT:  I'm sorry.  You get what?  You said the
10  strip would work and you would get what?

11         THE WITNESS:  If you have the strips in the side of
12  the cup, which is what this is talking about, it's very easy to
13  beat this cup because you could spit in it or put a little
14  water in it and it activates on that, because the strips are in
15  the bottom of the cup.  They are vertical like this.

16         The Brannon cup, the strips are built into the lid.
17  So you can give the donor the Brannon cup, they can come back
18  and you put the lid on it and the donor never has access to the
19  drug testing device itself.  They only have access to a cup
20  with a temperature strip on it.

21         This type of cup, the strips are built into the side
22  of the cup vertically, and then whatever fluid hits the bottom
23  of it, they activate on them.  So I can beat this type of a cup
24  very easily by activating it with water or something other than
25  urine and then pouring it out and voiding in there the dirty

urine.  This type of cup is very easy if the strips are built

into the side.  The Brannon cup where the strips are built into

the lid, the testing device, and then they have to but that on

afterwards, an administrator would tilt it.  Only at that point

would the cup activate.  That's a significant reason not to use

this type of cup where the strips are built into the side.

It's another specification that gives the state a better

product that's harder to beat.

THE COURT:  Mr. LaMarca?

MR. LAMARCA:  Thank you.

BY MR. LAMARCA:

Q    And in this instance, you're letting your consultant

July 24th of 2013 know that the bid needs to be changed.

Right?  Not the bid but the requirements need to be changed.

Right?

A    Yes.

Q    Now, you, on behalf of DTC, employed Investigative Research

on August 1 of 2013.  Right?  Let me show you your contract

that's part of G-1.  Do you see that in front of you?

A    I do.

Q    All right.  So this request of Mr. McCrory was prior to

your hiring him as a consultant.  Right?

A    Looks like that, yes.

Q    Yes?

A    Yes.

Q   You weren't going to hire him as a consultant until you had
all requirements that would give you a competitive edge on this
bid.  Right?

A   No, this just happens to be when we wrote the contract up
and everything and put the contract together.

Q   What do you mean by *this just happened to be?*  I don't
understand that.  Explain it.

A   Well, I had been talking to Cecil about this contract for a
long time, you know, I mean for -- when Cecil -- when I worked
with the consultant, I don't necessarily have that agreement
signed right then and there, but we are talking together.  He
lives in Mississippi, I live in Houston.  You know, I'm working
with him to get the bid specifications so that the state can
use our product which we feel is superior to a lot of different
products out there.

Q   Let me show you Government's Exhibit 2 again.  Now, this is
an e-mail directly from you or from Mr. Epps to you which
attaches or is an e-mail stream from you to Mr. Epps.  Is that
right?

A   I see the first page is an e-mail from Commissioner Epps to
me.

Q   Which contains an e-mail stream from you to Mr. Epps.
Right?

A   Yes, it does.

Q   All right.  Thank you.  Of course, at the bottom of that

1    e-mail -- because you're telling him what's wrong with the U.S.
2    Diagnostics bid.  Right?
3    A    I'm telling him what's -- can you lower that a little bit?
4    Q    Let me show you the first page.  I will put it wherever you
5    want.
6    A    I just couldn't see the top part of it.  It is cut off.
7    Q    There you go.
8    A    Bid specs.  All right.
9    Q    You see that?
10   A    Uh-huh.
11   Q    You're telling him what's wrong with the U.S. Diagnostics
12   bid.  Right?
13   A    I'm telling him what specs they don't meet, that's correct.
14   Q    And you actually had a copy of U.S. Diagnostics' bid.  Did
15   you not?
16   A    I don't know if I had a copy of U.S. Diagnostics' bid or
17   not.  I had a copy of their manufacturer's package insert.
18   Q    That's it?
19   A    I don't know.  I had a copy of their manufacturer's package
20   insert which clearly states the way that their product
21   performs, to what accuracy, to precision.  All of the technical
22   specs that their product meets or does not meet is in the
23   manufacturer's package insert.  So that's where these items
24   that they did not meet, that's what I was evaluating or
25   documenting to is from the manufacturer's package insert from

1  U.S. Diagnostics, the ProScreen cup.

2  Q    Did you tell Mr. McCrory that his efforts would give you a

3  competitive advantage than others?

4  A    I said on there that it would give our product a

5  competitive advantage over products that don't meet those

6  specs.   Inferior products, yes.

7  Q    When you asked that this needed to be changed back, do you

8  see that in your e-mail to Mr. McCrory after your explanation

9  about the strip being on the side of the cup that it needed to

10  be changed back to the top?

11  A    Yes.

12  Q    The cups you were going to submit to the state had the tops

13  with the strip in them.   Right?

14  A    Yes.

15  Q    During this period of time, you were negotiating or were

16  you not with Mr. McCrory about a contract to be a consultant

17  with DTC?

18  A    At that time I considered him my consultant, yes.

19  Q    When did you and Mr. McCrory decide on a dollar 40 per cup

20  being his commission?   Was it prior to this e-mail or after?

21  A    It was more than likely it was based on what we were going

22  to bid that cup for, because we have to establish what we are

23  going to bid it for first to see how much commission I can pay.

24  Q    So you don't know whether it was before or after this

25  e-mail?

1   A   I would have to look at the date of the -- my contract was

2   signed with him.

3   Q   All right.  Now, you recall that DTC produced the

4   agreement.  Do you remember that?  Under G-1?  The independent

5   contractor agreement?

6   A   I do.

7   Q   Between DTC and Investigative Research?

8   A   I do.

9   Q   Do you see that on the last page of that agreement there

10  are no signatures?

11  A   I do.

12  Q   So do you know when that agreement was signed?

13  A   I don't know because I couldn't find the signed copy of the

14  agreement.

15  Q   Do you know where this particular document, the independent

16  contract agreement, how it was produced?

17  A   When the -- when we were subpoenaed for records, we pulled

18  all the information that they wanted concerning this contract,

19  and we provided it at that time.

20  Q   Pulled it from where?

21  A   Pulled it from e-mail files, the folder that I have on

22  Mississippi Department of Corrections.  You know, anywhere in

23  my office that I have records.

24  Q   Did that come from a computer or did that come from a file

25  folder?

1    A    It probably came from a file -- I couldn't speak to that.

2    I am not sure if it was just a copy from the computer and was

3    reprinted or if it was from the actual M.D.O.C. vanilla [sic]

4    folder that I have in my file cabinet.

5    Q    And as part of G-1, pursuant to that agreement, you

6    actually paid him on September 16, 2013, and I will talk about

7    him being Investigative Research, $194,000.  Is that right?

8    A    That's correct.

9    Q    And at that time that you paid him that $194,000, you knew

10   at that time of his relationship with Commissioner Epps.  Did

11   you not?

12   A    That's correct.

13   Q    And you knew he was going to pay part of that to Mr. Epps.

14   Right?

15   A    I knew he was going to pay some part of that.  I just

16   didn't know how much.

17   Q    Do you recall a conversation you had with Mr. McCrory in

18   May of 2014 when the bridge purchase was about to be made and

19   Mr. McCrory asked you how much of it did you feel comfortable

20   that he should give to Mr. Epps, and he said about 12,000, and

21   you said just wait on that and let's see how much we are going

22   to bid for it?  Not bid but charge.

23   A    We weren't going to bid or charge anything.  Depending on

24   how much money they bought -- depending on how much product

25   that the state ordered to get them through from that physical

year until the next physical budget, typically they run out of

product at some point during the physical year.  I don't know

how much product they are going to order to get them through to

the next physical year when they have new funds.  So they do a

bridge order.  It would be based on the 5.95 per cup depending

on how much product they ordered.  If they ordered a hundred

cases or whatever, that would dictate how much commission would

be.

Q    All right.  And Mr. McCrory actually told you that the

commissioner had a daughter that was getting married and so he

needed to make this sale to you.  Did he not?

A    He said something to that effect.

Q    Mr. McCrory did to you?

A    Yes.

          MR. LAMARCA:  Your Honor, I would ask that this e-mail

that we have been referring to dated July 24th of 2013 be

admitted as Government's Exhibit 3.

          THE COURT:  Any objection?

          MR. FORTNER:  No, Your Honor.

          THE COURT:  G-3 is admitted.  G-4 vice G-3.

     (EXHIBIT G-4 MARKED)

BY MR. LAMARCA:

Q    Mr. Longoria, the conversation that we played earlier, the

telephone call, that was a conversation between you and whom?

A    Cecil McCrory.

1   Q   And that did occur back in May of 2014?

2   A   Yes, it did.

3   Q   All right.

4         MR. LAMARCA:  And I think that is G-3, Your Honor,

5 that we would like to admit.

6         THE COURT:  All right.  Is G-3 admitted, Hannah?

7         THE CLERK:  Yes, sir.

8         MR. LAMARCA:  Then that's all.

9         THE COURT:  Redirect?

10        MR. FORTNER:  No.  I don't think I have any redirect

11 of Mr. Longoria, Your Honor.  Thank you.

12        THE COURT:  All right.  You can step down.

13        THE WITNESS:  Thank you, sir.

14        MR. FORTNER:  Your Honor, at this point I believe that

15 my Defendant's Exhibit Number 1 was the composite that was put

16 together by the accountant, Ms. Makris.  It was only admitted

17 for identification purposes.  I ask that it now be admitted as

18 Defendant's Exhibit Number 1.

19        THE COURT:  Any objection?

20        MR. LAMARCA:  I don't object, Your Honor.

21        THE COURT:  Admitted.

22   (EXHIBIT D-1 MARKED)

23        MR. FORTNER:  Your Honor, I do have several character

24 witnesses I would like to call.  They won't be very long.  I

25 don't know if Mr. LaMarca wants to put on any rebuttal to what

1    we have already done or if you want to hear that first on the

2    objections.

3          THE COURT:  Mr. LaMarca says he has a witness.  Is

4    that correct, Mr. LaMarca?

5          MR. LAMARCA:  I did, Your Honor, but at this point

6    considering the testimony and the exhibits we were able to

7    introduce, we will not be calling a witness.

8          THE COURT:  Okay.  Since he is not calling a witness,

9    how many character witnesses do you have?

10          MR. FORTNER:  Seven, Your Honor.  Two of them have to

11    catch a flight, and I would normally put them on a little

12    later, but I need to go ahead and call them first.  I don't

13    believe they will be very lengthy if the court would allow me

14    to proceed.  In fact, I don't think any of them will be

15    terribly lengthy, Your Honor.

16          THE COURT:  Call your witnesses.

17          MR. FORTNER:  Danny Longoria, Your Honor.

18          THE COURT:  Come forward.

19                    **DANNY LONGORIA,**

20    having first been duly sworn, testified as follows:

21          THE WITNESS:  I have a military background.  When I

22    take an oath, it's swear or affirm.

23          THE CLERK:  Do you solemnly affirm?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Okay.

1    MR. FORTNER:  Your Honor, just to make sure, I had

2 submitted a letter from Danny Longoria via e-mail to the court

3 and to Mr. LaMarca earlier and to the probation officer.  Do I

4 need to mark that as an exhibit, or will the court's copy be

5 marked as an exhibit?

6    THE COURT:  I will make mine a part of the record when

7 I discuss it later.

8    MR. FORTNER:  Thank you, Your Honor.

9                    **DIRECT EXAMINATION**

10 BY MR. FORTNER:

11 Q    Would you tell us your name, please.

12 A    Adam Danny Longoria, Jr.

13 Q    And how old are you, sir?

14 A    I'm 55 years old.

15 Q    And where do you live?

16 A    Hampton, Virginia.

17 Q    Do you know Mark Longoria?

18 A    Yes, sir.

19 Q    How do you know him?  How are you related to him?

20 A    Mark Longoria is my brother.

21 Q    Did y'all grow up together?

22 A    Yes, sir.

23 Q    Raised by the same parents?

24 A    Yes, sir.

25 Q    In the same household and so forth?

```
1    A    Yes, sir.

2    Q    And earlier at my request did you write a letter that you

3    forwarded to me on behalf of your brother, Mark Longoria?

4    A    Yes, sir.

5    Q    Danny, are you currently serving in the United States

6    military?

7    A    I am not, but I am employed by the D.O.D.

8    Q    And how long did you --

9              THE COURT:  Say that again now.  You are not --

10             THE WITNESS:  I am not active duty military, but I am

11   employed as a government civilian by the U.S. Navy.

12             THE COURT:  Okay.  Go ahead.

13   BY MR. FORTNER:

14   Q    By the Department of Defense?

15   A    Yes, sir.

16   Q    How long were you active military?

17   A    Yes, sir, I was active military just shy of 22 years.  21

18   years and 300 something days.

19   Q    And what branch of military service were you in?

20   A    United States Air Force.

21   Q    And how long have you been -- you were honorably

22   discharged, I presume?

23   A    Yes.  I retired from active duty in 2002, and it was an

24   honorable discharge.

25   Q    And how long have you been working for the Department of
```

1  Defense?

2  A    I retired in 2002, and after I retired, I was -- I started

3  working initially as a contractor for the United States Navy,

4  and then I was subsequently hired as a general schedule

5  government civilian for the United States Navy.  And then from

6  there, I bounced back and forth a couple of times.  I worked as

7  a contractor, but the majority of time since I retired I worked

8  as a government civilian.

9  Q    And where do you live?

10  A    I live in Hampton, Virginia.

11  Q    Are you older or younger than your brother, Mark?

12  A    I'm about a year and a half older than Mark.

13  Q    Are you the only two siblings in the family?

14  A    Yes, sir.

15  Q    Have you stayed in touch with your brother, Mark, over the

16  years?

17  A    Yes, sir.

18  Q    Are the two of you close?

19  A    I believe so, yes, sir.

20  Q    Do you know his children?

21  A    Sir?

22  Q    Do you know his children?

23  A    Yes, sir, absolutely.

24  Q    Do you know his wife?

25  A    Yes, sir.

1   Q    Has he been married more than one time?

2   A    No, sir.

3   Q    And do you know how long he has been married to his wife?

4   Best guess.

5   A    Let's see.  Forgive me.  I believe they were married in

6   '88.

7            THE DEFENDANT:  29 years today.

8            THE COURT:  You can't speak to him.  He is a witness.

9   BY MR. FORTNER:

10  Q    If I said 29 years?

11  A    That sounds right.

12  Q    Danny, when you first learned about your brother being

13  charged and pleading guilty in this incident, how did that

14  affect you?  What did you think?

15  A    You know, it was unbelievable to me.  I was stunned.  It

16  was unbelievable to me.  And, of course, I was very concerned.

17  Q    Were you shocked that he might get himself involved in some

18  illegal activity such as this?

19  A    Absolutely.

20  Q    Is there anything about his upbringing or his -- how he has

21  treated his family or how he has run his business that you are

22  aware of that would ever indicate to you any dishonesty on his

23  part?

24  A    Absolutely not.

25  Q    Are you surprised to have to be in this courtroom under

1  these circumstances?

2  A    Absolutely.  Yes, sir.

3  Q    Have you had discussions with your brother about this

4  situation since this happened?

5  A    Yes, I have.

6  Q    Do you have concerns that he might in the future engage in

7  any other illegal activity?

8  A    Absolutely not.

9  Q    Any doubts at all about that in your mind?

10  A    Absolutely not.  If I may?

11  Q    Talk to the judge.

12  A    May I make a comment like --

13  Q    Yes, you may make a comment?

14  A    Yes, sir.  Sir, you know, Mark is my only brother.  I love

15  him, and I feel like I know him well.  I feel like I know him,

16  his family.  And my mother and father, they live in Newport

17  News, Virginia.  It is adjacent to Hampton, Virginia.  It's

18  very close.  I think I can speak for them.

19       Your know, we -- and forgive me.  I'm kind of searching for

20  a way -- this seems to be so I guess out of character perhaps

21  or just not -- it doesn't jive with anything I know about my

22  brother, his family, his history, his business, anything like

23  that.  And, of course, my parents, you know, me, my family, we

24  are very concerned.  And I can't imagine -- I can't imagine

25  anything like this even being a possibility.  So as far as it

1  recurring, absolutely not.

2  Q   Danny, let me ask you this.  Knowing your brother the way

3  you know him, is there any doubt in your mind that he would

4  comply with whatever restrictions or orders the court might

5  place upon him?  Would he follow the court's orders?

6  A   Yes.  Absolutely.  Yes, sir.

7  Q   I mean has he been that type of person?  Is he that type of

8  person?

9  A   Absolutely.  Sir, as I know my brother, he is -- he is --

10  if I may, may I just describe him?

11  Q   Yes.

12  A   Sir, I was in the Air Force for 22 years essentially, and I

13  have worked for D.O.D. and the Department of Homeland Security

14  also.  I worked for the U.S. Coast Guard.  I've worked in a

15  culture -- I have come up in a culture of professionalism and

16  honor and honesty, service.  And I have -- sir, I'm not trying

17  to be boastful, but in my career, I have worked -- a lot of my

18  work was in what's called special duty assignments, and they

19  are just more selective.  And so I have worked in some various

20  jobs and jobs that were very important in the military, and I

21  have worked with a lot of quality people, and I have worked

22  with the whole gamut.  I have worked with general officers all

23  the way to recruits.  I have been all over the United States.

24      And, sir, I don't know anybody that's more honorable and

25  honest and good than my brother.  And that's sincere.  I mean I

wouldn't say it if I didn't believe that, if that wasn't my

experience.  Honestly the only person that I appreciate as

having a similar honor and character is my dad.  And that's

just the way it is, sir, respectfully.

Q    Thank you, Danny.

MR. FORTNER:  We will tender the witness, Your Honor.

THE COURT:  Cross-examination.

MR. LAMARCA:  No questions.

THE COURT:  One second.  I do have a few questions.
You retired as rank or rate?  What did you retire as?

THE WITNESS:  In the Air Force, I retired as an E7 in
the Air Force.  That's called a master sergeant.

THE COURT:  I know.  You're an E7?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  And what was your MOS?

THE WITNESS:  MOS in the Air Force, they call it Air
Force Specialty.  I finished up as a 3c0.  Over the years the
MOS or the AFSC changed, but basically I was computer IT.

THE COURT:  Okay.  In communications.  You were in
communications, intelligence -- not intelligence, but let's
see.  What did you do in communications?

THE WITNESS:  In the Air Force there is a lot of --
obviously there is a lot of different jobs, and a person tends
to become kind of specialized based on assignments and the work
they have done, etcetera, and that influences assignments as we

go.  I did work -- my career field was computer communications
and I kind of put it under the IT umbrella, but as far as
communications, the only significant job that I had
specifically in regards to communications, I was assigned at
Shemya Air Force Station in Alaska.  It is out in the Aleutian
Islands, and I was in charge.  I was the NCOIC of the base com
center.

THE COURT:  Okay.  And what was your highest
clearance?

THE WITNESS:  Top secret, sir.

THE COURT:  Did you actually have a top secret?

THE WITNESS:  Oh, I had a top secret almost my entire
career.

THE COURT:  One second on that.  You would not have
come in at top secret.

THE WITNESS:  Yes, sir.

THE COURT:  So at what point did you achieve top
secret?

THE WITNESS:  Let's see.  I came in '80 -- I would say
perhaps '86.  And the reason that I say that is because the
requirement for the -- okay.  When I first came in, the
clearance that I achieved and that I was investigated for and
that I was granted was based on the position that I was in.

THE COURT:  What was that position?

THE WITNESS:  My first assignment was at Langley Air

1  Force Base.  I supported software development for Langley Air

2  Force Base.  And so the requirement --

3       THE COURT:  Now everyone doesn't come in at a top

4  secret, so they had to put you in for top secret for a specific

5  reason, even put you in for secret for a specific reason

6  because you would not have had secret when you first came in.

7  So you had to work up to secret and then go to top secret.  So

8  I'm just asking you at what point did you come in at top secret

9  and for what reason.

10       THE WITNESS:  Yes, sir.

11       THE COURT:  I know the procedure for top secret.  I

12  had it when I was a Navy JAG.

13       THE WITNESS:  Yes, sir.

14       THE COURT:  So everybody even in Navy JAG doesn't have

15  top secret, but I was allowed it.  So tell me what procedure

16  you went through to get top secret.

17       THE WITNESS:  Yes, sir.  My initial granting of a top

18  secret clearance was due to my career field requiring a top

19  secret because of the range of assignments that were subject

20  to.  So it wasn't necessarily based on the position or the job

21  that I was in at that particular time but the career field was

22  changed so that it required a TS.  Subsequent to that, I did

23  work in positions that required a TS.

24       THE COURT:  You retired as E7?

25       THE WITNESS:  Yes, sir.

1          THE COURT:  And so then were you eligible for E8?

2          THE WITNESS:  You know, sir, in the Air Force we test

3     and then there is different -- different things contribute to a

4     promotion.

5          THE COURT:  Let me ask you my next question then.  How

6     long were you an E7?

7          THE WITNESS:  I was a -- I made E7 at about the

8     15-year point.

9          THE COURT:  And you retired at the 21st year?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  So then you should have been close to the

12    selection area for E8 about the time before you got out.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  So then what happened to the E8?

15         THE WITNESS:  Sir, it's -- yes, sir, I will be

16    perfectly glad to explain.

17         THE COURT:  The field is restricted for E8, and the

18    number of people who are eligible for E8 doesn't mean that just

19    because you are E7 and put in a certain amount of time, you

20    have got to go through a selection field and they tell you how

21    many are going to be selected of that number of E7s.  So it is

22    not automatic.  And you have to be -- well, I will just give

23    the process.  An E7 who has the requisite number of years as an

24    E7 who also has a jacket which merits being included in a

25    prospect for promotion then will have the name submitted.  That

goes to a committee, and that committee also determines where the cutoff point is. And only so many people will be promoted, notwithstanding that everybody who is being reviewed by that committee is an E7 who has the requisite number of years to go to E8. But that committee then determines whether it is going to be the top this or the top that. It might be the top 20, 30, 40 percent and then they make that determination as to that. They rely solely on the jacket. They do not interview anybody. They just go on the jacket.

And so then these officers which might even include an E8, E9, will make that determination, and then the people are notified. Now, there is another view on that, not a view but another aspect of that is that one can determine from the handwriting on the wall that one will not get to be an E8 because a person -- if the individual has gone up for E8 on more than one occasion and the person has not gotten it, then that individual knows that he will probably never go to E8. And that occurs. Now they call that being passed over. That's what the term is. And so as a JAG, when I was in, of course I participated in these various approaches because I not only was asked something about the enlistment promotion scheme but I also sat in on some of the officer promotion schemes as a recorder. Since I was an O3 getting ready to go to O4, then I would not have been allowed to actually vote on officers, but I was the recorder. A recorder is like a glorified secretary

there who puts all the information before the committee, and I
have to make sure that everything is in the jacket.  And so I
did all of that.  I also served on other promotion committees
where we were picking people to go to law school who would then
owe the Navy one year -- two years for every one year they
spent in law school.  And we had over a thousand people but
could only select something like I think 25.

        But nevertheless, I have been on more than one
selection committee.  And with regard to the enlisted in my
command, I worked with them to assist them in getting their
jackets together.  The jackets were held in D.C.  You have a
temporary jacket and you also have a permanent jacket.  The
permanent jacket is in D.C.  The temporary jacket, the
serviceman is supposed to carry that around with them.  They
had to make sure the two actually reflect each other.  Some
people have been denied promotion because they didn't have the
requisite inclusions in their service jacket that's permanent
that they had in their temporary jacket, and they had never
checked it, and, therefore, they didn't know that their
permanent jacket that was used by the selection committee
didn't have all the information that they had in their
temporary jacket.

        THE WITNESS:  Absolutely.  And, if I may, sir, one
common instance of that are decorations.

        THE COURT:  That's right.  You have to make sure

that's all that's in there.  So all those things have to be in there.  That was part of my job when I served on these boards as a recorder to make sure that everything was in the jackets and to go through their entire career, also to make sure there were no gaps in all of that.  So I'm readily familiar with all of that because they called me on more than one occasion to come to D.C. to serve on those various selection committees, not that I had a vote all the time, because some I had more influence than on others.  But I was called there and asked to put together the jackets, for instance, with the selection committee to go to law school to be paid for by the military.  On that one I didn't have a vote, but since I was the only one on that committee while I was serving as a recorder who knew something about law schools, then actually I had a huge input into what the others needed to know about law schools and etcetera.

        So now let me go back to you.  You were an E7 you said for -- you were E7 for 15 years.

        THE WITNESS:  Yes, sir.

        THE COURT:  And during that time period you said you acquired a top secret clearance.

        THE WITNESS:  Absolutely.  Yes, sir.

        THE COURT:  And when you went to work for D.O.D., did you keep your top secret clearance?

        THE WITNESS:  I did not.

1          THE COURT:  You had to give it up when you left the
2     military?
3          THE WITNESS:  Yes, sir.  Essentially, yes, sir.
4          THE COURT:  Okay.
5          THE WITNESS:  Now, if I may, sir, the clearance had
6     been granted and it was granted for X amount of time, but it
7     was not active because I wasn't --
8          THE COURT:  Doing the same job.
9          THE WITNESS:  Yes, sir.
10         THE COURT:  Right.  I understand.  I mean the same
11    way.  I mean I had top secret clearance for some special
12    matters I had to do for the Navy, but when I left the Navy, my
13    clearance reverted to secret.
14         THE WITNESS:  Yes, sir.  Exactly, sir.
15         THE COURT:  Same thing?
16         THE WITNESS:  Yes, sir.
17         THE COURT:  Now, let me turn to your brother.  And I'm
18    glad you came and want to share with us your devotion and your
19    confidence in your brother.  But you said you had discussions
20    with him about this matter.
21         THE WITNESS:  Yes, sir.
22         THE COURT:  So why did he tell you he did this?
23         THE WITNESS:  Sir, he said that he made a mistake.  He
24    said he made a bad decision.  He said that he -- as I
25    understand it, there is -- there are business processes

1    associated with this profession and the industry.  And my

2    understanding was that he did what he understood needed to be

3    done based on the industry and based on the practices and what

4    have you.  My brother told me that he made a mistake and he

5    made a bad decision.

6              THE COURT:  But did he tell you he only did it one

7    time?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Just once?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And if that's not -- well, let's see.  Mr.

12   LaMarca, do you agree he only made one mistake?

13             MR. LAMARCA:  One initial mistake that was

14   perpetuated.

15             THE COURT:  Explain that.

16             MR. LAMARCA:  The one time in May -- I'm sorry -- July

17   of 2013 and then again with the bridge loan -- the bridge sale

18   order of more test cups, that occurred again in May of 2014.

19   So it was perpetuated again for additional money.

20             THE COURT:  And over how many months did this scheme

21   last?

22             MR. LAMARCA:  Well, it was a year's contract, a

23   one-year contract.  So it began in August of 2013 and ended the

24   end of July of 2014.

25             THE COURT:  Okay.  Thank you.  I just wanted the

1    prosecution to tell you what their theory was about this

2    matter.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  So did you talk to your brother about all

5    of this?

6              THE WITNESS:  I just have a basic understanding, sir.

7    As a matter of fact, sitting in here, I have come to become

8    better aware of some of the particulars.  But I really just

9    kind of have a basic understanding of what the situation was.

10             THE COURT:  And do you have a basic understanding of

11   how much money he may have earned through his illegal venture?

12             THE WITNESS:  Sir, as I understand it, and I know that

13   part of the -- I guess a fair amount of the discussion regarded

14   whether the state paid more or less and how much they made and

15   etcetera.  And, sir, my understanding is that the state saved

16   money in regards to the contracts and how much the bid was and

17   the item and etcetera.  And my understanding was that I guess

18   in relation to my brother's business, it wasn't -- it wasn't

19   really a substantial part.  That's my understanding now.

20             THE COURT:  I understand.  But with regard to whether

21   he committed a crime, what about that?  What's your opinion as

22   to whether he committed a crime?

23             THE WITNESS:  Sir, he said he did it.  He said he did

24   wrong and he made a bad decision.

25             THE COURT:  Okay.  And you heard the tape a few

1  moments ago.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And what impact did that have on you?

4          THE WITNESS:  Sir, it sounds like he was doing what he

5  needed to do -- excuse me.  It sounded to me like he was doing

6  what he needed to do to complete his business deal, but, you

7  know, I guess in my opinion based on what I understand and

8  based on what I heard, it sounded to me like he was conducting

9  business the way business is conducted.

10         THE COURT:  Okay.  And my last question.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  You said that you are surprised that your

13  brother ended up in this predicament.

14         THE WITNESS:  Absolutely.

15         THE COURT:  And you said it was a terrible shock to

16  you.

17         THE WITNESS:  Absolutely.

18         THE COURT:  So with that as a backdrop, how can you be

19  assured of what he might do in the future?

20         THE WITNESS:  Sir, when I consider this situation and

21  I put it in the context of my brother's life and what I know

22  about my brother and his family along with -- sir, along with

23  what my brother and his family, too, along with what I know

24  about my brother, based on what he has told me about the

25  consequences of this bad decision he made, the consequences,

1   you know, he -- his business has suffered substantially.  And I

2   don't know all the particulars about how the industry works and

3   how the word gets around or whatever, but from what I

4   understand, his business has suffered.  From what I understand,

5   there has been like repercussions from business and investments

6   my brother has.  He has had problems with I guess like tax

7   deferred savings and accounts and etcetera.  He had to

8   withdraw -- he had to withdraw money in accounts that were tax

9   deferred as I understand it, so he is taking a huge hit there.

10          The possibility of having to go to jail.  You know,

11  the consequences that -- you know, what the potential effects--

12  what the potential effects are for his family.  Sir, my brother

13  is not stupid respectfully.  Respectfully.  My brother is not

14  stupid and he knows he has made a mistake.  He knows he screwed

15  up.  And there is no way.  You know, there is no way that my

16  brother would make this same mistake twice.  Given the

17  potential -- it's like risk/reward, cost/benefit.  Based on

18  what he might stand to gain in comparison to what he has lost

19  and what could happen, sir, there is no way.  There is no way.

20          THE COURT:  Any questions based on mine?  Start first

21  with the defense.

22          MR. FORTNER:  No, Your Honor.

23          THE COURT:  Prosecution?

24          MR. LAMARCA:  No, Your Honor.

25          THE COURT:  All right.  Thank you.  You can step down.

1    Thank you much.

2            THE WITNESS:  Can I make one more comment?

3            THE COURT:  Any objection?  I don't.  Make your

4    comment.

5            THE WITNESS:  Sir, I thought a lot about this.  If I

6    may use an example, sir?  I have a son.  I have a daughter,

7    too.  But I have a son and he has had some health problems, and

8    he has had to have a couple of surgeries.  One, he had to have

9    open heart surgery.  You know, we had to go through a process

10   of medical procedures, whatever.  And he ended up having that

11   surgery, and we met with the surgeons, and I know they are

12   professionals.  They are professionals and doctors do what they

13   do and they have dedication, they have calling, they have

14   whatever.  They are professionals, and I was confident in their

15   ability, but I still felt compelled to ask them, sir, this is

16   my son; please, you know, please take care of him, you know.

17           And, you know, I thought about this, sir.  Sir, I just

18   wanted to ask you -- sir, I respect you.  I respect laws,

19   court.  I respect everything.  And I understand you're a

20   professional.  But, sir, I want to appeal to you.  I want to

21   ask you please to the degree that you can, please try to

22   understand my brother.  And you won't only hear it from me.

23   Anybody that you talk to will tell you what I have told you,

24   and I just ask you please to the degree that you can, please --

25   I don't know what the right terminology is.  Please be

merciful.  Please be lenient, whatever, sir, because I love my

brother.  I know what kind of person he is.  I know what effect

this has had on him.  I believe that I know -- you know, my

brother would never make the same mistake again, and I just ask

given all things considered, I ask you please be to the degree

you can I pray that you will be merciful and be lenient to my

brother.

        THE COURT:  All right.  Thank you so much.

        THE WITNESS:  Thank you very much.

        THE COURT:  Uh-huh.  Mr. Fortner, call your next

witness.

        MR. FORTNER:  Your Honor, we would call David Welch.

        THE COURT:  Mr. Welch, come forward.

**DAVID WELCH,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. FORTNER:

Q    Could tell us your name, please?

A    Yes.  My name is David Welch.

Q    And, David, what do you do for a living?

A    I am a pastor of a church.

Q    And what is your church?

A    It's Bear Creek Baptist Church in the Houston area.

Q    And how long have you been a pastor?

A    I have been in church ministry 40 years.

1    Q    And how long have you been pastor at Bear Creek Baptist

2    Church in Houston?

3    A    16 years.

4    Q    Do you know Mark Longoria and his family?

5    A    Yes, I do.

6    Q    And how long have you known them?

7    A    They have been a part of Bear Creek longer than I have

8    been, so they have been active all 16 years that I have been

9    pastor there.

10    Q    During your ministry at Bear Creek?

11    A    Yes.

12    Q    And when you say they have been active, active in what

13    ways?

14    A    Yes. So I mean that they have attended regularly, really

15    consistently, that they have volunteered in a lot of ways. Our

16    church probably has -- we are a church of about 2500 on a

17    Sunday morning, and so we have 7 or 800 volunteers, and they

18    have been -- they have volunteered with children, you know, and

19    so that's -- that's how they have been involved and by giving

20    as well.

21    Q    And you know -- do you know his wife and his daughter?

22    A    Kimberly, yes, and the daughters, yes. I do. I know them

23    well.

24    Q    And do all of them attend Bear Creek?

25    A    Yes.

Q    At Bear Creek do you keep records of charitable giving of your members at Bear Creek?

A    Yes.  It is a legal requirement, yes.

Q    Let me hand you this paperwork and ask you if you can identify that.

A    Yes.  This is an individual giving statement for contributions to Bear Creek.

Q    And what does that reflect?  Does it reflect the giving patterns of Mr. Longoria and his family over how long a period of time?

A    Yes.  The IRS requires churches to keep these records, and for them, this goes back to 2002 it looks like.

Q    And is that about as long as you have been a pastor at Bear Creek?

A    Yes.  I was there maybe -- well, this is just where it cuts off with these records.  So, yes, that's right, I have been there since 2001.

Q    Okay.

         MR. FORTNER:  Your Honor, just for our purposes, I would like to ask that this be marked as an exhibit, a defense exhibit to this witness' testimony.

         THE COURT:  Any objection?

         MR. LAMARCA:  No objection, Your Honor.

         THE COURT:  All right.  It will be received.

         THE CLERK:  D-3 marked.

1      (EXHIBIT D-3 MARKED)

2  BY MR. FORTNER:

3  Q    Pastor, is it your understanding or belief that the

4  Longorias are a tithing family at your church?

5  A    It appears so based on that, yes.

6  Q    Okay.  And do you find them to be sincere active members of

7  your congregation?

8  A    By all means, yes.

9  Q    And let me ask you, the position that you find yourself in

10  and that you see Mr. Longoria in, is this position -- does this

11  surprise you?

12  A    Oh, yes.

13  Q    Based upon your knowledge of him and his family?

14  A    Yes.

15  Q    Are you surprised that he has found himself in this

16  situation?

17  A    Yes.

18  Q    You do understand that he has pled guilty to committing a

19  federal crime.  Correct?

20  A    Yes.

21  Q    Involving money.  Correct?

22  A    Correct.

23  Q    When confronted with this charge, are you surprised that he

24  pled guilty, admitted it, if he was -- assuming that he is, in

25  fact, wrong, that he did, in fact, commit this crime, are you

1   surprised that he stood forth and admitted it?

2   A    I am not surprised that he stood forth.

3   Q    Is that the type of person that he is?  Does he have that

4   character?

5   A    Yes.

6   Q    Reverend, do you believe from what you know of him and his

7   family, do you believe that Mr. Longoria will take seriously

8   any punishment the court gave him?

9   A    Oh, yes, I do.

10  Q    Do you believe or do you have confidence as his pastor that

11  he would not commit a crime of this nature or any nature in the

12  future?

13  A    Based on what I know about he and his family, that's

14  correct.  I do believe he would not.

15              MR. FORTNER:  We will tender the witness, Your Honor.

16              THE COURT:  Cross-examination.

17              MR. LAMARCA:  I have no questions, Your Honor.

18              THE COURT:  What denomination, please?

19              THE WITNESS:  Southern Baptist.

20              THE COURT:  All right.  And do you go to the

21  convention every year?

22              THE WITNESS:  No, I do not.

23              THE COURT:  Any particular reason?

24              THE WITNESS:  I just object to the politics.

25              THE COURT:  Okay.  So when is the last time you have

1  been?

2          THE WITNESS:  To a convention?

3          THE COURT:  To a Southern Baptist convention?

4          THE WITNESS:  Let's see.  When the Southern Baptist

5  convention was in Houston, that would have been three or four

6  years ago.  Maybe three or four years ago.  I can't remember.

7  I went then.

8          THE COURT:  All right.  And you are ordained?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  And when were you ordained?

11          THE WITNESS:  In 1987.

12          THE COURT:  And with regard to background education,

13  can you tell me what that is?

14          THE WITNESS:  I'm sorry?

15          THE COURT:  Your education level.

16          THE WITNESS:  Yes.  So I have a master's in theology

17  from Southwestern Seminary, and then I have additional doctoral

18  work but not completed from New Orleans Baptist Theological

19  Seminary.

20          THE COURT:  And how much time do you have left on

21  that?

22          THE WITNESS:  I have suspended it, but I did about a

23  third of the work.

24          THE COURT:  Okay.  Now, you talked about the giving,

25  the charitable giving of the defendant's family, but I didn't

1  hear you say how often he attends church.

2  THE WITNESS:  They are very consistent.  Now it is a

3  large church, so for me personally, I can only go by, you know,

4  what I see.  But I see them quite often in our church.

5  THE COURT:  Do you have assistant pastors there?

6  THE WITNESS:  Yes.  Oh, yes.

7  THE COURT:  How many?

8  THE WITNESS:  Let's see.  We have five pastors and

9  then other directors and coordinators.  It is an equivalent of

10  about 30 ministry staff members.

11  THE COURT:  All right.  And finally, did you talk to

12  the defendant about this matter?

13  THE WITNESS:  Yes.  I sat with he and his wife and

14  did -- they told me about it.

15  THE COURT:  And what did they tell you?

16  THE WITNESS:  They -- he told me that this had

17  happened and that he had made a big mistake and that he was

18  disappointed in himself and he was very sorry for what this was

19  going to mean to his family and others around him.

20  THE COURT:  Did he provide to you any outline of how

21  he would seek to atone for these acts?

22  THE WITNESS:  He did not.  We did not talk about that.

23  THE COURT:  Okay.  Anything else you want to tell me?

24  Well, do you know how well he is received and respected by his

25  fellow parishioners?

THE WITNESS:  Yes.  There is much to say about him.
So what he is known for is just what a generous man he is in
our community.  And so he gives not just to his church but also
to other really meaningful charities like St. Jude's and like
Habitat for Humanity and like Shriner's.  In fact, I know that
he has actually privately -- without others knowing it, he has
on two different occasions paid for a person's funeral.

And so I have sat with his daughter and son-in-law.  I
did their wedding, and so I did premarital counseling with them
and so I sat with them for six hours and I could just see such
great character coming out of his daughter.  And that's not
done by accident.  That comes as a result of really consistent,
excellent parenting.  And you don't sit through church for 16
years, at least not in our church you wouldn't sit through it
16 years, without being really serious about your faith and
serious about growing.  And from what I know about Mark, this
is a mistake, a terrible mistake he has made that is out of
character with the rest of his life.

THE COURT:  Okay.  And finally, sometimes when persons
have strayed into the criminal justice system and they enlist
the support of their pastor as well as the church, they ask the
entire church body to pray for them by confessing what they
have done.  Did he do that?

THE WITNESS:  No, not church-wide.  No.  He came to me
personally.

1          THE COURT:  So then with regard to his confession of

2     wrongdoing and his request for spiritual assistance, he didn't

3     carry it to the full congregation?

4          THE WITNESS:  That's correct.  That's correct.  And

5     that would not be a normal thing in our church.  That's not a

6     normal thing we would do that we would call for some sort of

7     public confession.

8          THE COURT:  You don't have testimonials?

9          THE WITNESS:  No.

10         THE COURT:  So you have never had parishioners who

11    would call upon the entire church for support?

12         THE WITNESS:  For prayer, yes, but not as a confession

13    of sin.  To stand publicly and confess sin, no, that's not a

14    normal -- that would not be a normal practice for us.

15         THE COURT:  And with regard to the parishioners at the

16    church, is it your impression they know about this or do not

17    know about this?

18         THE WITNESS:  It's my impression that very few would

19    know about it.

20         THE COURT:  Okay.  Any questions based on mine from

21    either side?

22         MR. LAMARCA:  No, Your Honor.

23         MR. FORTNER:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you so much.

25         THE WITNESS:  Thank you, sir.

1           THE COURT:  Mr. Fortner, I presume the rest of your

2      witnesses are going to be here tomorrow.  Am I correct?

3           MR. FORTNER:  May I have just a minute, Judge?

4           THE COURT:  Go right ahead.

5       (SHORT PAUSE)

6           MR. FORTNER:  Your Honor, my client's daughters are

7      both here.  His son-in-law is here.  They have work and college

8      classes and so forth tomorrow, and they have not made

9      arrangements to miss and were going to drive back tonight.  I

10     don't think they would be very long.  If we could put them on,

11     that would be helpful.  Would it be all right with the court,

12     or is that going to take too much time?

13          THE COURT:  It's not going to take too much time.  I

14     will take a 15-minute recess and then I will come back and take

15     them up.

16          MR. FORTNER:  Thank you, Judge.

17          THE COURT:  Okay.

18      (RECESS)

19          THE COURT:  Mr. Fortner, call your next witness.

20          MR. FORTNER:  Your Honor, if I may, Ms. Makris, while

21     she testified, we had marked this series of documents

22     Defendant's Exhibit Number 2 for identification, and she left

23     the witness stand with them in her hands inadvertently.  She

24     gave them to me.  I don't think Mr. LaMarca has any objection

25     if we now mark this as Defendants' Exhibit Number 2.

```
 1          THE COURT:  All right.  Please give it to my court
 2    reporter.
 3          MR. LAMARCA:  And I do have no objection, Your Honor.
 4          THE COURT:  All right.  Give it to her.
 5       (EXHIBIT D-2 MARKED)
 6          MR. FORTNER:  Your Honor, we would call Savanna Craig.
 7                        SAVANNA CRAIG,
 8    having first been duly sworn, testified as follows:
 9                       DIRECT EXAMINATION
10    BY MR. FORTNER:
11    Q    Would you tell us your name, please?
12    A    Savanna Craig.
13    Q    And, Savanna, how old are you?
14    A    I'm 22.
15    Q    Are you married?
16    A    I am.
17    Q    And what is your husband's name?
18    A    Cameron Craig.
19    Q    And how long have y'all been married?
20    A    Three months.
21    Q    And who is your father?
22    A    Mark Longoria.
23    Q    And your mother?
24    A    Kimberly Longoria.
25    Q    And when you say Mark Longoria, you are referring to the
```

1    defendant in this case.  Is that correct?

2    A    Yes.

3    Q    You have to speak up.  All right?

4    A    Okay.

5    Q    Do you -- are you employed or in school?

6    A    I'm in school full-time.

7    Q    And where do you go to school?

8    A    The University of Houston.

9    Q    And what are you studying?

10   A    Psychology with a minor in human development and family

11   studies.

12   Q    Now you understand that your father is here to be

13   sentenced.  Correct?

14   A    I do.

15   Q    And have you sat down with your family and your father and

16   discussed this matter, what he is here for?

17   A    Yes, we have.

18   Q    And has he explained that to you?

19   A    Yes.

20   Q    Did you -- I'm going to ask you some other questions, but

21   did you prepare a statement that you wanted to read to the

22   court about your father, Savanna?

23   A    I did, yes.

24        MR. FORTNER:  With the court's permission, I would

25   like to ask the witness to read what she has prepared, Your

Honor.

THE COURT: Go right ahead.

A    Okay.  I am a proud daughter of Mark Longoria.  This is the hardest task for me to try and explain who my dad is to me and what he has done for everyone that he loves throughout his lifetime because the list goes on and on.

My goal is to show you who he is and what kind of man he is and in my opinion what a disservice it would be to not only our family but the community as well if he were sentenced.  I don't know a lot about his business but I do know the type of business owner that he is and how he has always conducted his business in the most professional manner possible and he will go above and beyond to meet his customers' needs.  He always takes a phonecall whenever his phone rings.  He always is responding to e-mails.  He always is in his office until 11:00 p.m.

For as long as I can remember my dad has always instilled the right principles into us, but more than that, he has always instilled what family means and how family is the most important thing in life.

My dad is my favorite person in the entire world.  Most families nowadays are broken.  Some daughters don't have the opportunity to know who their dads are or to be loved by their dads.  But for my husband and I, my parents are our best friends.  We choose to hang out with them, just going to the

movies or grabbing dinner on Saturday nights.  We chose to live 15 minutes away from them back in Houston so that we can see them as often as possible.

The fact that we are here today almost feels as if it's not even real, and I'm afraid I haven't even come to terms with the possible outcome, because in my eyes my dad is not a criminal. He has a pure heart with only the best of intentions, and if you knew our family better than -- you don't know us, but if you could know us, you would know just how close we are and how much we lean on him.  We call him when something breaks at our house or if our car won't start.  We count on him more than anybody else.  If there is one person that I ever call when I need something, it's always my dad.

We have never been away from my dad for more than two weeks from what I can remember, and that's just from him traveling for work.  He has morals and he values my education.  At a point in my college career I wanted to quit, but he steered me back in the right direction because he wants the absolute best for me.  Over the next year, I will graduate college and have babies soon after that.  We will purchase our first house.  My sister will get married and start her life as well.  Your Honor, we are just starting the fun part of life, and we need our dad here to witness all of it with us.  I don't feel right living life if he can't be physically there to experience it all with me.  He is the person I want to make proud the most,

1   but I can't do that if he is in prison.

2      My dad is our rock.  My prayer is that you open your heart

3   to who he is as a person and to all of the good that he has

4   done in life, not just based off of one bad choice that led us

5   here today.  My hope is that you would reason with everything

6   that's been presented today and give him anything but time away

7   from his family.  If he doesn't get time sentenced, he can

8   continue working, tithing, giving to charities, serving others,

9   loving his friends and family and contributing to society in

10  all the other many ways that he does.

11     Today this is your job.  You face cases all the time I

12  would imagine, but today this is the worst day of our lives,

13  and I just beg that you wouldn't take him away from us.  He has

14  always been a fearless superman in my eyes, if you will, but I

15  have never seen him more ashamed or embarrassed than I have

16  now, and that kills me.  Thank you.

17         THE COURT:  Counsel, do you want to follow up with any

18  questions?

19         MR. FORTNER:  I don't, Your Honor.  I will tender the

20  witness.

21         THE COURT:  Cross-examination.

22         MR. LAMARCA:  I have no questions, Your Honor.

23         THE COURT:  You are a sophomore?

24         THE WITNESS:  I'm a junior.

25         THE COURT:  Junior.  Okay.  Rising junior?

1    THE WITNESS:  Uh-huh.  Yes, Your Honor.

2    THE COURT:  All right.  Anything else you want to say?

3    THE WITNESS:  That's it.

4    THE COURT:  All right.  Thank you so much.

5    THE WITNESS:  Thank you.

6    MR. FORTNER:  Thank you, Your Honor.  We would call

7    Cameron Craig, Your Honor.

8    THE COURT:  Okay.

9                      **CAMERON CRAIG,**

10   having first been duly sworn, testified as follows:

11                   **DIRECT EXAMINATION**

12   BY MR. FORTNER:

13   Q   Would you tell us your name, please?

14   A   Cameron Craig.

15   Q   And how old are you, Cameron?

16   A   I am 22.

17   Q   And how are you related to the Longoria family?

18   A   Savanna is my wife, and Mark is my father-in-law.

19   Q   And when did you -- when were you and Savanna married?

20   A   Three months ago.

21   Q   And how long have y'all known one another?

22   A   Five years, I believe.

23   Q   So this has been -- this is a long-term relationship?

24   A   Yes, sir.

25   Q   You're in this for the long haul?

```
1    A    Yes, sir.

2    Q    Do you know the Longoria family?  Have you spent time with

3    them?

4    A    Absolutely.

5    Q    Do you feel like you know your father-in-law fairly well?

6    A    Absolutely.

7    Q    What do you do for a living or school or what do you do,

8    Cameron?

9    A    I do sales for a land surveying company and in and out of

10   school.  I go to a community college in Houston.

11   Q    And are you currently enrolled in community college?

12   A    Yes, sir.

13   Q    And are you also working full-time?

14   A    Yes, sir.

15   Q    And where do you and your wife, Savanna, live?

16   A    Houston.  About 15 minutes away from Mark and Kimberly.

17   Q    Were you raised in Houston?  Is that where you have lived

18   all your life?

19   A    Yes, sir.

20   Q    Did you also prepare something to read to the court?

21   A    Yes, sir.

22   Q    In the event you were allowed to testify?

23   A    Yes, sir.

24   Q    Would you like to do that now?

25   A    Yes, sir.  It would be impossible to impress upon you the
```

exact depth of character that Mark has that he displays on a day-in and day-out basis and the impact that he has had on my life.  My dad actually died five years ago when I was in high school, days, weeks before I met Savanna.  So at that time I did not have another person in my life who I could reach out to and look up to, and I don't believe that it was by coincidence that I met Savanna.

I was adopted into a family like I was already one of their own.  From the first day that I met him, Mark, until now, not once has this man shown anything other than pure selflessness, integrity and leadership.  He quickly became a father figure to me and continues to help me become the man that I know I can be for my future family and for his daughter.  He has always instilled the right core values in me that my father did before he passed.  He would always talk about keeping your priorities straight:  God, country, family, business.

And like what's already been stated, Mark has always given to the church 10 percent first always.  He served his country honorably as a young man and he has always put his family first.  No matter what the situation is, Mark has always stuck up for his girls and for anyone close to him.  He is a pillar of strength that so many people lean on emotionally and financially and so many other ways.  He is a light in many people's lives.

Savanna and I got married in November.  It was a long

process to say the least. The only thing that he thought about was giving his youngest the wedding that she had always wanted and that she deserved.

My dad died suddenly when I was 18. And like I have already mentioned, at that point I had no sense of direction. I was failing school. I was working a minimum wage job. I had no focus on where I was going, what I wanted to do with my life. And Mark came in and stepped in when I needed him most.

Your Honor, I know it's your job. I know you must have all sorts of different people come in here, different circumstances, different cases. However, I doubt that you have come across a family like this or a man like him. So please show mercy and leniency when making a decision today.

MR. FORTNER: That's all I have, Your Honor.

THE COURT: Cross-examination.

MR. LAMARCA: None, Your Honor.

THE COURT: What's your major?

THE WITNESS: Cameron Craig.

THE COURT: Major.

THE WITNESS: Business.

THE COURT: What are you going to do with it?

THE WITNESS: Right now I do sales for a land surveying company, so I would actually like to stay with the current company I have, but I would like to have the degree just for backup.

1    THE COURT:  Any intentions, you or your wife, to get

2    an advanced degree?

3    THE WITNESS:  I do want to.  I want to graduate with

4    my associates from the community college that I am at right now

5    and go to U of H and finish up a bachelor's with just general

6    business management.

7    THE COURT:  And your wife raised her hand back there

8    when I said advanced degree.  Does she intend to get one?

9    THE WITNESS:  She looks to get her master's in

10    psychology.

11    THE COURT:  In psychology?

12    THE WITNESS:  Yes, sir.

13    THE COURT:  Great field.  Have you done any work in

14    your area so far?

15    THE WITNESS:  Any work for my current company?

16    THE COURT:  In a business vein.

17    THE WITNESS:  Just with my current company doing

18    sales.  I reach out to civil engineers, architects, land

19    developers and talk to them about our service.

20    THE COURT:  Now I'm going to ask you something about

21    this matter.  How did you find out about all of this?

22    THE WITNESS:  Mark and Kimberly sat me and Savanna

23    down at our house and told us the general situation, and that

24    was it.

25    THE COURT:  Were other people there at the time they

1  told you?

2         THE WITNESS:  Alexis Longoria was there.

3         THE COURT:  And when you were told about this matter,

4  how was it presented to you?

5         THE WITNESS:  They sat down with us.  It was very,

6  very serious, very, very emotional, and I really didn't know

7  how to take it at the time.  We sat down and we just realized

8  that was something that our family was facing at that time and

9  it was a time for us to pull together and be strong moving

10 forward and to deal with it.

11        THE COURT:  Give me the backdrop as to how it came

12 about.  Did he just say, Look, I have something I want to talk

13 to you, or was it a formal notification?  What was it?

14        THE WITNESS:  He basically just said, Hey, let's have

15 lunch.  Him and Kimberly came over, we ate and then he sat down

16 with us and told us.

17        THE COURT:  So just four of you there?

18        THE WITNESS:  Alexis came over, my sister-in-law.

19        THE COURT:  And do you know whether he repeated that

20 with other family members?

21        THE WITNESS:  Yes.  He had told them previously, I

22 believe, a few days before or a few weeks before.

23        THE COURT:  Did you ask any questions?

24        THE WITNESS:  No.  No.  I didn't ask any questions.  I

25 really didn't know a lot about the field or anything about this

1  industry, so I didn't have any questions.

2  THE COURT:  Did anyone ask any questions?

3  THE WITNESS:  Not that I can remember, no, sir.

4  THE COURT:  So then what did he say?

5  THE WITNESS:  He just gave us a general outline of

6  what was going on.

7  THE COURT:  He said he had been indicted?

8  THE WITNESS:  Yes, sir.  He said he had made a bad

9  decision.

10  THE COURT:  He said he was indicted?

11  THE WITNESS:  Yes, sir, I believe so.

12  THE COURT:  Did you know at the time what an

13  indictment was?

14  THE WITNESS:  Did I know what indictment meant?  Yes,

15  sir.

16  THE COURT:  And did he tell you what he was indicted

17  for?

18  THE WITNESS:  Yes, sir.

19  THE COURT:  And what did he say?

20  THE WITNESS:  He said that he -- I couldn't tell you

21  exact terminology, but he said he had made a bad decision and

22  that he had done business with the wrong people and things like

23  that.

24  THE COURT:  Did he say anything about signing

25  contracts or working with the Mississippi Department of

1  Corrections?

2      THE WITNESS:  No, sir, not that I can remember, not

3  specifically.

4      THE COURT:  So did you know where the crime allegedly

5  occurred?  In this state?

6      THE WITNESS:  Mississippi, yes, sir.

7      THE COURT:  Did you know whether it concerned the

8  Mississippi Department of Corrections or some other entity?

9      THE WITNESS:  I did not know.

10     THE COURT:  Did you ask?

11     THE WITNESS:  No, sir.

12     THE COURT:  So as far as the outline of what had

13  happened, you really didn't ask anything at all and you really

14  don't know much about this.  Is that so?

15     THE WITNESS:  Right.

16     THE COURT:  What about right now?  Do you know much

17  about it?

18     THE WITNESS:  I couldn't repeat back to you what's

19  going on in the court today.

20     THE COURT:  You said you couldn't?

21     THE WITNESS:  Right.

22     THE COURT:  And so you and your wife when you all seek

23  to talk about this matter, then what do you talk about?

24     THE WITNESS:  Just that he has made a bad decision,

25  that I know that he is very repentant of it.  And I'm just here

1 to talk about his character, to talk about the integrity that

2 he has as a man, how he conducts his business and things like

3 that.  As far as the specifics and the transactions that were

4 made and all the different people and entities that are a part

5 of it I don't know much about.

6    THE COURT:  But you see when people are character

7 witnesses, it's fair game to ask them what do they know about

8 the crime itself.

9    THE WITNESS:  Sure.

10    THE COURT:  Because that might be a factor the court

11 weighs as to what the character witness actually knows about

12 the person.

13    THE WITNESS:  Yes, sir.

14    THE COURT:  And so while I'm asking these questions,

15 I'm just asking what do you know about this matter, because

16 then, you see, I could follow it up by asking you that if you

17 know all the details about this matter, especially from the

18 prosecution's standpoint, would you still say the same thing

19 about his character.  You see why I'm asking?

20    THE WITNESS:  Yes, absolutely.

21    THE COURT:  So I'm just asking, you know, about that.

22 And the reason I'm asking you some of these questions that I

23 did not ask your wife is because I enjoyed her letter but I saw

24 that she was also very emotional and I didn't want to add to

25 her emotional state.  Had you been under the same emotional

1  state, I wouldn't have asked you either, but you appeared to be

2  a bit stronger at this point than she on this matter, because

3  when she finished testifying, I could tell that she was quite

4  distraught as one would be under these circumstances.  So

5  that's why I didn't ask her more questions about it.  But I

6  just asked you that, so I see now what you know and don't know.

7  I will just give you an opportunity to say anything

8  else you want to say on behalf of your father-in-law.  Anything

9  else you would like to say on behalf of your father-in-law?  So

10  think deeply and just tell me is there anything else you and

11  your wife may have discussed.

12  THE WITNESS:  I believe that throughout the five years

13  that I have known Mark, he has always acted with integrity,

14  definitely outside of his business.  Like I said, I don't know

15  much about his business, but everything outside of his business

16  he has always acted with integrity and honesty and he has

17  always instilled those principles in me as a man and as the

18  leader in my future family.  With everything that's going on

19  right now, I can only assume that it was just a mistake and

20  that, like Savanna was saying, he would never ever jeopardize

21  that ever again in his business.  Whatever extent he has to go

22  to to make sure that this never happens again, he would go to

23  it, because spending time with his family and the more

24  important things in life, those are more important than money

25  or business or anything.

1          THE COURT:  All right.  Thank you.  You can step down.

2     Savanna, you wanted to say something else, didn't you?  If you

3     do, come on back up.

4          (SHORT PAUSE)

5          THE COURT:  Go ahead and take the chair.  You don't

6     have to be sworn again.  You are still under oath, Savanna.

7     All right?  Now, I'm calling you Savanna because your last name

8     is Craig.

9          THE WITNESS:  Yes, sir.

10         THE COURT:  So I can either say Mrs. Craig or I can

11    say Savanna, and you have been referred to several times here

12    as Savanna.  So I took the liberty of saying Savanna, but I

13    don't mean to disrespect you.

14         THE WITNESS:  No, that's fine.

15         THE COURT:  So, Mrs. Craig, do you have something else

16    you want to say?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  Go ahead.

19         THE WITNESS:  My husband doesn't remember, but I did

20    ask a few questions when they did come and tell us.  I do

21    remember better.  If you did want to ask me questions, I'm

22    comfortable answering them.  But I did ask some questions.

23         THE COURT:  Tell me what you remember.

24         THE WITNESS:  When they came over, we finished eating

25    and then he opened by saying there is something going on with

your mother and I.  And then, you know, automatically -- I
don't know, because it's out of character that this is
happening.  Our whole family is in shock about the whole
situation because it is 100 percent out of character.  And
divorce was out of character, too, so I thought somebody was
sick or we didn't know what to think.

        And they told us a basic summary of everything, and he
did tell us that he admitted that he was guilty.  He did tell
us that.  And the only really thing that I got out of it was
that prison time was a possible outcome.  So I wasn't really
focused on everything that had happened or all the details, but
I did ask what's the next step.  I'm kind of like my dad in
that way of wanting to know this is the situation, how do we
deal with it, what do we do next.  So I did ask when will we
find out what's going to happen.  I asked for how long.  I
asked which prison if he was going to be sentenced.  I wanted
to know where he was going to be if he was going to be in
Houston or where.  But those were the main questions that I
asked.

        THE COURT:  Were you satisfied at the answers?

        THE WITNESS:  No, because they didn't really know.
They told me that the prison could be anywhere and that it
could be zero to five years is what they told us.  So I found
hope immediately when they said zero to five, and that's kind
of where we have been focused thus far.  I haven't really

1    processed it up until today.

2            THE COURT:  Now, did you ever ask why did he do it?

3            THE WITNESS:  I never asked why, but I know -- well,

4    my dad would do anything to support his family, but he would

5    never do anything to jeopardize his time with his family.

6            THE COURT:  I don't understand the answer then.  You

7    are saying he didn't appreciate that he could actually face

8    prison?

9            THE WITNESS:  What was the question?

10           THE COURT:  You are saying that he didn't appreciate

11   that he could face prison for that?

12           THE WITNESS:  No, he knows that he could.

13           THE COURT:  No.  What I mean is at the time that he

14   indulged in this criminal conduct, you are saying that he

15   didn't really know that he could actually, if he was revealed,

16   could face prison time?

17           THE WITNESS:  I don't know.

18           THE COURT:  Well, see, you made a comment and you said

19   that he wouldn't do anything that would take him away from his

20   family.  So does that mean that at the time that he was

21   involved in this matter he didn't think that even if it came to

22   light that he could be taken away from his family?

23           THE WITNESS:  I don't know.  I just know that from my

24   opinion of who my dad is he would never want to spend time away

25   from us.

1       THE COURT:  That's what I'm saying.  That's what I'm

2  asking about, that he wouldn't want to spend time away from you

3  all, but then if he was in the process of committing a crime,

4  then are you saying that he would know that the possibility is

5  that if charged he could spend time in prison but yet he would

6  never do anything that would expose him to that?

7       THE WITNESS:  I don't know if he knew that that would

8  be an outcome.

9       THE COURT:  Okay.  Well, you see what I'm asking,

10  though?

11       THE WITNESS:  I do understand.  I just don't know.

12       THE COURT:  Because if you don't want to be apart from

13  your husband, then that means that there are -- there is a

14  certain type of conduct that would never be attractive to you.

15  So if somebody came along and offered you an opportunity to

16  make some money but nevertheless that opportunity would expose

17  you to the possibility that it's a criminal matter and if that

18  matter is charged you could actually go to prison, that means

19  you would be away from your husband.

20       THE WITNESS:  Uh-huh.

21       THE COURT:  So that means that you would never ever

22  consider that.  Am I right?

23       THE WITNESS:  Yes, Your Honor.

24       THE COURT:  So what I'm asking then is when you say

25  that you know your father never wanted to be apart from his

1    family, then I'm asking that same question is that did he ever

2    explain to you why with that in mind that he never wanted to be

3    away from his family, never wanted to take a chance on doing

4    anything that could separate him from his family by going to

5    prison that he would actually get involved in this matter.

6          THE WITNESS:  He didn't explain why.  I just mean that

7    I know he would never do anything again that would compromise

8    his time with us.

9          THE COURT:  Okay.  And then you are not telling me

10   that he was under any duress, because that is a defense for

11   someone to get involved in certain types of crimes, so he is

12   not saying he was forced to do anything.

13         THE WITNESS:  Nuh-uh.

14         THE COURT:  And from his financial status it doesn't

15   appear that he was looking for some finances to desperately

16   support his family because it appears he had finances.  So the

17   question looms as to what was the motivation to get involved in

18   this in the first place.  Now I'm asking these questions

19   because remember, just like your husband said, I have to make

20   some determination about your father.  And just as your husband

21   said, I should try to get to know everything I can about him so

22   I can make a fair ruling which encompasses him, you know, the

23   he who he is.  You see?  And who is this person.

24         So then a person in my position would always ask what

25   is the motivating factor here.  You know, some people commit

crimes because they are just greedy, they just want money.

Others commit violent crimes because they are just mean.  Then

there are those who commit crimes for other reasons but they

are not legal, but nevertheless sometimes you can understand

why they did what they did, at least an explanation.  So here,

when I allow character witnesses, when I allow character

letters, I'm always looking for more information about that

person because I want to fashion a sentence which is -- that

benefits society but also takes into account the individual

himself.  So I always want to know more about the person, which

is why I am open to character witnesses, because when they come

in, I want to hear all I can.

So in a matter like this, the question I have, and I

can tell you what that is, the basic question, what motivated

your father to do what he did with such a loving, supportive,

wonderful family around him where he takes the chance on going

to prison.  What is it?  What's that factor?  You see now?

THE WITNESS:  Yes, Your Honor.

THE COURT:  So then the rest of it sort of falls in

place.  So you can tell me how he is in the community.  That's

wonderful.  That's great.  This matter of tithing.  That's

wonderful.  The pastor comes in and talks about him and says

wonderful things.  His brother comes in and says wonderful

things.  But I have asked this question more than one occasion,

and that question has been:  What is your theory as to what

motivated him to do this?  You see now?  And I have asked the
pastor what did he know.  I asked his brother what did he know.
And then in these letters, I have gone through what has been
submitted to me.  I have read the presentence investigation
report.  I don't know if you know that we get a presentence
investigation report.  Do you know anything about that?  If you
don't know, you are not expected to know, but do you know?

THE WITNESS:  I know that there was one other meeting
like this.

THE COURT:  But do you know the report that I get?

THE WITNESS:  No, Your Honor.

THE COURT:  You see this?  You see all these pages
here?  Now, I have here -- unless your father or his lawyer has
an objection, ask him to show you his report, because this
report is pretty detailed.  It has in here a whole lot about
his life, where he grew up, his family.  It has information
here about this crime.  It has here any co-defendants, related
cases.

Then it has a section starting on Page 6 with the
offense conduct here which goes on to Page 7 and 8 and give an
idea about all of the persons who were involved in this.  And
then on Page 9 it starts off with the victim impact, like what
impact all of this had on the persons or victims who are
involved here, namely the State of Mississippi and the
Mississippi Department of Corrections.  And then there is a

matter here for adjustment of acceptance for responsibility.
That is where a defendant has a chance to explain whether that
person feels like he actually is guilty, because a lot of
people want to plead guilty but don't want to admit that they
really are guilty.  So then they can leave the court and say, *I
just did it because I could get a lesser sentence but actually
I'm not guilty*.  But see, here in federal court, they are
interviewed by the probation officer who sits over here, and
the probation officer asks these various questions.  So then in
this Paragraph 32, your father acknowledged the accuracy of the
factual basis which was read into the record at the plea
hearing.  He expressed remorse for his actions, and he notified
the government of his intentions to plead guilty which says
something in his favor.

And since I'm operating on points, then you have some
points for the crime.  You have points for any aggravating
feature of the crime, which means I take into account the
amount of money involved, and that might bring in some more
points.  And then with regard to any mitigating factors, those
factors where the court says that's in his favor, I subtract
any of those facts.  So for acceptance of responsibility, he
gets some mitigating points, so you subtract those.  And then
with regard to all of that, he goes into his personal and
family data.  It tells me when he was born, to whom and where;
that he is the older brother -- his older brother is Danny

Longoria and his age and where he resides and where he works.

And then I have his childhood, and they talk about his childhood because he is interviewed on all of this. And then after that, it talks about his marriage and his children. You are mentioned and all of that's in there. His personal condition, his physical condition is in here, his mental and emotional health is in here. Whether he has ever abused substance is in here. That includes alcohol or any other intoxicating substance.

And then in here there is whether he has educational, vocational or special skills. And I have all of that in here. I have his employment record that goes all the way back to 2004. And then I have his financial ability to pay. So I have all his finances here. I know what he owes on everything. I know what his liabilities are. I know what his assets are. I know what his net worth is. All of that's in here. I know what his monthly income is. That's all here. I know what his monthly expenses are. So all of that's in here. I know when he paid his income taxes. I know how much he paid on his income taxes.

So, you see, I have all of that here in the record. So when a character witness wants to come, I'm looking to see if that character witness is going to tell me something that takes me beyond this, because, you see, the probation officer, as hard as they work, they can't go out in the community and

interview everybody and try to find out every little iota of that individual.  So a character witness can help me and then I can learn something.

Now, just as a character good witness can come to court, a bad character witness can come to court if somebody wants to say something bad about the defendant.  To my knowledge, nobody signed up to say anything bad about your father.  So all the character witnesses who are expected to testify would be witnesses who wanted to offer something good about your father.  So I have been taking copious notes about what everybody has said.  I have asked some questions.  You have heard me ask questions, but those questions are to feel out the character witness as well as to hear what each witness has to say.  Just because I have asked a question or two to the character witness doesn't mean I'm challenging the character witness.  It merely means that if someone is going to come here and offer something great about the person on trial, I want to know something about the person who is talking so I can know something about them, too.  So then I can see what their experiences are.

So this is my presentence investigation report.  This report is 19 pages.  As I said, it starts off with his picture, his date of birth, his age, his race, his sex, his education, his dependents, his citizenship, his religious preference, his country of birth, his place of birth, his legal address, his

residence address and whether he has ever used any aliases.
That is on the first page.  Then you see it is written up from
there.  Then I have all this narrative after that.  You see
now?

Now, I read every page of my presentence investigation
reports.  If my probation officer back there takes the time to
pull all of this information together, then I'm going to take
the time to read it.  So I read it in-depth, and I highlight,
underline and all of that.  I have actually had cases where
people have come in and thought to be character witnesses and
they say something which is totally contradictory to what I
have in here.  And then I have told them that it does and given
them an opportunity to know where I'm coming from, because I
don't want to ambush them and then later say that they said
something that was inaccurate when they didn't know that I had
all of this up here and they might be right.  What they might
have is something my probation officer might not have known.
And so I try to fill in all the gaps about this.

So that's how I proceed, because I take sentencing
extremely seriously.  This is where the court can impose upon a
defendant and cause that person to be denied liberty.  But not
only that, but the person also in the process suffers another
punishment, being convicted of a felony.  And being convicted
of a felony by itself carries some results.  You can't carry a
firearm, can't apply for government jobs and all those kinds of

things.  And in his position after all of this is over, he
might not be able to get any federal contracts.  So we will see
how that works out.  But, you see, there are a lot of other
drastic effects which come with being a defendant in a court.
And I try to find out everything I can because I just don't
walk into court and just say this is the sentence and walk back
out.  I have a conscience, and I want to make sure that at
night when I go to sleep I'm not troubled by something I have
done in court.  And if I feel like I need more information, I
will not hesitate to stop the court and try to get an answer to
my question, either way it goes.

But now, in this instance, I have to look at the
impact on society about the crime.  I have to look at the
impact upon the defendant.  I have to try and look at all the
other factors that went into the crime as well as all the
factors which counsel one type of punishment or another.  And
see, I have to look at deterrence, that is, whether the
sentence deters others in the same situation.  I have to look
at whether a sentence reflects society's disdain for this type
of crime.  But then I also have to look at rehabilitation as to
whether a person should be in need of rehabilitation.

Now, in your case, your father's case, we are not
looking at whether he is a danger to society, because if so,
then I have to look at restraint, and I don't have to look at
that factor here because there is nothing to say that he has --

that he poses any kind of danger.  So I'm looking at all of
those factors and try and weigh them and look at them and see
where we are.  Now, I don't take a poll of the public to see
what the public's pulse is on a particular matter because I
have been entrusted with the spokesperson for the public to
make that decision as a judge.  And so it is imperative that I
take to heart that responsibility.  So then when I see a
character witness, then I want to know what am I looking at.
And so then I want to know is the defendant really remorseful.

Now, your father has already pleaded guilty, so he
said he did it.  He told the probation officer that he is
remorseful for what he did.  But you notice I also asked how
much in detail did he talk to you and your husband about this
matter, for instance.

Now, I also asked the minister did he talk in detail
about what he had done about this matter, because in closing on
my little talk here, there is one thing that -- not one thing.
There is a matter which constantly bothers the court is after I
have sentenced someone and then I hear in the community how the
person was not really guilty of anything, because the public is
not here and they don't read the trial record and they don't
know the person confessed to the crime, and then the person
after having gotten some sentence then wants to go back and
state to the community how innocent he or she was the whole
time, in which case you know the person never was remorseful

1  and instead the person then undermines the criminal justice

2  system by saying, *I got sentenced on something and I didn't do*

3  *this and I didn't do that.*  I mean I have seen it so often how

4  people do that.  So you heard me ask the question about what

5  did he say that he did.  And so that's why I was asking the

6  question, trying to know more about your father.  You see?

7          Now, and I also told you when you finished talking a

8  few moments ago and got off the stand, you appeared to be

9  emotional.  And I can understand that.  Really I can.  I mean

10  it's quite easy to understand your emotionalism on this, having

11  to sit there.  You never dreamed that one day you would be

12  sitting there testifying in court for your father.  I know you

13  never dreamed about that, so I know this has to be trying for

14  you.  But I also asked you right at the end is there anything

15  else you want to say, because I'm open for anything you want to

16  tell me so I could flesh out my report.  What you have said

17  already is how much you love your father, how shocked you are

18  about this because he raised you the right way and he instilled

19  in you certain virtues that you have subscribed to and that

20  this is a surprise to the entire family, destructive to the

21  family in one sense because if he is removed from the family

22  embrace how badly that would hurt all of you because you depend

23  so much on him and how he is a go-to guy in times of need and

24  all of that.  I took all of that in.  So again, is there

25  anything else that you would like to say?  Then please say it.

1          THE WITNESS:  No, sir, Your Honor.

2          THE COURT:  Okay, then.  But I thank you for coming

3  here to share with me what you had to say.  Okay?

4          THE WITNESS:  Thank you.

5          THE COURT:  Mr. Fortner, I allowed those two because

6  you said they had to leave.  Was there one more who can't be

7  here tomorrow?

8          MR. FORTNER:  No.  There is one more who can't be here

9  tomorrow, Judge.

10          THE COURT:  If there is one more who can't be here

11  tomorrow --

12          MR. FORTNER:  And I only have one other short one

13  after that.

14          THE COURT:  Still, if you have one more who can't be

15  here tomorrow, my court reporter has been going strong all day.

16  We seem to do this often where we are going late in the

17  afternoons because I always want to take just one more.  So

18  call her forward.  Let's take her and we will start back at

19  9:00 in the morning.  But let's have her, because I want

20  everyone who came to testify to be able to.

21          MR. FORTNER:  This is Alexis Longoria, Your Honor.

22          THE COURT:  Okay.  Right here.

23                      **ALEXIS LONGORIA**,

24  having first been duly sworn, testified as follows:

25                      **DIRECT EXAMINATION**

BY MR. FORTNER:

Q   Would you tell us your name, please?

A   Alexis Longoria.

Q   Okay.  You're going to have to move towards the microphone and speak up a little bit.

A   Alexis Longoria.

Q   And how old are you?

A   I'm 24.

Q   Alexis, are you married or single?

A   I am engaged.

Q   And when are you scheduled to be -- when is your wedding scheduled for?

A   April 8, 2017.

Q   Alexis, are you the daughter of Mark and Kimberly Longoria?

A   Yes.

Q   I'm sorry.  I know I asked you.  How old are you?

A   24.

Q   Have you graduated from college?

A   I have.

Q   What school?  What college did you graduate from?

A   I graduated from University of Houston.

Q   And what was your degree in?

A   I have a bachelor of science in communication sciences and disorders with a minor in sociology.

Q   And do you currently -- are you currently employed?

```
 1   A   Yes.

 2   Q   And where do you work?

 3   A   I work at the parish school.

 4   Q   And what is your -- what do you -- are you employed as a

 5   teacher?

 6   A   My title is a paraeducator.  I am a licensed speech

 7   language pathologist assistant.

 8   Q   Do you work with young children?

 9   A   Yes.  First graders.

10   Q   Is it all first graders?

11   A   Yes.

12   Q   Okay.  And you have been working there for how long now?

13   A   Since August 1st, 2016.

14   Q   Okay.  Now, would you tell the court how you came to find

15   out about your father's legal trouble, his legal situation?

16   A   Yes.  My fiance and I were going to book a venue for -- we

17   were looking at May of 2018.  And my parents asked us to come

18   and talk to them before booking anything.  From the way my mom

19   said that, we needed to come now and talk that night about it.

20       I knew it was something serious.  I never thought it was

21   this.  I thought kind of like my sister that someone was sick.

22   I knew that because it had something to do with the timeframe

23   of booking our wedding that it was either, like, going to be --

24   I don't know.  I thought someone was really sick and that they

25   were going to say we needed to move the wedding up because of
```

1    that.

2    Q    Okay.  Is your family a close -- are you close to one

3    another?

4    A    Yes.  Very.

5    Q    Alexis, what is the name of your fiance?

6    A    George Trigaris (phonetic).

7    Q    He is in the courtroom with you today?

8    A    Yes, sir.

9    Q    Now, tell us what your parents or what your father told you

10   was the problem.

11   A    They said that they wanted to talk to us about -- he said

12   that they had been dealing with something for a while but that

13   he felt that to be fair to me he had to tell me before booking

14   this venue that he may not be here to walk me down the aisle.

15   Q    And what did he tell you?  Where else might he be?

16   A    That's when he told us that he may be facing prison time.

17   Q    Did he explain to you why?

18   A    Yeah.  I was kind of taking in so many different things,

19   you know.  I got there thinking that someone was going to say

20   they had cancer or something.  And then I was, you know, had

21   looked at several venues that week, and so the wedding planning

22   was on my mind, and so many things were going on that I heard

23   what he was saying, and it's -- you know, I don't know all of

24   the -- that's not my field, so a lot of things they said I

25   didn't fully understand.  He said that -- he mentioned the name

1   Cecil.  I have never met Cecil.

2   Q    He mentioned who?

3   A    Cecil.

4   Q    Okay.  Cecil?

5   A    Yes.  Sorry.  Am I saying it wrong?

6        THE COURT:  I believe she is talking about Cecil

7   McCrory.

8        THE WITNESS:  Yes.

9   BY MR. FORTNER:

10  Q    Did he tell you that he had pled guilty to committing a

11  crime?

12  A    He did.

13  Q    Did he go into very much detail about the crime, or did

14  he -- was it a statement of that --

15  A    I did -- I did understand that there was a transaction and

16  then that there was I guess what y'all are referring to as a

17  bridge, that there was not enough ordered and they needed to

18  order more.  But as far as -- I don't fully understand

19  everything.

20  Q    Okay.  Do you understand that it involved some sort of

21  dishonesty on the part of your father?

22  A    Yes.  He told us that.

23  Q    And how did that make you feel?

24  A    I mean I hurt for my dad.  I have never seen him, you know,

25  embarrassed or ashamed, you know, not wanting us to share this

1  with anyone outside of our family.  I think kind of, too, I

2  know, Your Honor, that you had asked my sister and my

3  brother-in-law, you know, kind of why they didn't ask more

4  questions.  For me, I know that I didn't really ask maybe as

5  many questions is because I could see that my dad was so down

6  and so hurt and ashamed already that I didn't think it was

7  necessary for me to put him through that or have him explain

8  anything to me further than what he had already said.

9  Q    Did your father tell you that there was the possibility

10 that he could go to prison?

11 A    Yes.

12 Q    Then you understand that?

13 A    Yes.  We moved our wedding up an entire year just, you

14 know, in hopes that maybe there is a possibility, you know.

15 God forbid, you know, depending on the sentencing, we didn't

16 want it a year out.

17 Q    Alexis, how has this affected -- when you look at your

18 father, how has this affected him?

19 A    I mean he has aged more over this past year.  I have never

20 seen him cry until this year.  I know that he, you know,

21 just -- he is very much the man of our family, and I know this

22 is crushing him.

23 Q    And how has this affected your family?

24 A    When they told me, I thought I was going to get sick.  I

25 didn't sleep good.  I didn't want to be around a lot of people.

1    I wanted to stay home.  I was more attached to them.  I wanted
2    to be near them.
3    Q    I noticed that you have written out some words on some
4    paper.  Correct?
5    A    Yes.
6    Q    Is that something you would like to share with the court or
7    have you --
8    A    I'm sure.  Yes.
9    Q    Why don't you read it, then.
10   A    As I have stated, you know, all of this scares me from the
11   moment my parents sat us down to trying to plan our wedding and
12   not knowing if my dad is going to be here to walk me down the
13   aisle to being in a courtroom for the first time in my life and
14   for it to have to be here to defend my dad's character.  I love
15   my dad.  He has taught me how to swim, how to ride a bike, how
16   to drive a car.  He has been there for every cheer practice,
17   every flat tire.  And now I am praying that he will be here for
18   our wedding and for everything, for having kids, for holidays.
19       It breaks my heart because my dad is a good man.  He is a
20   man of his word, and he works hard.  I know he loves us very
21   much.  And actually I don't know if someone mentioned it
22   earlier or not, but today is my parents' 29th wedding
23   anniversary.  When I think about my fiance and I and what kind
24   of marriage I want us to have, I look up to my parents.  They
25   are honest with each other, true to each other, and they enjoy

1  each other's company.

2      It's unfortunate that this is happening, but please take

3  into account that my dad's punishment began when the FBI showed

4  up at our door.  This past year has turned our world upside

5  down.  I know it can be easy to hear what people say or read

6  something and then, you know, feel like everything is there or

7  like it could be cut and dry or black and white, but there are

8  gray areas.  I work with kids who have speech and language

9  disorders as well as other learning differences, and I work

10  closely with a team of speech therapists, occupational

11  therapists, a neurologist, a child psychologist, and we do that

12  in order to look at the child as a whole.  So I'm asking that

13  today you look at my dad as a whole, that you look at how he

14  was raised, how he served in the Army, how he has always given

15  to the church, his marriage with my mom, how he raised my

16  sister and I and how we need him here with us.

17  Q   Alexis, let me ask you.  Do you believe that your father

18  understands that he committed a crime, that he did something

19  wrong, broke the law?

20  A   I do.

21  Q   You believe he recognizes that?

22  A   Yes.

23  Q   Do you believe he is sincerely remorseful for that?

24  A   Yes, very.

25          MR. FORTNER:  We tender the witness, Your Honor.

1       THE COURT:  Cross-examination.

2       MR. LAMARCA:  I have no questions, Your Honor.

3       THE COURT:  All right.  Anything else you want to say?

4       THE WITNESS:  I think that pretty much sums it up.

5       THE COURT:  All right.  Thank you so much.

6       THE WITNESS:  Thank you.

7       THE COURT:  Mr. Fortner, you said you have one more

8   witness?

9       MR. FORTNER:  Just one more, Your Honor.

10      THE COURT:  Call your witness.

11      MR. FORTNER:  We would call Kimberly Longoria.

12                      **KIMBERLY LONGORIA,**

13  having first been duly sworn, testified as follows:

14                      **DIRECT EXAMINATION**

15  BY MR. FORTNER:

16  Q   Could you tell us your name, please?

17  A   Kimberly Longoria.

18  Q   How old are you?

19  A   49.

20  Q   Where do you live?

21  A   Houston, Texas.

22  Q   How are you related to Mark Longoria?

23  A   He is my husband.

24  Q   How long have y'all been married, Kimberly?

25  A   29 years today.

1   Q   Okay.  When all of this first -- do you work in the

2   business, in the Drug Testing Corporation?

3   A   A little bit I do, yeah.

4   Q   And is this a business that Mark runs from home?

5   A   Yes.

6   Q   And how long has he been doing this kind of work?

7   A   Oh, gosh, 20 plus years or more years than that, but the

8   DTC 20 plus.

9   Q   And y'all have been married 29 years today.  Is that right?

10  A   Yes.  Uh-huh.

11  Q   Kimberly, when -- were you present when the FBI agents came

12  to the house the first time?

13  A   Unfortunately, yes, I was.

14          THE COURT:  We can't hear you.  You need to speak

15  directly into that microphone.

16  A   Yes, I was.

17          THE COURT:  Go ahead now.

18  BY MR. FORTNER:

19  Q   Were you present?

20  A   Yes.

21  Q   Okay.  And were you present while they questioned Mark,

22  asked him questions?

23  A   For the most part, uh-huh.  When I wasn't, I was in the

24  bedroom so I could still hear everything.

25  Q   Okay.  Now, after that, did y'all begin to look for a

1  lawyer?

2  A    We did.

3  Q    And when Mark came to see me the first time or talked to me

4  on the phone the first time, were you involved in that

5  telephone conversation?  Was that on a speakerphone at your

6  house?

7  A    Yes.  Uh-huh.

8  Q    And we had a fairly lengthy conversation.  Did we not?

9  A    Yes.

10 Q    And how soon after that did you and Mark drive over from

11 Houston to Hattiesburg to meet with me?

12 A    Pretty promptly.  I would say within the week, I believe.

13 Q    Okay.  Now, I was -- we had a somewhat lengthy meeting when

14 you first came over to see me.  Is that correct?

15 A    Correct.

16 Q    And I let you know that I was leaving the country for a

17 month.  Is that correct?

18 A    Right.

19 Q    Okay.  And did you go ahead -- did you and Mark retain me

20 to represent him at that time?

21 A    Yes.

22 Q    All right.  Now, once I returned and met with the

23 prosecutor and the FBI agents, we had numerous -- you and Mark

24 and I had numerous telephone conversations.  Is that correct?

25 A    Yes.

1   Q   All right.  At some point did Mark make the decision to
2   plead guilty to the charge?
3   A   He did.
4   Q   And did you back him on that decision?
5   A   Yes.
6   Q   Did you feel like that was the right decision?
7   A   Yes.
8   Q   Did he in our conversations recognize that he had broken
9   the law and committed a crime?
10  A   Yes.
11  Q   And did you come here to court with him when he pled
12  guilty?
13  A   Yes.
14  Q   And have you continued to participate in our telephone
15  conversations when I would speak with him on the phone quite
16  often?
17  A   Yes.
18  Q   Correct?
19  A   Yes.
20  Q   And how did you and Mark go about telling your daughters
21  about this?
22  A   We sat them down one at a time separately.  We had planned
23  on doing it together, but the way circumstances played out, we
24  sat with Alexis and George one night and then Savanna and
25  Cameron on a different night.

1  Q   Okay.  And at that time did y'all tell them what was going

2  on legally with Mark's situation?

3  A   We did.

4  Q   And did Mark admit to his daughters that he had, in fact,

5  pled guilty to committing a crime?

6  A   Yes.

7  Q   And did you make them aware of possible sentencing?

8  A   We did.

9  Q   Prison and so forth?

10  A   Yes.

11  Q   Were you as forthright with them as you felt like you could

12  be?

13  A   Yes.

14  Q   And did Mark talk to them, or did you talk to them?

15  A   We both sat with them, but Mark did most of the talking.

16  Q   Is your family, your daughters, you and Mark, are you a

17  close-knit family?

18  A   Very much so.

19  Q   And what has happened let's talk about financially as a

20  result of this situation.  You had some retirement accounts, so

21  forth.  Is that correct?

22  A   Yes, that were frozen.  He can no longer do -- we receive

23  letters where they are frozen and they are not letting him do

24  any more trading and that kind of thing.

25  Q   And has some of those accounts closed and will you end up

1  suffering financial penalties as a result of that?

2  A    Yes.

3  Q    Have you even -- have y'all even been able to figure out

4  the extent of the financial harm that's going to be done to

5  your financial situation?

6  A    Not really.  We're just going day by day.  We get these

7  different letters through the mail.

8  Q    Is the business still operating?

9  A    It is.

10  Q    Has the amount of business you have been able to do fallen

11  off because of this?

12  A    Yes.  Some of it has, but we're still going along.

13  Q    You're still paying your bills?

14  A    Uh-huh.

15  Q    Doing the best you can?

16  A    Yes.

17  Q    And how has this affected your husband?

18  A    Enormously.  Emotionally.  Like my girls said, he is the

19  strongest man I have ever known, and I have never seen him

20  crying so much.  He uses the words ashamed, which I won't.  I

21  am still very much the proud wife because I know the real Mark,

22  but it's affected him, you know, with work, with his girls,

23  with everything.  But we are standing by him because I know the

24  real Mark Longoria.  Yes, he has made a mistake and he is

25  owning it, but it has definitely affected him in so many ways.

```
1    Q    Do you believe that he has owned up to his mistake?

2    A    Absolutely.

3    Q    Do you have any doubt that he would make the same mistake

4    again in the future?

5    A    Most definitely not.

6    Q    Why not?

7    A    Because it's affected him in so many ways.

8    Q    Because what?

9    A    Because it has affected him so much and he knows it was

10   wrong.  And I know I hear the judge ask why, and I think maybe

11   it's speculating for me, but I think the biggest thing and

12   maybe it's not a good word but I think it maybe would be

13   ignorance on his behalf.  I think maybe he didn't realize the

14   illegal behalf on his part.  I think he thought, you know,

15   that's Cecil's bad.  You know, he was paying the consultant.

16   But I think he thought he never paid a dime to Epps so I think

17   he just thought that was Cecil's bad.  I don't know.  That's

18   just my opinion.

19   Q    I understand.  Do you believe that he now understands that

20   it was his bad?

21   A    Oh, yeah, he found out and I think that's why I know he

22   would never ever do such a thing again because he certainly

23   learned that it was his bad and it is definitely his mistake,

24   and that's why I know he would never do that again.

25   Q    Kimberly, do you have anything else that you want to say to
```

1  the judge?

2  A    I had written something.  I don't even know if I will be

3  able to read it or if I will stick to it.  Every time I go to

4  look at it again, I change it, but it was just something I

5  wrote that I will try to read if that's okay.

6          THE COURT:  That's fine.  Go right ahead.

7  A    Okay.  Your Honor, first of all, I can hardly express how

8  nervous I am.  Like my girls said, this is so out of the

9  ordinary to even be in a courtroom.  I think the first time I

10  was was when I came with him back in June or July when I was

11  here.  So I wrote this down.

12      I was a shy girl that grew up in a small town.  I would

13  rather take a bad grade than get up and read a report, but I'm

14  going to try to read this, so please bear with me.

15      The fact that we are even here makes my stomach turn, but

16  as we stated, today is our 29th wedding anniversary.  We were

17  married on February 13th, 1988, when I was just 20 years old.

18  And to be honest, I have never been on my own ever since that

19  day that I left my parents' home.  And since Mark and I have

20  married, other than for short business trips, we have never

21  been apart.

22      Your Honor, I'm here to plead with you to please not take

23  this man from me and our daughters, Alexis and Savanna.  He is

24  literally the half that makes me whole.  I don't know how to do

25  life without him.  And to be honest, my biggest fear is that I

will walk out of here today without conveying enough to you the importance of keeping my husband and father of my daughters out of prison and here with us, the ones who truly know, love and depend upon him.

I remember when we first told our daughters of this and we explained to them that they could write letters on their dad's behalf, our youngest daughter, Savanna, asked if they could present some of our home videos and that way you could see and really appreciate a small insight to our lives, our birthday celebrations, graduations, anniversaries and most recent her wedding so that you could see that life without their dad would leave a hole in our hearts and in our lives as he is as God would have him to be our sole provider, leader, example, head of our household and the reason we are the family that we are today.

Your Honor, I plead with you to please grant not only Mark but our entire family the utmost leniency on us here today. I have never had to depend on anyone or ask anyone for anything. Usually we are the ones helping people. My husband has always worked hard and provided for me, whether it has been our family home or a mobile home, and suddenly these thoughts are consuming me. For 29 years we have sat together in church every Sunday. The thought of going alone is unimaginable. We are the old-fashioned couple who come from long-lasting marriages, and that's what we pray for ourselves as well as for

1  our daughters.

2  My paternal grandparents were married for 70 years, my

3  maternal grandparents for 66.  My in-laws are currently at 59

4  years and my parents are at 54.  I remember when Mark and I

5  met, he asked me what I wanted to be.  And I said to him, *You*

6  *are probably going to laugh at me but I just want to be a*

7  *housewife and a mom*.  And through much sacrifice, he and God

8  have granted me that life.  I have never paid my own bills or

9  fixed a flat tire or bought a car because these are the things

10  that he, as head of our household, has always done for me and

11  our daughters.  He has always taken care of not only our girls

12  and myself but literally anyone --

13  THE COURT:  Slow down just a little bit.  He has

14  always taken care of me and my daughters.  Just slow down some.

15  Go ahead.  You don't have to rush.

16  THE WITNESS:  Okay.  He is always taking care of not

17  only our girls and myself but literally anyone who presents a

18  need.  My best friend and her husband came into hard times and

19  needed a car, so Mark arranged to finance them our 2000 SUV for

20  a fair price.  Two weeks later they came into worse times and

21  her husband lost his job.  That was nearly two years ago, and

22  my husband has never once asked them one question as to when we

23  will receive payment.  That is my husband, Your Honor, not this

24  one bad decision he is caught up in.  While he accepts

25  responsibility for his part in this offense, I beg of you to

1  please allow him to stay in our home while doing so so that he

2  can continue to provide and bless those of us who depend upon

3  him in so many ways.  Please allow him to continue to be the

4  man that he really is and has always been for all of his life

5  and all of his career and not this one bad decision that got

6  him here today.

7          Please consider his whole life story and choices long

8  before and long after this offense and believe those of us who

9  really know and love the real Mark Longoria, those who sent in

10 their letters along with those of us who have spoken here

11 today.

12         Believe us when we tell you that he is the most

13 generous, honest, hard-working, taxpaying, God-fearing man who

14 accepted a plea almost a year ago after the FBI came knocking

15 on our door and already began his sentence as his life as a

16 felon plays out before his daughters, parents, myself and other

17 loved ones hugely effecting his career and personal life.

18 Please consider all of this along with his military service to

19 our country, no criminal record and this being his first-time

20 offense, Your Honor, and all of the help and service he

21 provides to the community and loved ones.  And please consider

22 the upmost possible leniency on my husband and father of our

23 two daughters.  Thank you for allowing me to speak, Your Honor.

24         MR. FORTNER:  That's all, Your Honor.

25         THE COURT:  Cross-examination.

1          MR. LAMARCA:  I have a couple of questions.

2          THE COURT:  Go right ahead.

3                    **CROSS-EXAMINATION**

4    BY MR. LAMARCA:

5    Q    Mrs. Longoria, you had mentioned something about accounts

6    being frozen.  Do you recall that?

7    A    Yes.

8    Q    Can you explain what you mean by that?

9    A    I'm talking about our personal, like, IRA, stuff like that,

10   our personal accounts.

11   Q    When you say frozen, what do you mean, though?

12   A    Like we got a letter from, like, for example, like, our

13   retirement accounts.  Mark's retirement accounts, a letter

14   saying he can no longer trade with them and here is your money,

15   you have to --

16   Q    Oh, I see.  They weren't confiscated, just he was no longer

17   able to trade?

18   A    Yes.

19   Q    It was relinquished to you.  Is that right?

20   A    Yes.

21   Q    All right.  And then last, when the FBI came to see you

22   back in May of 2016, they had with them a letter.  Is that

23   right?

24   A    I believe so.

25   Q    Advising that Mr. Longoria needed to get a lawyer?

A   I'm not sure what the letter -- I couldn't remember.  I

don't know what the letter said.  We were told later we didn't

have to let them in the home, but at the time, we didn't know

and we let them in.  But I don't remember what the letter said.

Q   Thank you.

MR. LAMARCA:  That's all, Your Honor.

MR. FORTNER:  No redirect, Your Honor.

THE COURT:  All right.  Anything else you want to say?

THE WITNESS:  I think I'm good.  Thank you.

THE COURT:  All right.  Thank you.  You can step down.

MR. FORTNER:  Judge, just for scheduling purposes, my

client does have some allocution he wants to make.  I'm not

sure if we want to actually put him on the witness stand or

not, but that would be the only other witness we might call.

So I don't know if you want to try to finish this tonight or if

you want us to come back.

THE COURT:  No, no.  We will take it up first thing in

the morning at 9:00.  And then in the interim, you can discuss

with him whether he simply wants to make allocution or whether

he wishes to testify.  And then that will give you a chance to

go over these matters with him during the course of the night.

So we will start back at 9:00 in the morning.  I will see you

all then.

MR. FORTNER:  Thank you.

MR. LAMARCA:  Thank you, Your Honor.

1          (Hearing was recessed.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                     CERTIFICATE OF REPORTER

3

4          I, BRENDA D. WOLVERTON, Official Court Reporter,

5    United States District Court, Southern District of

6    Mississippi, do hereby certify that the above and foregoing

7    pages contain a full, true and correct transcript of the

8    proceedings had in the aforenamed case at the time and

9    place indicated, which proceedings were recorded by me to

10   the best of my skill and ability.

11          I certify that the transcript fees and format

12   comply with those prescribed by the Court and Judicial

13   Conference of the United States.

14          This the 28THnd day of February, 2017.

15

16                              s/ Brenda D. Wolverton_____
                                BRENDA D. WOLVERTON, RPR-CRR
17

18

19

20

21

22

23

24

25