1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF MISSISSIPPI
2            NORTHERN DIVISION

3

4   UNITED STATES OF AMERICA

5        vs.            Criminal Action No. 3:16CR54HTW-FKB

6

7   MARK LONGORIA

8

9

10      COURT REPORTER'S TRANSCRIPT OF SENTENCING HEARING

11

        BEFORE HONORABLE HENRY T. WINGATE
12      UNITED STATES DISTRICT COURT JUDGE

13            February 14, 2017
              Jackson, Mississippi
14

15

16  APPEARANCES:

17  MR. DARREN J. LAMARCA
    Assistant United States Attorney
18
        Representing the Government,
19      United States of America

20

    MR. THOMAS M. FORTNER
21  Attorney at Law

22      Representing the Defendant,
        Mark Longoria
23

24  COURT REPORTER:
    Brenda D. Wolverton, RPR, CRR, FCRR
25  Jackson, Mississippi

THE COURT: Good morning. Let's go on record. Now, last night I heard witnesses from the defense. I heard a number of character witnesses. And so, Mr. Fortner, are there any additional witnesses from your side?

MR. FORTNER: There are not, Your Honor.

THE COURT: Okay. Character and/or otherwise?

MR. FORTNER: That's correct, Your Honor. There are no further witnesses.

THE COURT: Last night you were contemplating whether you were going to call the defendant as a regular witness or just allow him to make allocution. So I presume that you have made some sort of decision as to how you wish to proceed.

MR. FORTNER: I have, Your Honor, and I wish to ask the court to allow him to allocute, after which we will rest.

THE COURT: All right. Thank you. Now let me turn to the prosecution. Do you have any live witnesses whom you wish to present?

MR. LAMARCA: I do not, Your Honor.

THE COURT: Okay. Then let's return to this issue about which the court is to make a legal finding. Mr. Fortner, you had raised a question about how much net loss there is because you have contended that the defendant did not cause any loss of any amount of money to the Mississippi Department of Corrections. Is that correct?

MR. FORTNER: Yes, Your Honor. That's correct.

1           THE COURT:  Well, why don't you go to the podium and

2    complete your argument, and then, Mr. LaMarca, are you ready to

3    address that argument?

4           MR. LAMARCA:  Yes, I am, Your Honor.

5           THE COURT:  Okay.  Mr. Fortner.

6           MR. FORTNER:  Thank you, Your Honor.  And I will more

7    than likely get a little bit confused as I go along just

8    because of the numbers and the length of numbers that we are

9    repeating.  And I hope that the court will bear with me.

10          Judge, as best I can figure out, and I think -- and

11   really the truth is I got -- depended on just the reports that

12   I had and the presentence report that was put together by the

13   probation office to rely upon when coming up with the various

14   numbers that we are going to be talking about, but -- excuse

15   me.  Okay.

16          It appears to me that the total cost of the contract

17   that was paid fiscal year 2013 to 2014, and as I understand the

18   fiscal year runs from July 1st to June 30th.  So the 2013-2014

19   fiscal year, total amount paid by the Mississippi Department of

20   Corrections to Drug Testing Corporation for the drug testing --

21   seven cups was $782,276.25.  That was the total paid.

22          Now, the original bid that was awarded was less than

23   that.  However, there was a bridge contract entered into

24   sometime in the month of May of 2014 when all of the product

25   that had been contracted for had already been provided and the

1  M.D.O.C. needed to finish up the next couple of months, May and
2  June.  And that's what totaled up to $782,276.25.
3      The Mississippi Department of Corrections paid that
4  payment in two different forms, two different amounts.  The
5  first payment was $632,336.25.  The second payment for the
6  bridge contract was $149,940 for a total of $782,276.25.
7      Drug Testing Corporation turned around pursuant to a
8  consulting contract they had with Investigative Research, Inc.,
9  slash Cecil McCrory, who was the sole owner and operator and
10  worker at the consulting company, and DTC paid Cecil McCrory
11  two different payments, one for $194,837.50, the initial
12  contract, and $34,997.64 for the bridge contract for a total
13  consulting fee of $229,835.14.
14      From that $229,000 roughly, Mr. McCrory paid a
15  bribe -- two separate individual bribes to Christopher Epps
16  that totaled $60,000.  I think those are the figures that all
17  of the parties have agreed on.  Those are the figures that are
18  in the presentence investigation report.  Those are the figures
19  from which I have derived and which they have reached their
20  conclusions about the total value benefited to Drug Testing
21  Corporation, ergo, Mr. Longoria.
22      Now, the government or the probation officer has cited
23  the court to two different cases.
24      THE COURT:  Well, let's keep talking about the facts.
25  So let's go back to the bidding process itself.  The government

1  contends that the bidding process was rigged.

2      MR. FORTNER:  Well, I hate to interrupt you.  May I

3  respond to that?

4      THE COURT:  Go ahead.

5      MR. FORTNER:  Judge, here is the problem with that

6  argument.  All over this country departments of corrections

7  engage in all sorts of contracts with all kinds of people, food

8  contracts, telephone contracts, medical contracts, medical

9  service providers, all manner and make of contracts.  One of

10  those types of contracts has to do with drug testing apparatus

11  which they use not only to test their employees, they also use

12  that to test the inmates.  And those tests and the results of

13  those tests have various ramifications.

14      THE COURT:  All right.  Now, we know all of that.

15  Let's go to the part where the government says that the bidding

16  process was rigged.

17      MR. FORTNER:  Judge, I simply -- I'm just not going

18  to -- because of the nature of prison business and the way

19  states do prison business, the nature of private prison

20  corporations, because of all of that nature, I can't and will

21  not admit that this was a rigged bidding process, because when

22  you get down to the bottom line, the year before this happened,

23  Mississippi paid almost $1 million for drug testing cups, and

24  they were prepared -- and you have got the purchase order in

25  front of you.  They were prepared to pay for drug testing cups

1    $990,000 for fiscal year 2013-2014.

2            THE COURT:  Turn with me to Page 8 of the presentence

3    investigation report, specifically Paragraph 25, and let's

4    start reading to ourselves at Line 4, the first sentence in

5    Line 4 which starts, *Three companies submitted bids for the*

6    *contract.  U.S. Diagnostics bid $2.98 per kit.  Drug Testing*

7    *Corporation bid $5.95 per kit, and Redwood Toxicology bid $6*

8    *per kit.*

9            Now, keep reading.  *After the bids were unsealed,*

10   *M.D.O.C. disqualified the bid from U.S. Diagnostics because the*

11   *testing cups did not yield accurate results within three to*

12   *five minutes as required by the request for -- as the proposal*

13   *indicated.  M.D.O.C. subsequently awarded the contract to Drug*

14   *Testing Corporation at $5.95 per testing cup.  The contract was*

15   *valued at $632,336.25 and was from August 1, 2013 through*

16   *July 13, 2014.*

17           Now, let's recap here.  The defendants, your client

18   and I imagine Epps through your defendant or McCrory through

19   your defendant but certainly your defendant, had some impact on

20   Redwood.  And then with regard to U.S. Diagnostics which bid

21   the $2.98 per kit which would have been the lowest bid, that

22   company was disqualified based upon the representations made by

23   Epps as he was informed by your client to do because your

24   client wanted a better opportunity to win the bid.  So then

25   based on this -- these factors suggested by your client,

embraced by Epps, the lowest bidder, U.S. Diagnostics, was
disqualified.

MR. FORTNER:  Your Honor, that's absolutely true.
Everything you said is absolutely correct.  And they were
disqualified for five factually true reasons.

THE COURT:  Well, those five reasons were the reasons
that your client submitted to Epps.

MR. FORTNER:  And they were true.  I mean that's the
problem with the government's argument and the probation report
writer's argument.  Not one time has the probation officer
alleged or contended in this report that any of those factual
bases for denying U.S. Diagnostics' lowest bid were false.
They have never said they were false.  Their burden of proof --
they have a burden of proof here, and their burden is to prove
what they say.  And if they say that my client gave false
information to McCrory who related it to Epps who then wrote it
down on a piece of paper in a letter form and had it signed by
four officials of the Department of Corrections and that was
false and that's how he got the bid, then they need to prove
that that was false.  Those five reasons that you have seen
that have been included in two or three documents and an e-mail
are all absolutely factually true and correct.  U.S.
Diagnostics' drug testing cup did not meet the specifications
set forth by the M.D.O.C.  And I would point out to the court
--

1          THE COURT:  But who set those specifications?

2          MR. FORTNER:  I would point out to the court while the

3    government would like to argue that Mr. Longoria set those

4    specifications, that drug testing cup that met those

5    specifications was the exact same drug testing cup that

6    M.D.O.C. paid almost a million dollars a year for the year

7    before when they bought it from Brannon Medical.  It is the

8    same cup.  It is the same product with the same bid specs.

9          THE COURT:  So then why did your client have to go

10   through this trouble of trying to ensure that these were the

11   specs that were to be utilized this particular year?

12         MR. FORTNER:  Because he was asked to provide those

13   specs because nobody in the M.D.O.C. knew how to write specs.

14         THE COURT:  Now, this report doesn't suggest that

15   that's what happened.  This report suggests that he wrote those

16   specs to try and tilt the bidding process towards his company.

17         MR. FORTNER:  And I'm not saying that you can't

18   advocate that.  The government is certainly free to advocate

19   that.  But my problem with this probation report, with this

20   presentence report, is that this presentence report is -- I

21   always assumed that the probation office, the federal probation

22   offices, were set up to give the court a neutral objective view

23   of the facts in the case, not to opine whether or not someone

24   did something legal or not legal.  That's what -- this report

25   is an advocate's report.  This is written as if that person is

1  an advocate for the maximum sentence the government can make to

2  convince somebody.  The truth is there are two -- you could

3  look at it that way, Judge.  I will grant you that.  You could

4  say, *It sounds to me like your client, Mr. Fortner, gave them*

5  *the specs so that he would gain an advantage.*  Okay?  You could

6  certainly look at it that way.  However, that would be ignoring

7  the fact that the same cup that he got the bid for and caused

8  the State of Mississippi to pay over $200,000 a year less for

9  was the cup that the State of Mississippi Department of

10 Corrections chose to use the year before my client got the bid.

11       THE COURT:  Well, then let's look at Page 6, Paragraph

12 17.  In Paragraph 17, it says that your client sought to

13 contact McCrory to gain help in securing contracts with

14 M.D.O.C.  And according to Paragraph 17, McCrory told the

15 agents that Longoria was aware that McCrory paid bribes and

16 kickbacks to Epps.  It was McCrory's belief that Longoria was

17 seeking a quote, unquote, competitive advantage for his company

18 and knew that McCrory could talk to Epps on Longoria's behalf.

19       McCrory stated that Longoria was concerned about being

20 underbid by companies that used drug testing cups manufactured

21 in China.  Longoria requested that McCrory have Epps add

22 language to the request for proposal that required the cups to

23 be manufactured in America as well as other language that would

24 benefit Drug Testing Corporation.

25       While McCrory and Longoria discussed McCrory's

1    commission from each cup sold to the M.D.O.C., McCrory recalled

2    he told Longoria that, quote, We have to take care of Epps,

3    unquote.  Longoria and McCrory agreed upon a commission price

4    of $1.40 per cup for McCrory, and this price included Epps'

5    portion of the bribe.  McCrory added that he told Epps to add

6    the stipulation that the cups were manufactured in the United

7    States and to make the other changes suggested by Longoria.

8          McCrory explained that he told Epps that by making

9    these changes to the request for proposal, this would give Drug

10   Testing Corporation an advantage over other bidders.  Further,

11   McCrory informed Epps that if the language was changed in the

12   request for a proposal, McCrory would make a nice commission.

13   Epps agreed to make the changes and understood that he, Epps,

14   would be receiving a share of McCrory's commission.

15         Now, that is the quote from Paragraph 17.

16         MR. FORTNER:  Well, do you want me to respond to that,

17   Judge?

18         THE COURT:  Go right ahead.

19         MR. FORTNER:  I would be happy to.

20         THE COURT:  Go right ahead.  Tell me how that's legal.

21   You are saying that's legal?

22         MR. FORTNER:  I'm saying most of that is legal.

23         THE COURT:  Okay.  What part is legal?  The part that

24   talks about the kickbacks or what parts?

25         MR. FORTNER:  There is nothing illegal about Mark

1  Longoria suggesting to his consultant that if his consultant

2  can make sure that the bid specifications say cups have to be

3  made in America, we want to buy an American-made product rather

4  than a Chinese-made product that the Department of Corrections

5  has the authority to do that.  And that's what people pay

6  consultants to try to do.

7          THE COURT:  With the aim of excluding competitors?

8          MR. FORTNER:  Sure, Judge.  That's the system.

9          THE COURT:  So it's okay for a bidder to have direct

10  contact with the Commissioner of the Department of Corrections

11  with the idea of excluding other bidders?

12          MR. FORTNER:  I don't know that they said that my

13  client had direct contact with the Commissioner of the

14  Department of Corrections.  Everything in here in that

15  paragraph talks about my client having contact with McCrory,

16  his contracting consultant.

17          THE COURT:  Why don't you finish your argument then

18  and tell me what's legal about that paragraph.

19          MR. FORTNER:  I also disagree with the probation

20  writer's conclusion, or with us, so the court reaching a

21  conclusion based on the probation officer saying that McCrory

22  told him that Mr. Longoria knew when he first approached

23  McCrory that McCrory was paying bribes to Epps.  I have never

24  seen any proof of that.

25          THE COURT:  Now, I don't recall your having made an

```
1   objection to that.
2           MR. FORTNER:  Well, I made an objection --
3           THE COURT:  Wait a minute, Mr. Fortner.  In your list
4   of objections, I don't recall your having objected to that
5   sentence or anything in that paragraph.
6           MR. FORTNER:  I didn't make that specific objection to
7   that sentence.
8           THE COURT:  That's what I'm saying.  You didn't make
9   that objection, did you?
10          MR. FORTNER:  No, sir, I did not object to that
11  sentence.
12          THE COURT:  Either written or oral.
13          MR. FORTNER:  Neither written nor oral did I make
14  objection to that sentence, that's correct.  And, in fact, my
15  client did plead guilty to a conspiracy that involved two
16  illicit bribes being paid to Epps, one to get the initial
17  contract, the second for the bridge contract.  And he entered a
18  guilty plea to that, so we have certainly not denied that.
19          THE COURT:  Okay.  Continue.
20          MR. FORTNER:  My only problem is the way the probation
21  officer has worded this in here.
22          THE COURT:  But that's a recent objection as of a few
23  minutes ago, because I hadn't heard it before.
24          MR. FORTNER:  Yes, sir, that's absolutely true.
25          THE COURT:  Okay.  Continue.
```

1    MR. FORTNER:  It is an on-the-spot objection that I

2    just made.

3    THE COURT:  All right.

4    MR. FORTNER:  But other than that, Judge, if the

5    M.D.O.C. wants to write bid specs that require the bidders to

6    provide American-made products as opposed to Mexican-made

7    products or Chinese-made products or Japanese-made products,

8    that's the Department of Corrections' business.  I mean I don't

9    know who makes that call.  But I don't know of any illegality

10   to the Department of Corrections making that a requirement of

11   their bid specs.

12   THE COURT:  Did your client do anything illegal in

13   Paragraph 17?

14   MR. FORTNER:  Judge, I'm having a hard time seeing

15   what's illegal there other than the bribe being paid to Epps.

16   I think the two bribes paid by McCrory with money received from

17   a consulting contract from my client and paid to Epps, I think

18   that's illegal, and I think my client has pled guilty to that.

19   But as far as submitting bid proposals or bid specifications to

20   your consultant that you are going to ask your consultant whose

21   job it is to help you get the bid, to use his position to try

22   to make these bid specifications, the bid specifications that

23   the Department of Corrections puts out when they put out that

24   bid for bidding processes, I don't think there is anything

25   illegal about that at all.  I think there is something

1    inherently capitalist about that but not illegal.

2         THE COURT:  And you have ignored this paragraph which

3    says that it has to be something in it for Epps.  That's from

4    the bottom, 11 -- hold it.  It's 10.  10 from the bottom.  *We*

5    *have to take care of Epps*.

6         MR. FORTNER:  McCrory recalled he told Longoria that,

7    quote, *We have to take care of Epps*.  Nobody ever provided me

8    with that statement until I saw that in this report.

9         THE COURT:  But you didn't object to it.

10        MR. FORTNER:  I have never heard that conversation.  I

11   have never heard a recording of that statement, and the

12   government never provided me with any report that says McCrory

13   told Longoria that, *We have to take care of Epps*.

14        THE COURT:  And if your client said that, that

15   wouldn't be illegal either?

16        MR. FORTNER:  I think it would be illegal, yes, I do.

17   I think if my client said that, it would be illegal.  I have

18   just never seen the proof that he said that other than --

19   unless we are basing everything we are going to talk about here

20   on Cecil McCrory.  And I have a real hard time basing

21   everything we do to my client on the word of Cecil McCrory.

22        THE COURT:  Okay.  Go ahead and finish your argument.

23        MR. FORTNER:  Judge, the fact is Mississippi was -- on

24   the amount of loss, the arguments are getting interspersed or

25   interrelated, so let me just separate quickly and go to the

total benefit or the amount of loss attributable to my client, the -- not the restitution but the amount of value of total benefit received by my client.

THE COURT:  I just want to be sure.  So then you are finished with 17, Paragraph 17?

MR. FORTNER:  Hang on.  Yeah.  Well, no, I'm not quite finished with Paragraph 17, Judge, so let me go back.  If you will look up on the 9th line immediately after that quote which kind of came out of nowhere, *We have to take care of Epps,* the writer says:  *Longoria and McCrory agreed upon a commission price of $1.40 per cup for McCrory, and this price included Epps' portion of the bribe.*  That sentence is written as if my client and McCrory sat down and had an agreement, a verbal agreement, a written agreement, some kind of open overt agreement that my client said to him, *I'm going to pay you $1.40 commission per cup and you pay Epps a bribe out of that amount.*  And there is no evidence that's been presented any time in any of these cases that I know of that relates that conversation ever happening between Mr. Longoria and Mr. McCrory, that he said that Mr. Longoria specifically told McCrory, *You pay Epps' bribe out of the $1.40 commission per cup.*  That's never come to my attention.  It has never been raised to me.  It has never been stated to me.  I don't know where the probation officer got that statement from.  And so, yeah, I would make a recent immediate objection to that being

considered by the court as part of its sentencing decision.

THE COURT: And, as I stated before, this was not objected to until now.

MR. FORTNER: That is correct, Your Honor.

THE COURT: Okay. Continue.

MR. FORTNER: Okay. Judge, the probation writer -- the probation officer has cited a Fifth Circuit case, *Landers*, which cites to a Third Circuit case, *Leonidas*, in which he states that the amount of the consultant fee paid to McCrory -- let me start over. $60,000 bribe was paid to Epps by McCrory. All right? My client is responsible for that $60,000 when you begin to add up the total benefit received by my client. He is responsible for that. The case law is clear on that.

He is responsible for the -- excuse me. He is responsible for the $131,389.90 that DTC -- I hesitate to use net or gross profit or value, but that's the amount that DTC walked away with after cost of goods and services was deducted from the total contract price.

If you add 131,389 and 60,000 for the bribe to Epps, that comes to a total of $191,389.90. That is the amount of money that we believe and contend should be used when the court determines the total value benefit to DTC for purposes of the sentencing guidelines level, a determination of the sentencing guidelines level.

The probation officer argues and urges the court to

1    also include in that amount the consulting contract amount paid

2    to McCrory minus the $60,000 bribe.  That would raise the level

3    at least two levels on the sentencing guidelines.  The problem

4    with that is that our case law says that direct costs to, in

5    this case Mr. Longoria or DTC, are deducted from the amount of

6    total benefit received.

7            So the amount of the payment by the State of

8    Mississippi to DTC total, minus the cost of the product itself

9    and its shipment to Mississippi, should be -- plus the bribe

10   should be the amount used.  They are suggesting that the amount

11   used should also include the contract paid to consulting

12   services of Cecil McCrory.  The problem with that is that the

13   circuit court -- both the Fifth Circuit and all of the circuits

14   have clearly said that direct costs are deducted from the total

15   value received.  You cannot deduct overhead costs from the

16   total value of benefit received.  And that's what *Leonidas* and

17   *Landers* talks about.  But you do deduct direct costs.

18           And they specifically in -- the 11th Circuit in

19   *Devegter* -- *United States v. Devegter* clearly states that a

20   consulting contract fee paid to a consulting company that is

21   directly identifiable to the criminal act involved is a direct

22   cost to the payer, the company, and it is deducted just as the

23   cost of goods and services is deducted.  A direct cost is the

24   cost of goods and services.  Somehow or other the probation

25   officer who wrote this report has concluded or made some

1    conclusion that the amount of the consulting contract minus the
2    $60,000 paid by McCrory to Epps should be attributable and is
3    attributable to Mr. Longoria when you're figuring out the total
4    value of the benefit received by DTC in this case.  And that's
5    incorrect.

6    The best example *Devegter* puts out or guidance they
7    give us is if the company paid an end of the year bonus to its
8    salesmen or to consultants and the end of the year bonus didn't
9    have anything to do with a particular contract, it was just an
10   end of the year bonus that had to do with all the business that
11   had been done that year, then that would not be separable.  You
12   couldn't separate that out.  It would be like overhead.  And so
13   you wouldn't include that when you're trying to figure out the
14   total value of the benefit received by Mr. Longoria in this
15   case.

16   However, when it's a specific consulting contract and
17   the amount paid to the consultant is specifically limited to
18   this particular contract, this particular incident, this
19   particular crime, for instance, then that amount is a direct
20   cost and it must be deducted before you determine the benefit
21   of the total value received by Mr. Longoria.  If the court
22   follows *Devegter*, then that -- it's around $190,000, maybe
23   $180,000, Judge, has to come off the total value received.  And
24   that would lower -- that would lower the level -- the total
25   base level, offense level, at least two points, at least two

levels.  And we are suggesting to the court that it follow the

11th Circuit in this matter in the *Devegter* case and deduct

that amount of money where the probation officer has added it

in to reach his total base offense level.  And we believe it

would make a difference.  That's my argument on that issue,

Judge.

Now, with reference to restitution, the presentence

report writer is arguing to the court to set restitution at

$369,000, give or take a few dollars, and he is basing that --

he is basing that amount on the difference in the total cost of

the contract for the product that my client provided and what

he believes the total cost of the contract would have been if

the U.S. Diagnostics bid had been accepted.  Okay?

The problem with that is that it would have been

illegal to accept the U.S. Diagnostics bid because it didn't

meet the bid specifications.  Their product was not CLIA

approved or CLIA waived, and that's a big deal.  I know that

you have heard some testimony about that and some explanation

about that, but this -- this Clinical Laboratory Improvement

Act, it's not a joke, and it's serious.  It's taken very

seriously in drug testing -- in the area of drug testing.  And

if your drug testing apparatus is not CLIA approved or CLIA

waived, your results aren't reliable and you will not maintain

your accreditation with the American Corrections Association.

If a prison who is accredited by the ACA uses drug testing

apparatus that is not CLIA waived or CLIA approved, they will lose their accreditation. And Mississippi has proudly announced its accreditation. The M.D.O.C. has been proud to announce its accreditation by the ACA every time you turn around. That's a big deal for them. And the fact of the matter is U.S. Diagnostics' product was not CLIA waived or CLIA approved, nor did it meet any of the other five reasons that were given for refusing that bid, for not taking that lower bid.

Now, I'm not suggesting to the court that McCrory didn't influence Epps. I'm not suggesting to the court that McCrory didn't bribe Epps. I'm not suggesting to the court that Mr. Longoria didn't know about that. And I'm not suggesting to the court that this crime didn't happen. In no way am I suggesting that, and in no way am I trying to absolve Mr. Longoria of his culpability and his participation and responsibility in this matter. However, they are asking you to assess $369,000 in restitution against someone who had the lowest and best bid and the only bid that qualified -- that qualified under the bid specifications put out by the Department of Corrections.

Rightly or wrongly, those were the specifications, and his drug testing cup met those specs, and it was the same drug testing cup that we had paid -- that Mississippi, when I say we, had paid Brannon Medical almost $250,000 more for the year

before and were prepared to do that this year until it went out
for bid.  And they are asking you now to say, Well, yeah, it
did cost Mississippi $250,000 less to use Mr. Longoria's
product than it did the year before, but we want him to pay
back $369,000 in restitution because we think we could have
used a cup that wasn't any good, that wasn't made in America,
that had five different reasons for us not accepting that bid,
but we want you to go ahead and say we would have accepted that
bid.  We would have accepted that bid except for Longoria's
illegal meddling in the process.  And that's simply not true
because U.S. Diagnostics bid a product that did not meet the
specifications.  And Mr. Longoria should not be penalized for
that.  I'm not saying he ought to be rewarded because he
participated in a scheme to bribe Commissioner Epps.  I'm not
asking you to reward him for that, Judge.  I'm just asking you
to look at the numbers and be fair about the numbers.  If
that's -- if what we are talking about are numbers, then let's
be fair and honest about the numbers.

        And the numbers don't lie in this case and the bid
specs don't lie either.  And there wasn't anything wrong with
those specs.  They were good, solid specs, and nobody not one
time anywhere in any of the documentation in this case has
anybody suggested that Mark Longoria provided an inferior
product to the State of Mississippi, that he provided a product
that wasn't worth what he charged the State of Mississippi,

that he provided a product that didn't work or he provided a
product that got Mississippi in trouble with the FDA or with
CLIA or with the ACA.  None of that has ever been suggested.
And, in fact -- in fact, Your Honor, the very next year after
this year we are talking about, Redwood Technology did underbid
Mr. Longoria's company and they did get the contract the next
year for M.D.O.C. drug testing cups, and they used the exact
same drug testing cup.

          THE COURT:  Now, they manufactured that cup, didn't
they?  Didn't Redwood manufacture it?

          MR. FORTNER:  I think Brannon Medical.

          THE COURT:  Didn't your client have some involvement
with Redwood?

          MR. FORTNER:  My client -- as he tried to explain
yesterday, Your Honor, my client's involvement with Redwood,
these -- there were companies buying other companies.
Corporate giants were picking up --

          THE COURT:  But your client had involvement with
Redwood.  Is that so?

          MR. FORTNER:  Yes.  And his involvement did not have
to do with the bidding process.  His involvement with Redwood
was to transfer contracts that had previously been in some
other company's name to the Redwood company.  These are
existing contracts, not bidding new contracts, not doing their
business.  He was --

1          THE COURT:  So what is your client guilty of?  Paying

2     a bribe for a result that he lawfully could have obtained or

3     did obtain?  Is that what you are saying?

4          MR. FORTNER:  No.  I mean my client is guilty of

5     entering into a consulting contract knowing that the consultant

6     was going to use some sort of illegal influence monetarily on

7     Commissioner Epps to help my client get the contract.

8          THE COURT:  And what was that illegal influence?

9          MR. FORTNER:  He paid McCrory money.

10         THE COURT:  To do what?

11         MR. FORTNER:  To influence Commissioner Epps.

12         THE COURT:  To do what?

13         MR. FORTNER:  To get him the contract.

14         THE COURT:  And did he get the contract?

15         MR. FORTNER:  He did get the contract.

16         THE COURT:  So was he paying the bribe because he got

17    the contract that you say that he would have gotten anyway

18    legally?

19         MR. FORTNER:  Judge, in retrospect, I think it's

20    possible that he might have been able to legally get the

21    contract, but that's not what he did.  He entered into conduct

22    that was clearly illegal in violation of a federal statute.

23    And he has readily admitted and pled guilty to that.

24         THE COURT:  He pled guilty to enter into a lawful

25    contract?

1          MR. FORTNER:  No, sir.

2          THE COURT:  I thought you said that he did nothing

3    wrong.

4          MR. FORTNER:  I didn't say that he did nothing wrong,

5    Your Honor.

6          THE COURT:  You said he did nothing wrong with

7    McCrory.

8          MR. FORTNER:  He did do something wrong with McCrory

9    because he knew McCrory was going to bribe Epps.

10         THE COURT:  Now, I thought you were quarreling with

11   whether he knew that.

12         MR. FORTNER:  Sir?

13         THE COURT:  I thought you were quarreling with the

14   presentence investigation report where it says that he knew

15   that McCrory was bribing Epps.  I thought you said you hadn't

16   seen anything on that.

17         MR. FORTNER:  I'm arguing with the way it was

18   presented by the presentence report writer.  I mean he is

19   advocating a position here.  I thought the presentence report

20   writer was supposed to be a neutral and objective fact-finder

21   for the court.  And rather, he is arguing the case for the

22   government.  That's what I'm arguing about.  That's one of the

23   things I'm complaining about.  However, I'm not suggesting to

24   the court that Mr. Longoria is not guilty of the crime to which

25   he pled guilty.

1          THE COURT:  Of bribing Epps through McCrory to secure

2    a contract that otherwise -- to otherwise he was not entitled.

3          MR. FORTNER:  Judge, to secure a contract.  And

4    whether he was entitled to it or not, it would still be illegal

5    for him to bribe Commissioner Epps or participate in a scheme

6    to bribe Commissioner Epps.  I'm saying in retrospect looking

7    back now knowing what we know now, had we known it then, had he

8    known that then, he might have chosen a different code of

9    conduct.  That's something he can explain to the court when he

10   allocutes.  But looking back on it --

11         THE COURT:  Then why didn't he plead not guilty?

12         MR. FORTNER:  Sir?

13         THE COURT:  So why didn't he plead not guilty?

14         MR. FORTNER:  Because he paid -- because he entered

15   into a scheme with McCrory to fix the contract, to get the

16   contract.

17         THE COURT:  But the contract didn't get fixed.

18         MR. FORTNER:  Judge, in retrospect, the contract

19   didn't need fixing, but that's not what he thought when he

20   entered into it.  Okay?

21         THE COURT:  I see.  So you are saying your client

22   entered into what he thought was an illegal scheme when

23   actually it wasn't illegal?

24         MR. FORTNER:  No.  I think it was illegal to pay a

25   bribe to Commissioner Epps.  It was illegal.

1    THE COURT:  He entered into a scheme to pay a bribe to

2 Commissioner Epps for the performance of a contract that your

3 client had lawfully engaged in?

4    MR. FORTNER:  Well, that my client -- well, he didn't

5 lawfully engage in it because he paid a bribe.

6    THE COURT:  You said he was entitled to that contract.

7    MR. FORTNER:  In retrospect, he was entitled to the

8 contract.  I believe he was, in retrospect.  But he didn't know

9 that at the time.

10    THE COURT:  I see.

11    MR. FORTNER:  When he entered into this activity with

12 McCrory and McCrory with Epps, he did not know that he might

13 have gotten the contract through legal means.  He opted --

14 basically he made a bad, wrong decision, and it was an illegal

15 decision, and it was an illegal act, and he knew that and he

16 was aware of that.

17    THE COURT:  So then Epps didn't do anything wrong

18 either, did he?

19    MR. FORTNER:  Epps did a lot wrong.  He took a bribe.

20    THE COURT:  He took a bribe to secure -- oh, I see.

21 He is wrong because he charged monies in a bribe for providing

22 something that was legal.

23    MR. FORTNER:  Judge, once he took the bribe, nothing

24 was legal.  Okay?  It wasn't legal after that.  Now, had Epps

25 never taken the bribe, had Mr. Longoria never paid McCrory, had

1    McCrory never paid Epps, Mr. Longoria might have gotten the
2    contract anyway.  I don't know.  I don't know if he would have
3    been awarded it or not.  But he could have been awarded it.
4            THE COURT:  Is your client saying now through you that
5    he did nothing wrong?
6            MR. FORTNER:  No.  My client is not saying that,
7    Judge.  He has never said that.
8            THE COURT:  Is he saying now through you that his
9    securing of this contract as a bid matter that he did nothing
10   wrong?
11           MR. FORTNER:  No, he is not saying that.
12           THE COURT:  Other than bribing Epps to get him this
13   contract, is your client saying he did nothing wrong?
14           MR. FORTNER:  Yeah, other than bribing Epps, he didn't
15   do anything wrong other than entering into this contract with
16   McCrory knowing McCrory was going to pay some of his fee to
17   Epps as a bribe.  Other than that, my client delivered
18   everything he contracted to deliver.
19           THE COURT:  So your client's conversation with Epps
20   was not wrong?  What you are saying -- I think you said one
21   time that this is a normal conversation between a would-be
22   purchaser and a middle person, a consultant individual?  So you
23   are saying none of that was wrong?
24           MR. FORTNER:  No, I'm not saying that all those
25   conversations were right.  I am not saying that.  But I am

saying that those conversations do occur in other states other times.

THE COURT:  But I'm talking about here.

MR. FORTNER:  In this particular case, because of the situation my client put himself into by hiring McCrory knowing McCrory was going to bribe Epps, after that, his conversations with Epps were improper.  Absolutely.  And they shouldn't have happened.

THE COURT:  So your client is guilty of improper conversation?

MR. FORTNER:  My client is guilty of conspiracy to bribe a public official, Your Honor.

THE COURT:  Right.  That's the improper conversation I'm talking about.

MR. FORTNER:  It's more than just improper conversation, Your Honor, and my client has pled guilty to far more than that.

THE COURT:  And your client is remorseful about the bribe?

MR. FORTNER:  My client is, always has been, and will address the court about that matter.

THE COURT:  But your client is not remorseful of his conversation with -- did he have a conversation with Epps?

MR. FORTNER:  He did have some conversations.

THE COURT:  He called Epps about, what, 17 times?

1              MR. FORTNER:  I'm not sure, Your Honor.

2              THE COURT:  I think he had conversations with Epps at

3     least 17 times on the telephone?

4              MR. FORTNER:  I know that --

5              THE COURT:  And had about 66 I think telephone calls

6     with McCrory?

7              MR. FORTNER:  I think, yes.  I don't --

8              THE COURT:  Let's see.  We're looking at page -- here

9     it is, Page 27.  The phone tolls illustrated that Epps and

10    Longoria communicated on 11 different occasions between

11    July 11th, 2013, and August 17, 2013.  Further toll records

12    reveal that McCrory and Longoria communicated 71 different

13    times between July 1, 2013, and August 29, 2013.

14             MR. FORTNER:  Yes, sir.

15             THE COURT:  Okay.  So you are saying that was just

16    simply conversations to flesh out how the bid proposal should

17    go and there was nothing illegal about that part of it?

18             MR. FORTNER:  May I have just a second, Judge?

19        (SHORT PAUSE)

20             MR. FORTNER:  Judge, I'm not going to sit here and

21    tell you that all 82 of these phone conversations were

22    appropriate or legal, but I am going to tell you that phone

23    conversations between service providers and product providers

24    of technical, scientific material and Department of Corrections

25    commissioners or consultants to explain their products to help

those people understand what it is they are looking for, what they need or don't need, happen all the time all over the country, and they are not always illegal.

Now, if there are bribes involved, if there are improper influences involved to obtain contracts for those services and products, yes, that is illegal. I can't sit here and tell you that all 82 of these conversations involved illegal contact. I'm sure that some of them did. I just don't know how many of those did.

But, once again, Judge, I -- I don't think -- the bottom line here is there was a bribe involved. My client pled guilty to that. He readily has admitted that and accepts responsibility for that. And through me, he is not trying to deny that to the court. He is not trying to say anything like that. But the flip side of that is while that portion of his activity was illegal and some of his other activities directly related to that were illegal, clearly, at the end of the day, at the end of fiscal year 2013-2014, the Mississippi Department of Corrections did receive a quality product that performed according to its guarantees, and they used that product. So they got their money's worth.

Now, I'm not saying that that makes it all all right. I am not trying to say that. I know it may sound like that to the court, but I am not trying to say that. But it doesn't make everything Mr. Longoria did illegal or wrong. He did

perform the contract, and he did provide the service, and it
did cost the State of Mississippi 200 to $250,000 less in
fiscal year 2013-2014 than it had cost them in the fiscal year
preceding that and that they were willing to pay for 2013-2014
until this went out for bid.

Now, that doesn't mean that he had any right
whatsoever to obtain the bid the way he obtained it, and it
doesn't mean that he had any right whatsoever to pay a bribe
through McCrory to Commissioner Epps. That's absolutely
illegal, and he has pled guilty to that clearly. But
Mississippi didn't lose $339,000 in this case, Judge. And
ordering him to pay restitution of $339,000 is just not right.
If you want to punish him monetarily, the court has available
to it the power of the fine, the monetary fine that the court
can exact. And that, I suggest, is more appropriate under
these circumstances than what I consider to be a fictitious
calculation of restitution, because there is no restitution in
this case due to the State of Mississippi.

THE COURT: All right. Now, just one second there.
Let me ask Mr. LaMarca to stand. Mr. LaMarca, at the time that
Mr. Longoria entered his plea of guilty, you read off a
statement of facts that the government could prove. Did you
not?

MR. LAMARCA: I did.

THE COURT: Do you have a copy of that now?

1          MR. LAMARCA:  I do not have that with me, Your Honor.

2          THE COURT:  Okay.  Then I want to take a 10-minute

3     recess, and then I want you to secure that statement of facts

4     that the government could prove to which Mr. Longoria agreed.

5          MR. LAMARCA:  I'm sorry, Your Honor.  I will tell the

6     court that yesterday on cross-examination Mr. Longoria admitted

7     that when he entered the contract in August of 2013 that he

8     knew Mr. Epps was being paid by Mr. McCrory, and he said that

9     yesterday from the witness stand.

10         THE COURT:  All right.  I still want to see what you

11    read off at the time, and I want to ask you one other question,

12    too, that I failed to ask yesterday.  The company involved

13    here, Drug Testing Corporation, is not owned by Mr. Longoria.

14    Is that correct?

15         MR. LAMARCA:  That is correct.

16         THE COURT:  You touched upon that yesterday in one of

17    your questions to Mrs. Longoria.  Didn't you?

18         MR. LAMARCA:  I think I questioned her about the

19    frozen accounts, but I don't know that I questioned her about

20    ownership other than she had some knowledge of the frozen

21    accounts.

22         THE COURT:  Okay.  But now, she was actually the owner

23    of Drug Testing Corporation.

24         MR. LAMARCA:  That's my understanding, yes, sir.

25         THE COURT:  So then in the presentence investigation

report where it's stated that -- like on Page 9, look at Page 9.  Mr. Fortner, look at Page 9.

      MR. FORTNER:  Yes, sir.

      THE COURT:  Look at D at the top.  *On September 16, 2013, a check was written from an account belonging to Drug Testing Corporation in the amount of $194,837.50 payable to Investigative Research, Inc., for consulting fees.*  Now that's in D.  And then later there is a repeat of that further down, for instance, in G, where it talks about another sum of $34,997.64 was a check written on the Drug Testing Corporation account payable to Investigative Research, Inc. for, quote, unquote, consulting commission, unquote.

      Now, my question is that's written in a passive voice, so it doesn't tell me who actually wrote the check.  So, Mr. LaMarca, do you know who wrote the check?  Because the owner of the corporation was Mrs. Longoria, not Mr. Longoria.  So who wrote those checks?

      MR. LAMARCA:  Your Honor, as part of G-1, the checks to Investigative Research that were produced by Drug Testing Corporation has the actual signature on the check redacted.

      THE COURT:  You don't know who wrote them?

      MR. LAMARCA:  I can't tell the court who wrote this particular check.  I will put it on the overhead.  It is part of G-1.

      THE COURT:  Okay.  Let me look at it.

1          MR. LAMARCA:  This is how it was produced to me from

2    Drug Testing Corporation pursuant to a subpoena.  Ms. Makris I

3    believe is still in the courtroom if the court needs to

4    question her with regard to that.  She was the one that

5    produced these documents.

6          THE COURT:  She produced them?

7          MR. LAMARCA:  Yes, she did.

8          MR. FORTNER:  My client has told me his wife was the

9    person who generally wrote all of the checks.

10          THE COURT:  Not generally, but I want to know who

11    wrote these checks.  Then when I come back, then she will

12    testify on this point.  I will call her back to the stand.  But

13    I'm going to call her back after a 10-minute recess so she can

14    be prepared to testify.  And the question I'm going to ask is

15    who wrote these checks listed on Page 9 under D and under G and

16    how the finances of Drug Testing Corporation were handled as to

17    who wrote the checks, who deposited the money, etcetera.  So I

18    will ask that when I come back.  All right?  We will be in

19    recess for 15 minutes.

20     (RECESS)

21          THE COURT:  All right.  I'm ready for the witness.

22          MR. LAMARCA:  I'm sorry, Your Honor.  I missed it.

23          THE COURT:  I said I'm ready for the witness.

24          MR. FORTNER:  Judge, I can tell you that --

25          THE COURT:  That's okay.  I want her to come up.

1        MR. FORTNER:  Ms. Makris?

2        THE COURT:  No.  I want the wife to come up.  She is

3   the owner of the company, Drug Testing Corporation.

4        MR. FORTNER:  Yes, sir.  Judge, I ask the court if the

5   court intends to ask her questions that might in the court's

6   mind be incriminating of her, then I have to ask the court to

7   appoint counsel to represent her, because I can't advise her.

8        THE COURT:  Well, let me ask the prosecution.  Has she

9   ever been a target?

10       MR. LAMARCA:  She is not a target.  We had no

11  information that she had knowledge.

12       THE COURT:  And on this matter of signing the checks,

13  did you know whether she signed the checks?

14       MR. LAMARCA:  I'm finding out now.  Our financial

15  analyst had received a number of checks, deposits, from

16  Investigative Research accounts.  So she is back in the office

17  now searching for those particular checks that went to

18  Mr. McCrory from his accounts that we can see who actually

19  signed those checks.  And we do know that she has got one check

20  and it's that Mr. Longoria signed it, and that was the first

21  check, the larger check.

22       THE COURT:  Okay.

23       MR. LAMARCA:  She is coming now with that.

24       THE COURT:  All right.  Then I will wait on her to

25  come back.  Why don't you proceed?  Mr. Fortner, are you

1  finished with your argument?

2        MR. FORTNER:  Did the court have any -- I think I

3  pretty much argued the two major objections that I had to the

4  presentence report writer's calculations, one having to do with

5  the total base offense level.  I believe it should be two

6  levels lower than what he reached based on the exclusion of the

7  total -- from the total benefit of value to Mr. Longoria of the

8  amount paid to Investigative Research by DTC minus the $60,000

9  bribe, of course, to Mr. Epps.  The second one was the argument

10  that restitution of $339,000 is not justified by any figures,

11  any action in any way in this particular case and is based on

12  the mistaken presumption without any proof whatsoever that U.S.

13  Diagnostics' lower bid should have been or would have been

14  accepted by the Department of Corrections even though it didn't

15  meet any of the bid specifications in at least five different

16  very specific areas, and M.D.O.C. would have been in violation

17  of ACA standards and CLIA standards if they had accepted the

18  United Diagnostics bid.  So the amount of that bid cannot in

19  any way be used to determine anything in this case, restitution

20  or anything else for that matter.

21        And the final thing I would point out to the court,

22  you received a letter late in this on Mr. Longoria's behalf

23  written by a woman named Betty Slack, who is the Deputy

24  Director of the West Virginia Correctional Industries.  And a

25  brief reading of that letter, while it's written as a character

1    letter, she also points out, though, conversations after

2    working for the Division of Corrections for 18 years that she

3    has had not only with Mr. Longoria but other service and

4    product providers to the West Virginia Department of

5    Corrections to learn about products that they are interested in

6    buying or might be trying to put out for bid to buy, such as

7    drug testing apparatus and other apparatus, and that the

8    information in the specifications that the Department of

9    Corrections receive and get and make into a bid proposal are

10   based on information they receive from the providers themselves

11   all over the country.  So it's not out of the ordinary in this

12   business for these conversations to occur as far as bid specs.

13          Now, once again, I readily admit to the court and am

14   in no way backing off of or denying that Mr. Longoria was

15   guilty of the crime to which he pled guilty and that he did, in

16   fact, engage with Cecil McCrory in a scheme to bribe

17   Christopher Epps.  And I have not backed off of that in any

18   way, shape or form.  And my argument to the court is simply a

19   practical argument about how business is done in this

20   particular field.  But in no way am I trying to justify the

21   actions of my client, the criminal actions that he has admitted

22   to before this court.

23          THE COURT:  All right.  Thank you.  Mr. LaMarca, did

24   you receive the documents you were hoping to receive?

25          MR. LAMARCA:  We do have, Your Honor, the first check,

1    and I can put it on the projector.

2            THE COURT:  Okay.

3            MR. LAMARCA:  That is the check dated 9-16 of '13 and

4    made payable to Investigative Research.  The signature line is

5    what it is, but the government believes that this is another

6    check to Mrs. Longoria with the same appearing signature.  And

7    then we also have another check of Mrs. Longoria with her

8    signature which is certainly not the signature here.  We can

9    only eliminate Mrs. Longoria from having signed that check that

10   you see right here, Your Honor.

11           THE COURT:  Which one?

12           MR. LAMARCA:  The 194.

13           THE COURT:  194.

14           MR. LAMARCA:  Check Number 1012.

15           THE COURT:  Point to it.  Point to it.

16           MR. LAMARCA:  Here.  And the signature line here.

17           THE COURT:  So you don't know who signed that check?

18           MR. LAMARCA:  We deduct it was Mr. Longoria, but we

19   can't say for sure.  We do have another check that was made

20   payable to Mrs. Longoria here with the similar signature.

21           THE COURT:  Then you have one that's written by her?

22           MR. LAMARCA:  We do, Your Honor.  And that appears to

23   be Mrs. Longoria's signature there.

24           THE COURT:  Go ahead and make your argument.

25           MR. LAMARCA:  Your Honor, a couple of things.  With

regard to the amount of loss, as the court is aware, the amount of loss is the net benefit to the company, which is, in this case, the total value of the contract less indirect costs, which would be overhead and things such as that. The court is also instructed that you do not deduct the value of the bribe itself in computing the value of the benefit.

Mr. Fortner is saying the value of the bribe in this case is just the $60,000 that actually went to Mr. Epps. So he is telling the court you can add that but you don't add the entire consulting fee that was paid to Mr. McCrory to get the higher amount.

The entire payment to Mr. McCrory was paid with the understanding that he was going to share that with Mr. Epps. That was the understanding of Mr. Longoria. That was the understanding of Mr. Epps and the understanding of his confederate, Mr. McCrory. It's the entire amount to Mr. McCrory that is tainted in this case. Mr. McCrory's efforts were all at securing a contract through getting the State of Mississippi to include information in the request for proposal that would give his company a competitive advantage. This was all part of the scheme. This was part of Mr. McCrory saying, *We've got to take care of Mr. Epps,* as part of Mr. Epps' wanting to be taken care of for making sure these things happened the way they needed to happen for that contract to go to Mr. Longoria.

           Now, the very case, the 11th Circuit case that
Mr. Fortner has cited to the court with regard to bonuses being
paid to employees, that there was no specific bonus for that
one particularly bad contract that the employee entered, bad,
bribed contract, so the court did not deduct the bonuses as the
net benefit because they said that's all indirect costs; that's
just the costs of the company staying in business.  They give
their bonuses to employees for work throughout the entire year.

           That very case said that when the company, the law
firm in this case, paid an intermediary $83,000 of which half
of that was paid to the recipient who they needed to bribe, the
11th Circuit said it's the full amount that is considered the
bribe, not just that small part, in that case half, that went
to the person being bribed.  The payment that went to the
intermediary was also included as part of that bribe amount,
which is what you have in this case, Your Honor.  You have
Mr. McCrory being the intermediary.  It is the full amount that
went to Mr. McCrory that's tainted that should be considered
the full amount that it cost this company to execute its scheme
to bribe Mr. Epps.  Mr. Epps and Mr. McCrory were in it
together to get money that -- Mr. Epps used Mr. McCrory as his
go-between in a lot of different contracts.

           They had it set up.  In this case, Mr. Longoria knew
of that setup when he entered this contract.  He said so
yesterday, that he provided the information as was part of our

exhibits where it was stated he didn't want the side test strip on the cup on the side, it should be on the top, that it was not CLIA request. It was just his request of the state to include the test strip on the top rather than on the side because it would give a more accurate, a result that you could not defeat through adulteration, yet that was a request he gave and sent to Mr. McCrory -- it might have actually been sent to Mr. Epps -- stating that this would take out all of the cheaper cups.

I don't think it's a leap at all for this court to find that the whole process in getting this contract was manipulated, that what -- and I don't take issue with Mr. Fortner's position that the things said in the response as to why U.S. Diagnostics should not get this contract were untrue. I don't think they were untrue. I don't think you even need to go there to determine whether they were true or not. What you do is you look and see why his cups or his offer beat out U.S. Diagnostics when the request for proposal was set up in such a manner that his cups, his product, would be the product that met this proposal. That is rigging the process to cost the state more money than it should.

The issue is not whether the state saved money from the year prior but whether the state lost money in fiscal year '13 or '14, from August 2013 to July of 2014. That is the issue. Did the state pay more than it should have? I submit

1  to the court that it did, that the proposal that was submitted

2  whether it was CLIA accepted, approved or waived or not is

3  beside the point.  U.S. Diagnostics sent in their bid under the

4  request for proposal.

5       To say that the state had to rely on this new

6  information provided by Mr. Longoria is to say that the state

7  could not remember what it had done the year before.  If it

8  were the same cups and ended up costing $900,000, the state is

9  going to issue the same request for proposal?  No.  They did

10  not.  As a matter of fact, they actually changed part of it,

11  and Mr. Longoria said, No, no, no, you can't change that; that

12  will allow too many cheaper cups to come in for the state.

13       Now, based upon U.S. Diagnostics' bid and why it was

14  thrown out, I think the court should look at the efforts as to

15  who was going to gain by having U.S. Diagnostics' bid thrown

16  out:  Mr. McCrory, Mr. Longoria and Mr. Epps.  Did the State of

17  Mississippi gain by having that bid thrown out?  I submit to

18  the court no, it did not.

19       The amount that is set forth in the presentence report

20  is the amount that the state overpaid, $368,205.75.  The

21  offense level should include the total amount of payments to

22  Mr. McCrory plus the actual as stated the gross profit of 131.

23  A total of $361,225 should be considered the net benefit which

24  includes Mr. McCrory's payment and the gross profit to Drug

25  Testing Corporation.

1      THE COURT:  Mr. Fortner contends that the other

2  bidders were simply not qualified under the various standards

3  to be awarded the contract in question.  What's your response

4  to that?

5      MR. LAMARCA:  Standards established through collusion

6  for a competitive advantage to Mr. Longoria, it was set up, it

7  was rigged so that Mr. Longoria would be the bidder.

8      One other point that I failed to mention previously is

9  the court heard the recording that Mr. Longoria had Redwood

10  Toxicology bid higher at his request.  It makes one pause to

11  wonder why Redwood would bid higher than him at his request on

12  a competitive bid to the State of Mississippi.  Was it a

13  courtesy bid that Redwood Toxicology was putting in that he had

14  some control over?  We don't know the answer other than he said

15  on the witness stand that Brannon told him.  What he said, I

16  never could comprehend.  I might just be slow in that regard,

17  but I couldn't comprehend why another company who is submitting

18  a bid would agree to bid higher than you on a competitive

19  process other than the fact that you can get it this time and I

20  will get it next time and you promise me you will bid higher

21  than me next time.  I don't know the answer, but it just

22  doesn't make economic sense for that to have occurred.  But it

23  is recorded in his own words, something that's very difficult

24  to refute.

25      But that's what I say to the court is the fact that

the other bid, the other one bid, may not have qualified

because of the qualifications that were set up to give

Mr. Longoria the competitive advantage that he needed to have

his product.  The plausible explanation that he could give

these other officials with M.D.O.C. who have to approve this

contract so that they go, Okay, I can see an arm's length deal

here, you would never have known that this was an issue without

the recordings being made and the bank account analysis showing

Mr. McCrory after having received his money paid Mr. Epps.  It

would show that, but Mr. Longoria's involvement, his knowledge

of this, was through the recordings and the T-III that was in

place, Your Honor.  That was Mr. Longoria's undoing.

        THE COURT:  All right.  Thank you.

        MR. LAMARCA:  Yes, sir.

        THE COURT:  It's almost 11:00 now.  I'm going to take

one look back through these exhibits one more time and then

finish the sentencing at 1:00.  So I will see you all then.

    (RECESS)

        THE COURT:  Now, we are back on record.  Let me hear

from probation on this whole matter about the overpayment and

what probation contends should be reimbursable or what is the

net gain to the defendant.

        PROBATION OFFICER:  Your Honor, it has always been the

contention of probation that the amount of the net gain should

be what was determined in the presentence report which was

```
1   $361,225.04.
2            THE COURT:  Is it 361?
3            PROBATION OFFICER:  I'm sorry.  361,225.04.
4            THE COURT:  Okay.  That's still your impression.  In
5   other words, what I'm asking you is are you moved at all by the
6   argument of defense counsel to make any type of changes?
7            PROBATION OFFICER:  No, sir, I am not.
8            THE COURT:  All right.  Thank you so much.
9   Mr. Fortner?
10           MR. FORTNER:  Yes, sir, Your Honor.
11           THE COURT:  Would you go to the podium and take your
12  presentence investigation report with you?
13           MR. FORTNER:  Yes, sir.
14           THE COURT:  It is my customary practice to make sure
15  that I advise defense counsel and government counsel of any
16  matters in the presentence report that I think might be a
17  matter of contemplation on sentencing.  So I would like to be
18  sure that I have my facts right and that there need not be any
19  adjustments.
20           So there are a few places in the presentence
21  investigation report that I would like to just tell you what my
22  concern is and give you a chance to respond before I actually
23  issue some sentence.  Is that okay with you?
24           MR. FORTNER:  Yes, sir.  I might also add, Your Honor,
25  that my client would like to make allocution to you.
```

1    THE COURT:  Yes.  I haven't gotten there yet.  I'm

2  just going to go through this, and then I'm going to take your

3  client's allocution, because there might be something that I

4  need to comment on here.

5    So now I will start over here on Page 15, at Page 15

6  where it deals with the financial condition/ability to pay

7  which is over on Page 14 continuing on to Page 15.  There are

8  some matters there.  Among those matters are two residences.

9  One is his primary residence, and that's at $350,000.  Then

10  there is another residence which is described as rental

11  property, and the valuation there is $150,000.  Now, it's

12  described as rental property, but I don't see in this financial

13  report the report of any rentals.  Of any rentals.  And my

14  question is is did I miss that somewhere?  I see down under

15  monthly expenses, I see rental property for $1,021.95, but

16  that's an expense under home mortgage.  But I don't see any

17  report of rents for this rental property that's listed at

18  $150,000.

19    MR. FORTNER:  May I speak to my client?

20    THE COURT:  Okay.

21  (SHORT PAUSE)

22    MR. FORTNER:  That piece of rental property is lived

23  in by his recently married daughter and her husband, and

24  basically the rent is enough to pay the note on the monthly

25  mortgage on the property.

THE COURT:  Now, the mortgage is listed down further
where it says mortgage, primary residence, and mortgage, rental
property.  And the mortgage on the rental property is
$14,131.83.  Do you see that under liabilities?  Look under --

MR. FORTNER:  I see that.

THE COURT:  Okay.  So you are saying that the amount
of rent that's collected goes towards the satisfaction of the
mortgage?

MR. FORTNER:  Yes, sir.

THE COURT:  So how much is the rent?

PROBATION OFFICER:  Your Honor, if I may, down at the
bottom of the page of Page 15, there's a monthly expense of --
it says rental property of $1,021.

THE COURT:  That's for home mortgage.

PROBATION OFFICER:  That's for the rental property.
The home mortgage is $1,587.26.

THE COURT:  Hold it.  You are saying that this
1,021.95 is how much the defendant has to pay in the mortgage.

PROBATION OFFICER:  That's a monthly note, yes, sir.

THE COURT:  Okay.  Now, but did you have a report from
him that his daughter and her new husband are paying that
amount?

PROBATION OFFICER:  No, sir.  At the time of the
presentence report, the defendant had provided me with
documents through Mr. Fortner which Mr. Fortner left at my

office, and he did provide me with numerous financial statements.  But at the time, his -- and I don't know who was the -- who was living in the residence at the time the presentence report was written.  As we heard testimony yesterday, his daughter has only been married about three months.  This report was produced back in September of 2015.  So she was not married at the time.  I don't know who the tenant was at that time.

THE COURT:  So you don't know whether he derived income at that time?

PROBATION OFFICER:  No, sir, I do not.

THE COURT:  So you do not know obviously then from the time of his arrest until now how much income he has actually made off that residence?

PROBATION OFFICER:  No, sir, I do not.

THE COURT:  Okay.  Was he ever asked anything about rental income?

PROBATION OFFICER:  Your Honor, if I may, let me look through his financial papers, because I know I interviewed the defendant via the telephone.  We talked about his income and whatnot.

THE COURT:  And while you're looking, also think about the next question in connection to that as to whether this was reported on his income tax returns.  You can be looking that over, and I can go on down the page.  Look those over and I

1  will take up something else with Mr. Fortner.

2            MR. FORTNER:  Yes, sir.

3            THE COURT:  Mr. Fortner, let's go down to monthly

4  income.  Monthly income is listed for the spouse at $7,749.  Do

5  you see that?

6            MR. FORTNER:  Yes, sir.

7            THE COURT:  Okay.  And does that come from ownership

8  of the business we have been talking about?

9            MR. FORTNER:  Yes, sir.

10           THE COURT:  Now, he is also employed by the business.

11 Is that correct?

12           MR. FORTNER:  Yes, sir, I believe so.

13           THE COURT:  Because it says here that he gets paid in

14 commissions and a monthly average of $5,000.

15           MR. FORTNER:  That's correct, Your Honor.  That's what

16 I'm reading also.

17           THE COURT:  So it says here total monthly income is a

18 bit more than $15,089.61.

19           MR. FORTNER:  I think at the time that this occurred,

20 yes, I think that's true.

21           THE COURT:  What's different?

22           MR. FORTNER:  I think probably in the last year that

23 my guess is that income has dropped substantially because of

24 his guilty plea to a felony charge.

25           THE COURT:  But he was working for her, though, wasn't

1    he?

2              MR. FORTNER:  Yes, sir.  I guess you could say that.

3    I mean they had the company together.

4              THE COURT:  My report doesn't say together.  My report

5    says that she is the owner.

6              MR. FORTNER:  I think she is the listed owner of the

7    company.

8              THE COURT:  You are saying that he owns part of the

9    company?

10             MR. FORTNER:  I am not saying that, Judge.  I am

11   saying he is the primary worker in the company.

12             THE COURT:  Well, who else works for the company?

13             MR. FORTNER:  Well, the accountant, Ms. Makris who

14   testified works for the company.  She is -- I think she is the

15   only other employee.

16             THE COURT:  Well, I have it that he has a salary of

17   $2,340.61.

18             MR. FORTNER:  And I have no reason to doubt that, Your

19   Honor.

20             THE COURT:  And that he also gets money on

21   commissions.

22             MR. FORTNER:  And I have no reason to doubt that, and

23   I think that's probably an estimate of what the monthly

24   commissions were at the time he gave this information to

25   Mr. Alexis.

1          THE COURT:  Well, you know, he had worked for another

2     place from 2004 to 2013, I believe.  And then after this matter

3     happened, he went to work for his wife.

4          MR. FORTNER:  Well, and I think technically DTC has

5     existed for several years, Your Honor.  I think that it's been

6     slowly building up over the years.  But I think he has been

7     working technically for his wife for years.  But he has also

8     worked for Brannon Medical and Rush Diagnostics as you saw in

9     his autobiography.

10          THE COURT:  Counsel, look at Page 14.

11          MR. FORTNER:  Yes, sir.  I'm there.

12          THE COURT:  That gives his employment history.  It

13     goes back to 2004.  And there are only two employers listed

14     there, Brannon Medical Corporation in Irvine, California, and

15     that's from 2004 to 2013, and then from 2013 to the present,

16     Drug Testing Corporation, Houston, Texas.

17          MR. FORTNER:  Yes, sir.

18          THE COURT:  What are these other places you are

19     talking about?

20          MR. FORTNER:  I can tell you that prior to 2004 he

21     worked at Roche Laboratories.  In the autobiography that I

22     forwarded to Your Honor, he goes through all of that employment

23     history in that autobiography that I forwarded to Your Honor.

24          THE COURT:  Okay.  So you do agree that his spouse

25     owns the company?

1          MR. FORTNER:  Yes.

2          THE COURT:  And this is her salary from the company of

3  $7,749 a month?

4          MR. FORTNER:  Yes, sir.

5          THE COURT:  Okay.  And then I notice over here under

6  credit card, look over here on Page 16 at the top up there,

7  three from the bottom -- I mean right before total monthly

8  expenses.  Before that, it has credit card minimum payments.

9  Do you see that?

10          MR. FORTNER:  Yes, sir.

11          THE COURT:  It says that's $2,000?

12          MR. FORTNER:  Yes, sir.

13          THE COURT:  But it just says minimum payments.  Is

14  there any reason why his credit card debt was not listed to

15  show what it was in its entirety?

16          MR. FORTNER:  Judge, I feel -- I sat with Mr. Alexis

17  while they had a phone conference and went through all these

18  questions, I think, and I know the documents were sent to

19  Mr. Alexis.  All I can tell you is my client answered all the

20  questions that were asked of him.  I don't know why a credit

21  card expense is not listed here or is listed.  I can't answer

22  that.

23          THE COURT:  Let me turn to probation.

24          PROBATION OFFICER:  Your Honor, this information was

25  obtained through his credit bureau inquiry that I ran

independent of what the defendant provided to me.  This was

done on August 26th of 2016.  At the time, defendant -- and I

think I've -- I should have notated it.  He has one account in

collection status for medical bills of $92.  And as far as his

credit cards go, he wasn't showing much -- a balance of -- he

has one account, and I can't make out who it is, of $10,000,

and a Bank of America of 1886.  And then of course -- that 1886

is actually a second mortgage.  Excuse me.  It is not a charge

account.  And then all of his other charge accounts have zero

balances, Your Honor, that I could find.

      THE COURT:  Okay.  So then with regard to his monthly

expenses, they are higher than what's listed here?  What's

listed here is $14,325.19.

      PROBATION OFFICER:  I believe that to be accurate.

That's what the defendant provided to me, and I believe it to

be truthful from the documentation that he provided to me.

      THE COURT:  What is truthful?

      PROBATION OFFICER:  The 14,325.19.

      THE COURT:  Those are his monthly expenses?

      PROBATION OFFICER:  I believe that to be the case,

yes, sir.

      THE COURT:  Okay.  What about the page before that

where we talk about liabilities?  Are you saying these

liabilities then are understated if you are saying that he has

credit card of $10,000?  Because under liabilities --

1          PROBATION OFFICER:  I may have missed that one.

2          THE COURT:  Under liabilities, I don't see where there

3     are credit card liabilities.

4          PROBATION OFFICER:  The only one that's listed, Your

5     Honor, is Chase Bank.

6          THE COURT:  That's 2800, but it's not --

7          PROBATION OFFICER:  I may have missed the other one,

8     which I believe it says preferred customer.  And I can't --

9     there is another word behind it.  It just says charge account.

10    The balance on 8-15 of 2016 was $10,164.

11         THE COURT:  10,000.

12         PROBATION OFFICER:  $10,164, yes, sir.

13         THE COURT:  So then what would that do to his net

14    worth?  Reduce it by 10,000?

15         PROBATION OFFICER:  Yes, sir, I believe it would.

16         THE COURT:  And what would that then do to his net

17    worth?  Again reduce it by 10,000?

18         PROBATION OFFICER:  It would increase the total

19    liabilities by 10,000, and it would reduce his net worth by

20    10,000.

21         THE COURT:  And so where would that put us?

22         PROBATION OFFICER:  I believe his total net worth

23    would be roughly $333,000.

24         THE COURT:  Mr. Fortner, do you object to that?

25         MR. FORTNER:  No, Your Honor, I don't.

1    THE COURT:  Mr. LaMarca, do you?

2    MR. LAMARCA:  I do not.

3    THE COURT:  Then turn over to Page 16 under other

4  expenses, the last line before you get to total monthly

5  expenses.  It says other expenses.

6    MR. FORTNER:  Yes, sir.

7    THE COURT:  Church giving, college, charitable giving.

8  I'm thinking that church giving and college means college

9  giving and then charitable giving.  Is it?

10    MR. FORTNER:  My client -- I believe the reference to

11  college means whatever tuition or college expenses he and his

12  wife were paying for their daughter.  I don't think college is

13  a charitable contribution.  I think that's an expense.

14    THE COURT:  Okay.  I see church giving under that same

15  category.

16    MR. FORTNER:  I don't know why they are lumped in the

17  same category, but I think they are different things.

18    THE COURT:  I see charitable giving in the same

19  category.

20    MR. FORTNER:  They do have charitable giving outside

21  of their church also.

22    THE COURT:  Okay.  And then I see the figure of

23  $2,133.33 per month.

24    MR. FORTNER:  My guess is or my opinion is that's what

25  he estimated those expenses to be when he gave his report.

THE COURT:  Let me turn to the probation officer.  How do you break that down?  Is that mostly -- I was under the impression that this category was probably all charitable giving, but since it is not, how much of this is actually charitable and church giving as opposed to college expense?

PROBATION OFFICER:  Your Honor, when he provided his cash outflow statement, there is a blank here that says other. It says list other necessary monthly amounts paid each month you have not yet reported.  Next to that, he wrote in tithing, college and Shriner's Foundation, and he provided one lump sum of $2,133.33, which is where that number came from.

THE COURT:  So what businesses were the objects of charitable giving?

PROBATION OFFICER:  The only thing he had listed here was Shriner's Foundation, Your Honor.

THE COURT:  How much did he list?

PROBATION OFFICER:  He didn't.  He lumped it all together.

THE COURT:  Okay.  So you have Shriner's.  He had his church.

PROBATION OFFICER:  His tithing, yes, sir.

THE COURT:  And did he list how much?

PROBATION OFFICER:  He didn't.  It was all lumped to together.

THE COURT:  And was there anything else under

1　charitable giving?

2　　　　PROBATION OFFICER:  No, sir.  It just says other

3　expenses.  He had tithing, college, Shriner's Foundation.  I

4　understood college to be tuition and expenses that were

5　incurred by his daughter as a father of someone who has a

6　college student.

7　　　　THE COURT:  At least two of the witnesses who

8　testified stated that he was a very generous man who gave to a

9　lot of causes.  That's not on the sheet that he provided?

10　　　　PROBATION OFFICER:  Not beyond the $2,133.33, no, sir.

11　　　　THE COURT:  But I'm talking about as befits the

12　identity of any charities.

13　　　　PROBATION OFFICER:  The only one identified was the

14　Shriner's Foundation, Your Honor, other than his church.

15　　　　THE COURT:  Okay.  Mr. Fortner, I will allow you to

16　comment on that and point me to any evidence of substance

17　concerning this matter.  You know, several witnesses talked

18　about his legendary history of giving, but apparently he didn't

19　list this -- any number of charities to which -- for which he

20　was supporting.

21　　　　MR. FORTNER:  I understand on a monthly basis he

22　tithes to the church -- he and his wife tithe to the church,

23　they pay whatever college expenses their daughters have and

24　they give monthly to the Shriner's Association or Organization.

25　DTC also donates charitably each year to St. Jude's Foundation.

1   St. Jude's, Special Olympics and Lone Soldier.  I don't know if

2   there was a misunderstanding about the question, was this your

3   personal expenses or does the company donate.  I just don't

4   know about that.  That's what my client tells me.

5          THE COURT:  Well, when the witnesses were testifying

6   and they were talking about his history of giving and they

7   named some of the entities, I was writing them down.

8          MR. FORTNER:  Yes, sir.

9          THE COURT:  And surprised to find that they were not

10  reflected in the presentence investigation report.  So they

11  said that he gave.  But anyway, is that your explanation for

12  it?

13         MR. FORTNER:  That's my explanation.  That's probably

14  my mistake for not going through this financial information

15  carefully enough and recognizing that there was no mention,

16  because St. Jude's, Lone Soldier and Special Olympics have

17  always been mentioned and were mentioned in several of the

18  letters that were written.

19         THE COURT:  I agree they are in the letters.

20         MR. FORTNER:  But I did not make the appropriate

21  objection or ask to amend the presentence report or respond to

22  that.

23         THE COURT:  All right.  Anything else you want to tell

24  me then that has erupted because of my inquiries on these

25  various matters?

1          MR. FORTNER:  No, sir.  I don't believe so.  I think

2     my client tried to truthfully and honestly answer all the

3     questions that were asked of him by the probation officer and

4     provide the information that he was able to provide.  I don't

5     think he tried to mislead the court or the probation officer in

6     any way.

7          And the statement, the charitable giving to the

8     church, I think that was marked as an exhibit, Your Honor.

9          THE COURT:  Okay.  All right.  My last question on

10    that, and I know I have said that before, but this is my last

11    question.  Mr. Fortner, is there some explanation as to why the

12    business in question was placed in the wife's name?

13         MR. FORTNER:  I don't know.  You know, I read the

14    presentence report that indicated that because his wife is the

15    owner that the company can apply for minority status, and I'm

16    not exactly sure what benefit or plus or minus that is one way

17    or the other, Judge.  I don't do that type of business law.  I

18    presume that the indication is that because the business is in

19    her name that as a female she can -- she would be considered a

20    minority status -- the company would be minority status owned.

21    That's what I'm presuming.  I don't know if that's good or bad

22    or right or wrong.  That's just the business is in her name.

23         And if that's why and there is -- I assume that

24    it's -- I mean I -- my understanding, nobody has ever charged

25    them with doing something wrong or alleging that there is

1  something improper about that.  But I don't know.

2          THE COURT:  So you are saying that someone can be a

3  figurehead owner of a business to get some kind of acquired tax

4  status?

5          MR. FORTNER:  I don't know if it's a tax status issue,

6  Judge, as much as it might be some sort of consideration --

7          THE COURT:  Or business loan.

8          MR. FORTNER:  Maybe beneficial consideration.

9          THE COURT:  So you are saying someone could be a

10  figurehead owner and lawfully derive loans as a person who

11  actually owns it when the person is merely a figurehead?

12          MR. FORTNER:  Well, yes, I am saying that, and I

13  believe that it happens every day hundreds of times all across

14  this country.

15          THE COURT:  I'm asking you is that legal.

16          MR. FORTNER:  I can't answer that question, Judge.  As

17  far as I know, it's not illegal, but I'm not a -- that's not an

18  area of the law I specialize in at all or claim any knowledge

19  of.

20          THE COURT:  Well, I said that because remember she

21  testified she said that she was a housewife.

22          MR. FORTNER:  And I think that she said that in her

23  letter to Your Honor, too.  I agree.

24          THE COURT:  She said she was a housewife.  And she

25  didn't say that she owned the business or that she started the

business or that she ran a business.  She said that she was a housewife.

MR. FORTNER:  Yes, sir.

THE COURT:  So when I saw that, then I remembered what was in the presentence investigation report, that she actually is listed as the owner.  And when I first brought the matter up to you, you said that they own it.  And I reminded you that in the presentence report that it only says he owns it.

MR. FORTNER:  Judge, let me say that I think I was answering your inquiry from a practical standpoint.  From a practical standpoint, Mr. Longoria is the main worker in this business and he is the main breadwinner in this family.  I think that his wife is a housewife/mother.  I think she is also the technical legal owner of the business.  I think she participates to some degree in the business but not nearly to the degree that Mr. Longoria does.  And if you wanted me to put a percentage on it, then my guess would be 90 percent of this business is Mr. Longoria and 10 percent is her.  But that's just my guess.  But I think technically on paper she is listed as the owner of the business.

THE COURT:  All right.  Thank you.  Now let me turn to Mr. LaMarca and see if he has any final comment on that.  Mr. LaMarca, what is the government's appreciation of her relationship to the business?  Is she a figurehead, or is she a true active owner of the business?

1          MR. LAMARCA:  Based upon what I have heard today,

2     heard throughout the investigation, Mr. Longoria is the actual

3     worker in the business and handles all the business aspects of

4     the business.  We have uncovered nothing with regard to

5     Mrs. Longoria other than the fact that she is the title owner

6     of the business, the registration with the Secretary of State's

7     Office.

8          THE COURT:  Now then, while you're still standing,

9     what is your recommendation here?

10          MR. LAMARCA:  The lower 25 percent of the guideline

11     range.  We do need an agreed preliminary order of forfeiture to

12     be completed or signed by the defendant so as to complete his

13     bargain in the agreement, the plea agreement, and we will make

14     the recommendation with that.

15          THE COURT:  Why don't you talk to defense counsel and

16     see if you all can have that signed now.

17          MR. LAMARCA:  And also I wanted to bring to the

18     court's attention that if Mr. Longoria is receiving that rental

19     property payment that matches the mortgage payment on the

20     rental property that that would increase his net monthly

21     in-flow by $1,000.

22          THE COURT:  Okay.

23       (SHORT PAUSE)

24          MR. LAMARCA:  May it please the court?  Your Honor, we

25     do recommend the lower 25 percent of the guideline range

1    pursuant to our plea supplement, and we also have an agreed

2    preliminary order of forfeiture.  We would ask the court to

3    enter that and to also make forfeiture a part of the judgment.

4              THE COURT:  Can I see that order?

5              MR. LAMARCA:  Yes, Your Honor.

6         (DOCUMENT TENDERED TO COURT)

7              THE COURT:  I have a proposed order which is styled

8    Agreed Preliminary Order of Forfeiture between the United

9    States of America, the government, and the defendant, Mr. Mark

10   Longoria.  This order is in two pages.  It addresses a money

11   judgment of $131,389.90.  On the second page, I see signatures.

12   Mr. LaMarca, this is your signature on the second page?

13             MR. LAMARCA:  Yes, Your Honor.

14             THE COURT:  Mr. Longoria, is this your signature?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Before you signed this document, did you

17   read this document?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Did you understand it?

20             THE DEFENDANT:  As well as my attorney could explain

21   it to me, yes, sir.

22             THE COURT:  Do you need some more time with it?  I

23   will give you some more time if you need it.

24             THE DEFENDANT:  No, Your Honor.

25             THE COURT:  Do you want it to be read again to you?

1        THE DEFENDANT:  No, Your Honor.

2        THE COURT:  Would you like for me to read it to you?

3        THE DEFENDANT:  I'm fine, Your Honor.

4        MR. FORTNER:  If I may, Judge, I think Mr. Longoria

5   would benefit from the court's explanation of what the

6   government is likely to do with that judgment.

7        THE COURT:  This is a money judgment of forfeiture.

8   It concerns the amount of $131,389.90.  The document here is an

9   agreed preliminary order of forfeiture by which the parties

10  here all agree that the factual basis presented by the

11  government to which the defendant agrees that $131,389.90

12  constitutes property that was received as proceeds involved in

13  the violation charged in the criminal information to which you

14  pleaded guilty and was monetary proceeds traceable to such

15  violation.

16        Further, the criminal information charges that the

17  defendant in the conspiracy was charged with conspiracy in

18  violation of Title 18, United States Code, Section 371.

19  Therefore, pursuant to Title 18, United States Code, Section

20  981(a)(1)(C) and Title 28, United States Code, Section 2461(c),

21  the government is entitled to a forfeiture of said monies upon

22  proof that the money constitutes property that was received as

23  proceeds involved in the violation charged in the criminal

24  information and was monetary proceeds traceable to such

25  violation.

1          So, by signing this, you are agreeing with the

2     government on this particular approach.  In the first paragraph

3     it says that you are aware of the consequences of having agreed

4     to forfeit to the government your interest in and to the

5     property described, that is, the monies I have just mentioned;

6     that you have been apprized of such by your attorney and by

7     this court and that you have freely and voluntarily with

8     knowledge of the consequences entered into a plea agreement

9     with the government to forfeit such property.  And, by this

10    document, this formal document, you hereby waive your ownership

11    of such money and you recognize and agree that this money can

12    be transferred to the custody, possession and ownership of the

13    United States of America.  This document authorizes the court

14    to enter this order immediately and that this forfeiture order

15    shall be a part of the sentence of the court whether ordered at

16    that proceeding or not and whether or not attached as a part of

17    said judgment in the criminal case.

18         So then the court does not have to conduct any hearing

19    on this allegation of forfeiture which is here contended by the

20    government.  If you were to contest this forfeiture, the court

21    would have to have a hearing on this particular matter

22    involving this particular matter, money, and whether that money

23    again is traceable to the violation charged in the criminal

24    information and whether this money was received as proceeds

25    involved in that violation.

1    So, by signing this, you are giving up your right to

2    challenge this forfeiture action.  I remind you that when the

3    government charged you that the government charged you in the

4    substantive count of having violated the law and then charged

5    that you also were exposed to a forfeiture as here discussed.

6    If you had contested the substantive count against you to which

7    you entered a plea of guilty, you are entitled to a trial by a

8    jury.  You opted instead to plead guilty.  If you challenged

9    this entitlement to forfeiture, then again you would have the

10   right to challenge this matter at court and have a fact finder

11   determine whether the government has met its proof with regard

12   to the elements of forfeiture.  But by your signature here, by

13   your agreement here, you are saying a trial is not necessary on

14   this forfeiture, that you agree that you are liable for the

15   money and so say so by signing this agreed preliminary order of

16   forfeiture.

17         Now, even though you signed this particular document

18   which allows this court to file this matter in the court

19   proceeding and then subjects you to liability under this

20   document and which also says that the court shall retain

21   jurisdiction to enforce this order and to amend it as necessary

22   pursuant to Federal Rules of Criminal Procedure 32.2(e), that

23   even though you have signed this in the past, I imagine where

24   it says down here, Mark Longoria, Defendant, that even though

25   you signed it, if you tell me now that you wish not to sign it,

1    I will cross through the signature and set this matter for some

2    hearing and then determine the effect of your decision on the

3    rest of the proceedings.

4            Now, so what I have here on the top line is the

5    signature of Mr. Darren LaMarca, Assistant United States

6    Attorney.  On the second line I have Mr. Mark Longoria,

7    Defendant, and I have what appears to be a signature.  Is that

8    your signature?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Do you still wish to go through with this

11   order of forfeiture?  If you want to change your mind, you may

12   do so now, because I will only accept this order of forfeiture

13   if you are signing this document freely, voluntarily, knowingly

14   and without any coercion or undue influence on you whatsoever.

15   So then would you like to leave your signature here, or would

16   you prefer that I strike through this, void this entire

17   document and then we will go from there?

18           THE DEFENDANT:  Leave the signature, Your Honor.

19           THE COURT:  All right, then.  I will leave the

20   signature.  And when did you sign this form?

21           THE DEFENDANT:  Just before you read that to me, Your

22   Honor.

23           THE COURT:  Okay.  And, Mr. Fortner, when did you sign

24   it?

25           MR. FORTNER:  At the same time as my client, Your

1  Honor.

2          THE COURT:  And, Mr. Fortner, do you wish for this

3  matter to be entered as part of the record?

4          MR. FORTNER:  I do, Your Honor.

5          THE COURT:  Then I will sign the document where it

6  says so ordered and adjudged this, and I'm putting down 14th

7  day of February, 2017, and I'm signing my name thereunder.

8     (SHORT PAUSE)

9          THE COURT:  Now then, you said your client wants to

10  make allocution.  Okay.  If you all will approach the podium?

11  Will the probation officer stand and provide the guideline

12  range?  The full guideline range is 70 to 87 months

13  notwithstanding the statutory cap.  Am I correct?

14          PROBATION OFFICER:  Yes, sir, Your Honor, based upon

15  the information provided in the presentence report.

16          THE COURT:  So then under the guidelines as ruled upon

17  by the court relative to various objections, the guidelines

18  state a range of 70 months to 87 months, but the statutory

19  maximum here for incarceration is 60 months.  Therefore,

20  inasmuch as the statutory maximum is 60 months, then that is

21  the maximum sentence the court can impose as opposed to the

22  minimum of 70 months under the guidelines.  Do you agree with

23  that?

24          PROBATION OFFICER:  Yes, sir, Your Honor.

25          THE COURT:  The next is supervised release.

1  Supervised release is one year to three years. Do you agree?

2          PROBATION OFFICER: Yes, sir, Your Honor.

3          THE COURT: Probation here is not an option. Do you

4  agree with that, too?

5          PROBATION OFFICER: Based under the guidelines, yes,

6  sir.

7          THE COURT: Then under the fine provision from 12,500

8  to $125,000. Is that the fine range?

9          PROBATION OFFICER: Yes, sir, Your Honor.

10          THE COURT: Restitution I have ruled on, and I found

11  restitution at $368,205.75. Do you agree?

12          PROBATION OFFICER: Yes, sir, Your Honor.

13          THE COURT: In reaching this determination, the court

14  was impressed by the argument of the prosecution that this

15  should be the appropriate amount of restitution. Does

16  probation agree with that same assessment?

17          PROBATION OFFICER: Yes, sir.

18          THE COURT: And then with regard to special

19  assessment, Congress has required any defendant convicted

20  whether by plea or by trial of an offense must pay an

21  assessment of $100. Is that correct?

22          PROBATION OFFICER: Yes, sir.

23          THE COURT: Now, are there any other matters I need to

24  take up with regard to the sentencing guidelines, or does this

25  complete the whole approach to the sentencing guidelines?

PROBATION OFFICER:  I do not believe the court has any other matters to take up in regards to the guidelines.

THE COURT:  All right.  Now, finally, since this is a sentencing guideline matter, the court can upward depart, but there is nowhere to upward depart.  Is that correct?

PROBATION OFFICER:  No, sir.

THE COURT:  So the court in this instance has no upward depart option because 60 months is the max under the statute.

PROBATION OFFICER:  Yes, sir, that's correct.

THE COURT:  But the court can downward depart.  Is that so?

PROBATION OFFICER:  Yes, sir.

THE COURT:  The court can downward depart if the court is persuaded that there are factors here that warrant the court to sentence below the guideline range where those factors have not been considered by the sentencing guidelines.  Is that correct?

PROBATION OFFICER:  Yes, sir.

THE COURT:  From probation's standpoint, are there any factors for downward departure?

PROBATION OFFICER:  Probation did not identify any, Your Honor.

THE COURT:  Of course, that does not handcuff the court, though, does it?

1          PROBATION OFFICER:  No, sir, it does not.

2          THE COURT:  And the court could still downward depart.

3          PROBATION OFFICER:  Yes, sir.

4          THE COURT:  Because the court can make its own

5     independent finding.

6          PROBATION OFFICER:  Yes, sir.

7          THE COURT:  All right.  Thank you so much.  Let me

8     turn to the prosecutor.  With regard to downward departure,

9     what is your view as to whether there are any factors here that

10    would warrant the court downwardly departing in this instance?

11         MR. LAMARCA:  Your Honor, we don't identify any

12    factors along with probation or we concur with probation.  We

13    do make our recommendation of the lower 25 percent of the

14    guideline range, and that will be the recommendation of the

15    U.S. Attorney's Office.

16         THE COURT:  So then let me be sure I understand what

17    you are saying.  The matter is capped at 60 months.

18         MR. LAMARCA:  It is.

19         THE COURT:  So you are asking for the lower

20    25 percent.  So then how does that translate into months?

21         MR. LAMARCA:  The lower 25 percent, Your Honor, is

22    going to be higher than the statutory maximum, so, therefore,

23    the statutory maximum would be the recommendation of the U.S.

24    Attorney's Office.

25         THE COURT:  So then when you say the lower 25 percent

1   of the guideline range, you are saying the lower 25 percent of
2   the range between 70 and 87 months?

3           MR. LAMARCA:  That's correct.  Our agreement was the
4   lower 25 percent of the guideline range, whatever that came to.
5   And in this instance, if the court has found that the proper
6   application of the guidelines yields a 70 to 87-month range,
7   then the lower 25 percent of that would still be higher than
8   the statutory maximum.

9           THE COURT:  Let's see if we agree on the calculations.
10  So then if the court were to use 70 as the minimum -- did you
11  say the guideline range 70 to 87?

12          MR. LAMARCA:  I did, Your Honor.

13          THE COURT:  So then that's 17 months difference?

14          MR. LAMARCA:  There is.

15          THE COURT:  And then if you do the lower 25 percent,
16  it is one-fourth of that?

17          MR. LAMARCA:  It would be.

18          THE COURT:  And that's four months?

19          MR. LAMARCA:  It would be.

20          THE COURT:  And then you are saying that under your
21  agreement then you would only subtract four months from 70.  Is
22  that correct?

23          MR. LAMARCA:  It would be 70 to 74.

24          THE COURT:  So then the court could sentence the
25  defendant to 70 months under your agreement?

1  MR. LAMARCA:  That would be within it.

2  THE COURT:  But since that 70 is higher than the

3  statutory max, then it reverts to 60 months?

4  MR. LAMARCA:  That's correct.

5  THE COURT:  Okay.  Thank you.

6  MR. LAMARCA:  Yes, sir.

7  THE COURT:  Now, Mr. Longoria, I just wanted to make

8  sure that I spell all of this out to you because your attorney

9  says that you want to make allocution.  And during allocution,

10  a defendant has the right to ask the court for leniency on the

11  court's sentencing.  You have heard the prosecutor say and the

12  probation officer say that they identify no grounds for a

13  downward departure.  That doesn't have to handcuff you in your

14  presentation to the court.  So you know now what the guidelines

15  prescribe unless Mr. Fortner has an objection to those

16  guidelines.  Mr. Fortner, do you?  Do you object?

17  MR. FORTNER:  Other than the objections that I had

18  already expressed to the court.

19  THE COURT:  All right.  But as far as the calculations

20  after the court made its determinations, do you agree that what

21  has been described now would be the guideline range?

22  MR. FORTNER:  Yes.

23  THE COURT:  Okay.  So, Mr. Longoria, what I'm asking

24  you then is what matters you would like to discuss with the

25  court where you are asking for leniency that you are asking the

court to even go below the 60 months or go somewhere between 70 and 74 months, whatever your pleasure is.  But whatever you have to say with regard to this matter of allocution, I'm ready to hear you.

Now, one other thing I have to mention.  Now, Mr. Fortner, do you want your client to make this under oath or not under oath?

MR. FORTNER:  I think he is fine making it not under oath, Your Honor.

THE COURT:  Is that correct, Mr. Longoria?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  Okay, then.  Then you are now making an unsworn statement.  Go ahead.

THE DEFENDANT:  Your Honor, at the plea hearing -- at the plea hearing you went into great detail to help me understand what that meant and the legal process.  You also mentioned there would be a presentence investigative report and that I needed to pay real close attention to that report.

I spent numerous -- because I live in Houston and my attorney is here in Mississippi, we spent a lot of time on the phone over this process to review everything in the case, so much that I'm sure that his office staff refers to them saying that just by my first name, Mark is on the phone.  So we spent a lot of time.  And my attorney assured me that he was going to address the positions in the document, because I looked over

that document, Your Honor, and I took your word to heart and I
looked over that document frontwards and backwards, and I
talked to Tom all the time on, you know, what I didn't agree
with in that document.  And he said, *I understand it; I'm going
to make those objections.*

I believe at the end of the interview with the U.S.
Probation Officer, Your Honor, that according to my attorney
advised me and everything that we need to just like in signing
that deal that we needed to show cooperation, we needed to
admit the criminal act and we needed to show remorse in that
action and that I believe there was like a 3 percent or a
three-point deduction once you meet those requirements and
everything.  And I believe that I cooperated fully.  I admitted
to the crime, and I showed remorse at that time in the phone
conference call in that interview, Your Honor.  And I believe
that that was met.

In your conversations with my brother and my pastor,
my son, Cam, my daughters, Alexis and Savanna, three things
stood out to me yesterday.  Those things, Your Honor, were that
you were paying attention and engaged them in questions as to
how I explained this situation to each of those individuals,
what was my reason -- if they knew, what was my reason for my
involvement.  And, three, would I do this again, is there any
chance according to what they saw would I do this again.

Your Honor, yesterday we answered a lot of questions

1    back and forth regarding the -- regarding the employment of

2    Brannon Medical.  I was employed by Roche Diagnostics for 13

3    years as in the autobiography that I provided to you.  After

4    that division was sold off, they -- I had just achieved the

5    highest award for sales in the nation.  They only choose one

6    presidential achievement award annually for that, and that year

7    after receiving that, the next month they called and said, *Hey,*

8    *sorry, the division has been sold, you're being let go.*

9    Severance package, good luck and everything.

10          So I explained about Brannon being bought out by Alere

11   Toxicology.  Brannon was a manufacturer and still is a

12   manufacturer -- they actually closed that division and they are

13   having it manufactured by somebody else now, but Brannon is a

14   manufacturer of drug testing products and was purchased by

15   Alere because they have the only FDA cleared saliva product on

16   the market.  They were about 1.1 million in sales.  At the end

17   of 13 years, they were between 13 and 14 million in sales.

18   When they were purchased, Alere was buying -- has bought

19   Redwood, other manufacturers and other distributors -- large

20   distributors.

21          When Brannon was purchased, Your Honor, in the

22   beginning of 2013, January the announcement was made or

23   December the end of '12, we always go into the office for a

24   home office meeting in California that all the sales reps come

25   in from all over the United States.  When the company was

announced that it had been bought by Alere, immediately, Your
Honor, all the sales staff, all except for two, were let go.
Because I had a lot of government contracts and I worked those
government contracts and my name was on them representing by
the manufacturer's rep for Brannon, my name were on those
contracts and they were to Brannon Medical Corporation and I
was the authorized signer for the signatures of those
contracts.  They couldn't -- they wanted to get -- Alere wanted
to get all of those assigned to Redwood because they handled
the criminal justice -- they were a big criminal justice sales
force and they had a lot of contracts with criminal justice.
So they wanted to get those contracts all assigned over there.

          So I knew that when I signed over my last state
contract, Your Honor, to them, because they had already let
everybody else go and there was only one other guy, the
international sales guy, that was going to be my last day.  In
September -- mid September of 2013, I signed my last contract
over to the State of Virginia to Redwood, the legal
proceedings -- you know, they switched the name and assigned it
over from Brannon to Redwood.  That was on a Monday.  And on
Tuesday, Your Honor, HR called and said, You are gone, the
position has been eliminated, sorry, here is a couple months
severance or whatever that was and you're gone.  And I
understand that because it's happened before and I know the
business and I know the industry.

Your Honor, one of the questions that you wanted to know was a reason. What are the mitigating factors in this? And I can tell you, Your Honor, that I have three women in my house, my wife and my two girls. I have been the provider for them for 29 years, and I have provided for my daughters. I want my daughters to have a college degree and not have to struggle like I did. I want them to not have to depend on a man but hopefully find the right man and live the rest of their life in peace together and happily and to be able to provide for their families in a good way, in a, you know, a law abiding, Christian home. And I know without a degree, Your Honor, and in my autobiography to you I struggled to get an associate's degree after going through the military and going back to school after eight years from graduating high school and I only got an associate's degree. So I have been told no all my life as far as trying to get into sales or do this or that. I don't have the minimum requirements to do that. So I know how important it is.

My wife, Your Honor, she graduated high school, wanted to be a mom like her mom. And that's fine with me. But I know that I'm the sole provider for my wife and daughters and that I want them to go to school. At this time, Your Honor, they were both in school. Since then, my daughter, Alexis, graduated the day after the FBI came knocking on my door. And they said, Enjoy tomorrow, you know, the graduation. So we weren't going

1    to steal that honor and that happiness from our daughter.  We

2    told her after that.  But we didn't tell her until after the

3    graduation and everything, sometime after that.

4           But, Your Honor, when my daughter, Alexis, sat over

5    there and you asked her what her degree was in, that made me

6    proud because I know she accomplished something that nobody can

7    take away from her and I know no matter what that she has got a

8    chance.  I hope, I pray to God that her marriage works out when

9    she gets married to her future husband, and I pray that they

10   stay together forever and I pray that they have as good a

11   relationship as my wife and I do.

12          So that made me proud, Your Honor.  And it meant a lot

13   to me because I struggled to be able to provide for them where

14   my parents couldn't do some of the things that I tried to do

15   for them.  I tried to take what my parents did and I try to

16   improve on that.  My little one, Savanna, she is hardheaded.

17   She is like me.  She came to me, wanted to drop out of school

18   about a year ago, and I said, Hey, I'm okay being the bad guy,

19   but you drop out of school, you have got to move out, I take

20   the car back, take the cellphone, cut the money off.  As long

21   as you're in school, we will help you, pay for it.  And she

22   didn't like that.  She really resisted me and everything, but

23   she stuck in there.  And she knows now, now that she is married

24   and everything and as you heard yesterday, she wants to go on

25   and hopefully she will get her master's and everything.

1    But, Your Honor, all of this, you want to know what

2 was -- you wanted an answer to those questions.  When you were

3 asking, Savanna explaining, the process that you go through so

4 that you can sleep at night and everything like that, Your

5 Honor, I was paying attention.  And you wanted to know why,

6 what are the mitigating factors, what caused your father to

7 take a chance and a risk of not being with you.  Your Honor, if

8 I would have known that hiring Cecil McCrory and going after

9 this contract would have -- would have gotten me here, Your

10 Honor, there is nothing in the world that I wouldn't do to

11 change this.

12    I have got a lot of notes here, Your Honor, so bear

13 with me, please.

14    THE COURT:  Take your time on it.

15    THE DEFENDANT:  So I knew, Your Honor, that when I

16 got -- when I signed that last contract over to them I was out

17 of a job.  Your Honor, I have been a manufacturer's rep for

18 Roche Diagnostics for 13 years and Brannon Medical for 13

19 years, and I have worked a long time in this industry.  I know

20 when companies buy each other out and everything like that and

21 they move people around and they get rid of people and do away

22 with divisions and what have you, I have been there, I have

23 seen it.  Brannon, as a manufacturer's rep, Your Honor, was my

24 soul source of income.  It was my primary source of income.

25 And the small company, the small distributorship that I had

1    built was doing a couple hundred grand a year or so gross

2    numbers like that, and we provided confirmation testing and we

3    provided to smaller companies, you know, drug testing products

4    and things like that, drug testing products and services.  And

5    I know, Your Honor, that that wouldn't support me and my family

6    and continue to put my kids through school and everything like

7    that.

8              So all the presentence report, these 19 pages where

9    you are trying to fill in the blanks and everything like that,

10   you know, I don't think anybody asked why.  And I'm telling you

11   why, because I have always provided for them.  I'm proud of

12   that.  I have worked hard.  I served my country.  I am a proud

13   person.  And this has hurt me immensely to have to go through

14   this and to explain my crime.  And I'm taking full

15   responsibility for it.  I have pled guilty under my own free

16   will.

17             Your Honor, I didn't think -- once I lost that job

18   which I knew was coming, it happened mid September, I didn't

19   think, Your Honor, that I would be able to provide all those

20   things and be a provider.  I thought that I would let my kids

21   down, let my wife down.  And I have never let them down.  I

22   have always been there for them.  When the girls call mom, it's

23   fun stuff and everything.  When they call me, I know there is a

24   problem.  When my daughter was swimming way out and ran into

25   some jellyfish, she didn't call mom.  She calls dad.  When

something happens bad, they call me. We talk and everything.
We have a very loving family and we talk all the time, but I
know when something happens, they depend on me. They are
girls. Maybe I babied them too much and tried to give them too
much, but I have tried to instill in them the values that my
parents have, the values that I think are important. And, Your
Honor, I stand here and I use those words. And believe me I am
embarrassed, I'm ashamed.

You also asked about how I talked about this to my
pastor. I couldn't get through the conversation at the table
in his office without breaking down. How much of what actually
happened and everything like that, Your Honor, that he got from
that, I don't know what he got from it, but he saw that this
was tearing me apart and that this has had a profound impact on
me and my family and it will continue to do so.

When we told my brother, my brother, Danny said, Hey,
he lives in Virginia, I live in Houston, my wife and I were in
the car, I had him on speakerphone and I told him as soon as we
got the news, as soon as we hired the attorney, as soon as we
got back from the plea. And I told him, and he said, Mark,
stop right there; I don't want to know. I just want to know
what you need. That's what my brother told me, *I don't want to*
*know what happened; I don't care.* He said, *I will sell my*
*house, whatever you need. If you need money, I will help you.*
*Whatever you need me to do, I will help you. I don't want to*

*know.* And, of course, since then till now I have told him. I have gone over details and things like that. I have gone over this case. He knows I'm guilty. I have said I'm guilty here.

With my girls, Your Honor, they are 23 and 24, 22 and 24. They are -- one is very emotional. Savanna is not so emotional. Savanna said, *I don't care; what do we need to do*? Cam, my son, said, *What do we need to do to help you?* My daughter, Alexis, she thought that we were dying, thought one of us was dying. And she says, *Oh, thank God. I can visit you in prison; I can't visit you in heaven.* That was the first thing that popped out of her mouth because she thought one of us was dying. And she has been probably torn up and emotional. She is more emotional than Savanna. She is not as strong as Savanna. She is strong in her own ways.

But this has crushed my kids. How much of that they understand and how they can relate it back to Your Honor when they are nervous and sitting up here because they have never been in this situation -- and I am ashamed I have put them in this situation. I am ashamed that my wife has to sit through this and my employee. I am ashamed that I'm here.

So I wanted to try and answer those questions that you had, those blanks that you had yesterday. I'm trying not to leave anything out, Your Honor. Your Honor, the why? This is -- I've struggled all my life. I have tried to be honest. I have tried to do the right thing. Your Honor, on tithing, I

1    asked my pastor -- I struggled with this with my parents.  It

2    says in Matthew that you are not supposed to ring the bell when

3    you give, that you are supposed to give silently.  I want you

4    to know I didn't want to disclose these things to you.  But you

5    are making a decision on me and my family because of me,

6    because of what I have done in two days.  And I appreciate the

7    time that you are taking and the process of weighing all of

8    this out.  But I didn't want to ring the bell.  I didn't want

9    to disclose specifics.  But my pastor said this is different.

10   This isn't -- you need to do this for your sake.

11        I still struggled with the decision.  I wrote this

12   down:  Sometimes knowing the right decision is not clear and is

13   not known until after the decision is made.  And throughout

14   this whole thing, Your Honor, when I was getting let go from --

15   when I knew the handwriting was on the wall and I was going to

16   be let go and this contract, Your Honor, they were buying this

17   contract from Brannon before under the GSA.  It didn't have to

18   go out for bid.  They didn't need bid specifications.  They had

19   met all the requirements for CLIA, for ACA.  If an inmate

20   requests drug rehab and you're an ACA accredited facility, you

21   have to grant that treatment to that inmate or probationer

22   according to the accreditation of ACA.  That changes this --

23   products that are regulated by the FDA, it's a medical testing

24   device.  I don't want to go off on a tangent, but it changes

25   that to an assessment of health versus just whether they are

1   using drugs or not.  It impacts treatment and everything like

2   that.  That's why it has to be weighed by CLIA.  They were

3   using these products because they met the highest standard out

4   there.  And as a manufacturer's rep, Your Honor, it's my job to

5   educate them in that.  They had never been out to bid before.

6   In '05 it went through a study.  It was -- they were using

7   equipment before that, an on-site analyzer, which I know

8   because I used to rip them apart and put them back together

9   again as a field service engineer before I went into sales.

10  Brannon product came out Number 1.  Every result

11  positive/negative on the instrument, Brannon was the only one

12  that hit that.  The other companies missed.  They reported one

13  positive and Brannon reported negative.  That product, that

14  sample, was chain of custody and sent to scientific testing

15  laboratories, and the sample came out on gas mass spec which is

16  the quantitative analysis, it came out negative.  Brannon is

17  the only company that got that right.  The others would have

18  charged somebody with a positive.  And these are medical

19  testing devices, so they meet certain specifications.  And I

20  tried to sell and represent the best product out there, and I

21  feel that that's what I provide.

22          The other products, the lower one, did not meet those

23  specifications.  If they got audited by SAMHSA, by CLIA,

24  Clinical Laboratory Improvement Act, they would be fined for

25  doing that, for running those products.  I have got the cases.

1    I brought them with me in triplicate.

2          Your Honor, I was scared to death of letting my kids

3    down, letting my family down, letting my wife down, not being

4    able to provide for college, for simple things.  Losing.  That

5    little company making a couple hundred thousand dollars a year

6    gross couldn't make up -- what we netted from that was very

7    small, couldn't make up from this.  I thought, Your Honor, when

8    the opportunity to bid this out, Brannon wasn't bidding it, it

9    was going to go out to a distributor, I thought that the

10   decision, maybe this is the right thing to do.  And I hired

11   Cecil.  I know that's the wrong thing to do, Your Honor.  I

12   know it is.  I know in Mississippi, Your Honor, that Cecil had

13   a relationship with Commissioner Epps.  I don't doubt that.  I

14   know that.  It is like the 800-pound gorilla in the room.  It

15   is never talked about as far as that, but you knew that he

16   could get things done.

17         So, Your Honor, I was -- you wanted the reason?  I was

18   terrified to let my family down, to lose everything, to lose

19   anything, to not be able to keep my kids in college.  And I

20   thought that, you know, the opportunity to bid on this contract

21   because it was going out to bid -- and, Your Honor, Brannon has

22   a couple hundred distributors.  Anybody could have bid on that

23   product.  Anybody.  Anybody could bid another product that met

24   the specs.  Anybody could bid on it.  And usually there is at

25   least a dozen vendors that bid on those things.  So it going

1    out to bid.  There was a big chance in not getting it because I

2    wasn't the only one that sold Brannon product.  There was

3    customers that had bigger volume that Drug Testing Corp, and

4    they get it for less.  They could have bid less.  Why they

5    didn't bid, I have no idea, Your Honor.  I don't know.  But

6    there was three companies that did bid.  And the other one bid

7    higher, no doubt.

8         So, Your Honor, I just want to try to explain to you,

9    you know, what -- you know, how the course of events led me to

10   signing a deal with Cecil and hiring Cecil.  I know it was

11   wrong.  I knew he had some type of relationship with the

12   commissioner or the Department of Corrections.  I knew that,

13   Your Honor.  I'm not denying that at all.  And I know that when

14   I found out that he was paying him money, when he said that on

15   a phonecall, I knew I was in way over my head.  And I made the

16   wrong decision.  I made the decision to go ahead and fill that

17   bridge order and to ship the final shipment of product.  I know

18   I was wrong.

19        And I'm -- Your Honor, every time I look in the

20   mirror, every time I look at my wife, every time my kids --

21   every time I'm looking at them, I'm ashamed.  I'm ashamed of

22   what I have done.  I'm ashamed of how much I have hurt them.

23   And I don't even know the impact.  I got served today, Your

24   Honor, by I guess a subpoena from the Attorney General's Office

25   or something like that, a civil matter in this same thing.  I

don't know the extent that this is going to continue to hurt
me, Your Honor, and to hurt my family.  I don't know.  If you
send me to prison, that's going to have an impact that I don't
know the extent of that impact.  I don't know.

Even if I -- from the day I made that plea and I
accepted it, Your Honor, it hit whatever internet, it hit
bankings, all of my life savings.  I don't have a lot, Your
Honor.  You have my statements there.  I have saved all my
life.  That's the savings.  All those accounts for savings,
Fidelity, TD Ameritrade, all of those, I got notices that they
said they weren't canceled; they said they have been closed,
we're going to refund you your money, you can't keep your money
here and don't call us, we are not doing business with you ever
again.  Boom.  Overnight.  It was right after the interview.
It was literally the timeframe when the interview happened.  I
was like, Wow, did they notify these people?  Did they notify
my retirement accounts?

Your Honor, when this happened, it's almost -- it's
shy of a year.  It feels like an eternity.  Your Honor, I have
been paying for this ever since this happened.  It's
immediately -- I know that my family, my loved ones, I know
that it's impacted them.  I know that the business, it's
impacted our business.  We're probably down 40 percent from
where we were before this until now.  Our ability to continue
on is questionable at best.  But I'm going to work hard.  I

1  have to own this, and I do, and I can't change it.  I don't

2  want it to define me and ruin me, and I'm going to fight to --

3  I've ruined my reputation.  And I don't know if I'm rambling,

4  but I'm going to just try and read a short thing here, Your

5  Honor, to keep me back on track.

6       Sometimes knowing what's the right decision is not

7  clear and you don't know until after the decision is made.

8  This decision to do business with Cecil has impacted me and my

9  family in a profound way.  I have disgraced my wife, kids

10 parents, family, friends, myself.  I have tainted my reputation

11 in the industry that I have worked in for 27 years and that I

12 love, that I have studied, that I have worked hard.  And the

13 company that I built for 17 years, I have tainted that

14 reputation and my representation with that company also.

15      My wife and kids are all.  My wife and kids, my

16 family, they are all standing beside me, but it hurts when I

17 look in their eyes and I feel shame and embarrassment in that I

18 have let them all down.  The ones that depend on me the most,

19 even if they don't feel the same way I do, I know I still let

20 them down.  And they won't tell me that.

21      I have worked hard all my life, and I know God has

22 guided me in all things, and I give him the glory for

23 everything.  I know in my heart he has me and that I may not

24 get the outcome that I want but I know it's the outcome that he

25 has already.  But now I'm a felon.  This decision haunts me

1  relentlessly.  I would do anything to undo what I have done.

2  I'm still learning how devastating an impact this decision is

3  having and will have and will continue to have on my life and

4  my family, my wife and my children.  All of our life savings,

5  all of that's in question.  I'm going to have to pay IRS

6  penalties.  I don't even know what they are yet because they

7  are early withdrawals.  And it's my fault.  My small business,

8  Drug Testing Corp, instantly lost customers and business, and

9  that's my fault, too.  I don't know if -- that's all we have.

10  I'm a 54-year-old person that has an associate's degree and

11  that's worked hard because of how I process -- I have had to

12  work hard all my life, Your Honor, to get to where I'm at.  And

13  now I'm a felon.  When people Google Mark Longoria if they are

14  going to do business with me or something like that, that comes

15  up.

16       I know that I have instantly lost business, customers,

17  that proposals and things that I was looking at were a lock and

18  that we were getting ready to get that business and everything,

19  Your Honor.  Those customers after this has happened I'm sure

20  some people look you up and things like that and it's known in

21  the industry.  Those accounts that we thought that we were

22  going to be successful in earning their business and everything

23  won't return my phonecalls or e-mails anymore.  So I know the

24  impact that this is having.  When any business or person

25  Googles my name, felon comes up.  That's the first thing.  Not

my previous favorable reputation and my reputation in the industry, the business that I have grown and that I built.

Your Honor, my wife and family know this, but I ask God for forgiveness. I ask him for mercy. I ask him for guidance and I ask him for clarity in all my decisions, because sometimes decisions aren't clear. They are not -- you don't know what to do often. You try and make your best -- you try and weigh it all out and you try and make the best decision you can. Sometimes you don't know the impact of those decisions until after the decision has been made.

I started paying the price and taking responsibility immediately when this happened, Your Honor. We took responsibility for this immediately and started paying for the decision every minute of every day, and I will pay for this every minute of every day for the rest of my life, Your Honor. I made the decision. It's not Kimberly. She has got nothing to do with this. I made the decision to do business with Investigative Research, with Cecil. I knew, Your Honor, that he had a relationship, and I take full responsibility for that decision, Your Honor. It was the wrong decision.

I have not conducted business, Your Honor, in the past ever like this. If I have an opportunity to work in the future in whatever way that I'm going to work, Your Honor, I assure you I will never conduct business like this again. I wouldn't do -- I am very ashamed and embarrassed and humiliated for my

decision for my conduct and for making the wrong decision to
fill the bridge order and to continue to conduct business even
that I know that Cecil was paying Commissioner Epps, Your
Honor.  I'm very ashamed and regretful for the damage I have
caused my wife, my children, my family, my friends and all the
collateral damage to come.

As we were asked to provide information to the court,
we complied and cooperated without hesitation and with full
transparency.  I would humbly ask Your Honor to please
carefully weigh and consider all the information we have
provided today, my attorney's input, letters from families,
friends, coworkers, professionals in the industry, the people
that have flown and traveled to Jackson to speak on my behalf.

Your Honor, I'm 54 years old.  I am a felon.  I don't
know yet how this is going to impact me and my family, but it
hurts that I have let them down.  I have tried to make the
right decisions.  I have tried to make the right decisions with
my kids saying, Hey, be hard nosed, but you're going to go to
school or I will be the bad guy.  You know?  I will have to
stop help.  It's hard.  My wife, we fought over that.  She
disagreed with me.

Your Honor, I don't always know the right decisions,
but I would ask, Your Honor, that you would take all of this --
I know my life is in your hands and also my family's life.
Your Honor, I would just ask -- I'm remorseful.  The question,

1   will I ever do this again, Your Honor, that was the last one

2   when you asked everybody.  Your Honor, there is no chance.  I

3   would give anything to undo this.  I can't do it.  I would give

4   anything.

5          My cousin, Hope, and Richard Corbello (phonetic),

6   their kid was -- their son was a month older than my daughter,

7   Alexis.  We saw their kids born.  They saw our kids born.  He

8   was killed four years ago, shot in the head.  And, Your Honor,

9   I would not trade this, what I'm going through -- as bad as

10  this is, I wouldn't trade places with them.  I wouldn't do it.

11  I would suck this up and I would do it.

12         My brother, Danny, a great guy.  His son has some drug

13  problem issues, no college.  His daughter has no college.  They

14  are older and the daughter is right between my girls.  I know

15  Danny.  I know his character.  He would trade places with me if

16  his kids were on the same track that my kids were on.

17         Your Honor, I know I have taken up a lot of time, and

18  I appreciate your time.  I pray that God gives you the clarity

19  in weighing everything that's available to you in making your

20  decision.  I humbly ask the Mississippi Department of

21  Corrections, the State of Mississippi, the court, Your Honor,

22  for forgiveness for my crime and mercy and compassion in your

23  sentencing decision.

24         And, Your Honor, my worst nightmare is letting my

25  family down, and I have done that.  Your Honor, if I can't

1  continue to be there and support them and help them and it is

2  out of my control, I would ask, Your Honor, that if you have

3  that option to be able to allow me anything other than prison,

4  Your Honor, whatever it is, I will pay back whatever monies.

5  Things I have learned, Your Honor, things are not important.

6  My kids, I put them through this, my wife, my family, and I got

7  sidetracked.  I got confused on what's important.  All the

8  material things don't mean nothing.  The love that they have

9  showed me and are continuing to show me, sticking by my side,

10  and the embarrassment that I put them through and the shame,

11  that will haunt me, Your Honor, for the rest of my life.  I'm

12  paying for this.  I pay for it every time I look at my wife and

13  my kids.

14         I just ask for your mercy and if there is any way that

15  you can allow me to still be productive, work in society, pay

16  back whatever fines there are, Your Honor, I would do it

17  gladly.  I just don't want to not be able to be there for them

18  in the future, Your Honor.  So that's -- I appreciate your

19  time, sir.

20         THE COURT:  Mr. Fortner?

21         MR. FORTNER:  I don't think there is anything I can

22  add, Judge.

23         THE COURT:  All right.  Mr. Fortner, I just have two

24  observations here.  When your client allowed his wife to sign

25  some of those checks, potentially she could have ended up being

1    a target here.  When she signed some checks to McCrory,

2    potentially she could have ended up being a target even though

3    it may have later been proved that she didn't know anything or

4    at least the government might not have been able to prove that

5    she knew something about this matter, but she still could have

6    put herself in harm's way by signing those checks and then been

7    the subject of an investigation as to what she knew.

8        The second comment was your client says that he knew

9    that Epps had a connection.  He knew that McCrory had a

10   connection to Epps.  That was in the presentence, and he said

11   it just a few moments ago.  And I asked the -- I think I asked

12   the prosecution about that.  So, Mr. LaMarca, does the

13   government have any idea as to how this defendant would have

14   known that Epps had -- that McCrory had a connection to Epps

15   and that through McCrory, Epps could be reached to indulge in

16   criminal activity?

17       MR. LAMARCA:  Your Honor, the information we had from

18   Mr. McCrory was that they had discussed that.

19       THE COURT:  Who had discussed that?

20       MR. LAMARCA:  Mr. McCrory and Mr. Longoria.

21       THE COURT:  So what's in the presentence investigation

22   report seems to imply that when Mr. Longoria contacted the

23   middle person that he already knew that he had a connection to

24   Epps.  You are saying that that's not exactly how it happened?

25       MR. LAMARCA:  Based upon what I have heard today, it

1    appears that my take on this is that Mr. Longoria was aware

2    that in Mississippi all -- if you wanted to do business with

3    the State of Mississippi and the Department of Corrections, my

4    understanding through everything I have heard is that the best

5    way to do that is to go through Mr. McCrory; that then in

6    making the decision to hire Mr. McCrory, Mr. McCrory has

7    informed us that he had imparted to Mr. Longoria that he does,

8    in fact, have to take care of Mr. Epps through any kind of

9    contract.

10         THE COURT:  So before Mr. Longoria contacted McCrory,

11   you are saying he was not aware that McCrory dealt criminally?

12         MR. LAMARCA:  From what I understand or from what I

13   have heard, it appears that it was the reputation that

14   Mr. McCrory, to quote the phrase, was the 9,000-pound elephant

15   in the room, and that is that there was something shady with

16   regard to Mr. McCrory's ability to have all the consulting

17   contracts with the Department of Corrections in the State of

18   Mississippi; that they met at a conference, I say they met,

19   Mr. McCrory and Mr. Longoria met at a conference; that

20   Mr. McCrory was introduced as the man that can get things done

21   in Mississippi.

22         Based upon what I have heard, Mr. Longoria took

23   advantage of that.  A number of people did I think as the court

24   is well aware to obtain these particular contracts with the

25   State of Mississippi.

1          THE COURT:  Are you saying that there are other states

2     with the same problem as Mississippi back then?

3          MR. LAMARCA:  I can't say whether other states had the

4     same problem, Your Honor.

5          THE COURT:  Are you saying that other states had that

6     900-pound gorilla in the room who would have all the contact

7     with the main person in the Department of Corrections?

8          MR. LAMARCA:  I would say in the line of business,

9     Your Honor, I wouldn't be surprised, but it would just be a

10    speculation.

11         THE COURT:  Okay.  So my first question concerning the

12    wife of the defendant, was she ever a target?

13         MR. LAMARCA:  She was not.  The United States

14    government never had any information that she had knowledge of

15    any relationship between Mr. McCrory and Mr. Epps.  We just

16    don't have any knowledge in that regard, any information that

17    puts knowledge on Mrs. Longoria.  So, that being said, she was

18    not considered a target.

19         THE COURT:  All right.  Thank you very much.

20         MR. LAMARCA:  Yes, sir.

21         THE COURT:  All right.  Mr. Fortner, you said that you

22    have already addressed the court.  Is that correct?

23         MR. FORTNER:  Yes, sir.  If I may, just in response to

24    your earlier question to Mr. LaMarca, I made inquiries of my

25    client when I first talked to him and began to represent him

concerning Mr. McCrory's relationship with Mr. Epps, and I can tell the court that basically exactly what Mr. LaMarca has told the court, which is in the industry there was a common knowledge that if you wanted to do business with the Mississippi Department of Corrections, you needed to go through Cecil McCrory's consulting company. And that was how Mr. Longoria first approached doing business with the Department of Corrections here in Mississippi. And that was common knowledge. And not just the drug testing industry, in any provider of services or goods to the Mississippi Department of Corrections. Evidently we have had a problem for years in this area. My client ended up coming in on the tail end of it the last year before its discovery, but it's been going on for a long time is my understanding.

THE COURT: There's a reason why I asked the question about other states. I need not get into it, but there was a specific reason why I asked, because at one point in this investigation it appeared that this matter was going outside the state. But I will not get into that.

MR. FORTNER: Yes, sir.

THE COURT: All right. Now then, with regard to this defendant here, he has had his chance for allocution. Everybody has spoken on the various matters.

The court has considered the advisory guideline computations and the sentencing factors under 18 U.S.C. Section

1    3553(a).  The court has to render a judgment whether this

2    defendant, Mark Longoria, should serve time incarcerated.

3    Mr. Longoria asks this court to impose a sentence less than

4    what the guidelines prescribe.

5            I told him at the start of his address to the court

6    that the court would take any matters he stated under

7    consideration.  The court can downward depart if the court is

8    satisfied that factors have been revealed to the court that

9    have not been considered by the writers of the sentencing

10   guidelines.  This court has to conclude that no factors have

11   been discussed with this court that would entitle this

12   defendant to a downward departure, or, for that matter, to a

13   variance.  Therefore, this court has the guideline range here

14   in front of it.

15           As already has been explained, the guideline range is

16   from 70 to 87 months and with the government's recommendation

17   from 70 to 74 months.  But inasmuch as the statute prescribes a

18   maximum sentence of 60 months, then this court is capped at 60

19   months.

20           So then this court is going to sentence Mr. Mark

21   Longoria to serve a term of 60 months of imprisonment in the

22   custody of the United States Bureau of Prisons as to Count 1 of

23   the Bill of Information.  The term of imprisonment shall be

24   followed immediately by a three-year term of supervised release

25   as to Count 1 subject to the standard and mandatory conditions

as listed on the judgment order in addition to the following special conditions:

    1.  The defendant shall refrain from establishing any new lines of credit without prior approval from the supervising United States probation officer.

    2.  The defendant shall provide any requested personal or business financial information to the supervising probation officer.

    3.  The defendant shall submit his person, property, house, residence, vehicle, papers or office to a search conducted by a United States probation officer.  Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

    It is further ordered pursuant to 18 U.S.C. Section 3663A that the defendant pay restitution to the Mississippi Department of Corrections in the amount of $368,205.75. Restitution is payable immediately and during the term of incarceration.  The restitution is payable to the United States

District Court Clerk who will forward payment to the victim as listed on the judgment order.  Upon release from custody, any unpaid balance shall be paid at the rate of not less than $1,000 per month beginning 60 days after release from imprisonment.  Interest on the restitution is waived.

In ordering this nominal monthly payment, the court recognizes the full amount of restitution will likely not be paid in full prior to the termination of supervised release. In the event that restitution is not paid in full prior to the termination of supervised release, the defendant is ordered to enter into a written agreement with the Financial Litigation Unit of the United States Attorney's Office for payment of the remaining balance.

Additionally, the value of any future discovered assets may be applied to offset the balance of criminal monetary penalties.  The defendant may be included in the Treasury Offset Program allowing qualified federal benefits to be applied to offset the balance of criminal monetary penalties.

No fine is ordered based upon the total amount of restitution.

It is ordered that the defendant pay the mandatory special assessment fee of $100 which is due immediately.

Now, pursuant to the agreed preliminary order of forfeiture, the defendant has forfeited all rights, title and

interest in a money judgment of $131,389.90.

The defendant is to be remanded to the custody of the Bureau of Prisons unless a request is hereby made for him to voluntarily surrender and the court approves that request and there is no objection from the office of probation and the United States Attorney's Office.

Mr. Fortner, are you making such a request?

MR. FORTNER:  I am, Your Honor, and I would ask that Your Honor allow my client since he has certainly followed all the rules and regulations set upon him his pretrial release and post plea release requirements, I ask you that you allow him to self report after April 8th of 2017.

THE COURT:  Okay.  Is there a specific -- his daughter is getting married then?

MR. FORTNER:  Yes, sir, on April 8th.

THE COURT:  And where is she getting married?

MR. FORTNER:  In Houston, Texas, and that's where he resides.

THE COURT:  What says the prosecution about this request?

MR. LAMARCA:  Your Honor, we don't have any objection to that.

THE COURT:  What says probation to this request?

PROBATION OFFICER:  Probation doesn't have any objection to it.

1          THE COURT:  Then, Mr. LaMarca, you and probation give

2    me a date when you think he should report.

3       (SHORT PAUSE)

4          MR. LAMARCA:  Probation and I have discussed

5    April 11th, which is a Tuesday, the 8th being a Saturday.

6          THE COURT:  Mr. Fortner?

7          MR. FORTNER:  Judge, there are going to be numerous

8    people flying in for this wedding that will be staying a few

9    days probably.  If you could postpone this to the next week,

10   that would be helpful and appreciated, the week beginning

11   April 17th or 18th.  I think that's Monday and Tuesday maybe.

12         THE COURT:  April 18th is what day of the week?

13         THE CLERK:  Tuesday.

14         THE COURT:  Tuesday?  Let's make it April 17, then.

15   April 17 to report by 9:00 a.m. to the designated federal

16   facility.  Mr. Longoria, if you do not report to the designated

17   facility at that time, then you will be in further violation of

18   any federal -- of the appropriate federal law.  Do you

19   understand that?

20         THE DEFENDANT:  Yes, sir, Your Honor.

21         THE COURT:  So you are telling me that if I allow you

22   to remain free on bond under the same conditions, restrictions,

23   you are now under and order you to report on the date I have

24   stated that you will be there when I have stated that you

25   should be there.  Is that correct?

1          THE DEFENDANT:  Absolutely, Your Honor.

2          THE COURT:  And furthermore that you will not commit

3   any more crimes.  Is that so?

4          THE DEFENDANT:  That is so.

5          THE COURT:  Then I'm going to allow you to report on

6   the date I have just stated and time I have just stated.  The

7   Marshal Service will advise you and your attorney what the

8   designated prison facility will be, and you will have the days

9   in between to be sure that you are there when you are supposed

10  to be there.  All right?

11         THE DEFENDANT:  Yes, sir, Your Honor.

12         THE COURT:  Now, is there anything further from the

13  prosecution?

14         MR. LAMARCA:  No, Your Honor.

15         THE COURT:  Is there anything further from probation?

16         PROBATION OFFICER:  No, sir, Your Honor.

17         THE COURT:  Anything further from the defendant and/or

18  his lawyer?

19         MR. FORTNER:  No, Your Honor.

20         THE COURT:  Then good luck to you, Mr. Longoria.  I'm

21  sure this court won't see you again under these circumstances.

22         THE DEFENDANT:  Thank you, Your Honor.

23         THE COURT:  You all can be excused.

24      (*Hearing was concluded.*)

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, BRENDA D. WOLVERTON, Official Court Reporter,

 4   United States District Court, Southern District of

 5   Mississippi, do hereby certify that the above and foregoing

 6   pages contain a full, true and correct transcript of the

 7   proceedings had in the aforenamed case at the time and

 8   place indicated, which proceedings were recorded by me to

 9   the best of my skill and ability.

10          I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          This the 28th day of February, 2017.

14

15                              s/ Brenda D. Wolverton_____
                                BRENDA D. WOLVERTON, RPR-CRR
16

17

18

19

20

21

22

23

24

25
```